**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No. |
| | ) | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| META PLATFORMS, INC., a Delaware corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiffs, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Meta Platforms, Inc. ("Meta"), allege as follows:

**NATURE OF THE CASE**

1. Meta built a suite of commercial voice AI products using the voices of real people, including some of the most accomplished broadcast journalists, investigative podcasters, audiobook narrators, and voice performers working in the United States today. To build the foundational audio models that now power voice features integrated across Facebook, Instagram, WhatsApp, Messenger, Threads, Meta AI, AI Studio, the Reels AI voice translation feature,

1

and Ray-Ban Meta smart glasses — including Voicebox, Audiobox, the Massively Multilingual Speech model, and SeamlessM4T — Meta ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers from those recordings. Plaintiffs' voices are among them.

2.      Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields. They include Carol Marin, a five-decade investigative broadcast journalist, three-time Peabody winner, and 2025 recipient of the Order of Lincoln — Illinois's highest civilian honor; Philip Rogers, an Emmy- and Murrow Award-winning broadcaster who covered four decades of Chicago news at WBBM Newsradio and WMAQ-TV; Alison Flowers, a 2021 Pulitzer finalist for the investigative podcast *Somebody*; Robin Amer, a three-time duPont–Columbia honoree and creator of USA Today's *The City*; Lindsey Dorcus, a SOVAS and Independent Audiobook Award–winning narrator of more than two hundred audiobooks for the major American publishers; Yohance Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them was told that their voice was being used to train Meta's commercial voice AI. None of them was asked. None of them consented.

2

3.     A voiceprint is a digital fingerprint of the human voice. It is a mathematical representation of the acoustic features — pitch, timbre, resonance — that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice — the biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

4.     The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, along with a written release. 740 ILCS 14/15(b). Meta failed to comply with any of these requirements with respect to Plaintiffs.

5.     No defendant in any biometric-privacy matter pending in the United States has had more direct, more sustained, or more financially consequential notice of BIPA than Meta. Meta has paid the three largest biometric-privacy settlements in American history: $650 million to resolve BIPA claims arising from Facebook's Tag Suggestions facial-recognition feature, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal.) (final

approval Feb. 2021); $68.5 million to resolve BIPA claims arising from Instagram's biometric processing, *In re Instagram BIPA Consumer Privacy Litig.*, No. 1:20-cv-08208 (N.D. Ill.) (2023); and $1.4 billion to the State of Texas in 2024 to resolve claims under Texas's Capture or Use of Biometric Identifier Act — a statute that, like BIPA, expressly enumerates voiceprints as a covered biometric identifier — making the Texas settlement, at the time, the largest privacy settlement any state had ever obtained from any company. Meta is also presently defending an active BIPA voiceprint class action in the Northern District of California, *Delgado v. Meta Platforms, Inc.*, No. 3:23-cv-04181-SI, in which the court denied part of Meta's motion to dismiss in February 2024. By the time Meta released Voicebox in June 2023, MMS in May 2023, and SeamlessM4T in August 2023, Meta had been a BIPA defendant for nearly a decade and had paid more than $2 billion in biometric-privacy settlements.

6. Meta's noncompliance was not a failure of safety capability. When Meta determined that its Voicebox model posed risks of misuse, Meta declined to release the model weights publicly. Meta's Llama community license imposes a commercial-use threshold requiring licensees with more than 700 million monthly active users to obtain a separate commercial license from Meta. In September 2024, Meta executed formal voice-licensing contracts with Awkwafina, Dame Judi Dench, John Cena, Keegan-Michael Key, and Kristen Bell, reportedly paying millions of dollars per celebrity to license their voices for Meta AI. In August 2024, Meta and Universal Music Group jointly announced an expanded multi-year licensing agreement specifically to address

4

"unauthorized AI-generated content." Meta knows how to identify biometric-derived AI artifacts of particular sensitivity and withhold them from release. Meta knows how to draw the lines its products require. Meta knows how to obtain consent for the commercial use of human voices. Meta deployed each of those capabilities for the commercial uses that served Meta's interests. Meta deployed none of them for the speakers whose voiceprints Meta extracted to train its foundational audio models in the first place.

7. Meta's noncompliance was, instead, a deliberate institutional decision. Compliance with BIPA would have required Meta to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting that speaker's recording into the training pipeline. With foundational audio models trained on corpora measured in hundreds of thousands of hours of speech and millions of distinct speakers, that compliance burden would have constrained the speed and scale of Meta's voice AI development. Meta chose speed and scale over compliance. The choice is documented in the contrast between Meta's robust consent infrastructure for the celebrity voices Meta wished to license and the complete absence of consent infrastructure for the speakers whose voices Meta took to train the foundational models. It is documented in the contrast between Meta's specifically licensed music training data for MusicGen and the absence of any analogous licensing or consent infrastructure for the speech training data that powers Voicebox, Audiobox, MMS, and SeamlessM4T. And it is documented in Meta's deliberate exclusion

5

of Illinois and Texas — and only Illinois and Texas — from the geographic availability of Meta's Reels AI voice translation feature, on grounds widely reported as state biometric and voice-rights regulation. That choice was not an oversight. It was a business decision.

8. The voiceprints Meta extracted from Plaintiffs are not stored in a database that can be deleted on request. They are encoded in the parameters of Meta's foundational audio models and reproduced in the audio those models generate. The biometric data and the product are, at this point, the same thing. Meta protects the product, including by withholding Voicebox model weights, gating commercial use of Llama at the 700-million-user threshold, and imposing Acceptable Use Policies on licensees, more carefully than Meta protected the biometric data from which the product was built.

9. The technology Meta built using Plaintiffs' voices now competes with Plaintiffs in the markets where they earn their living. Voicebox can produce high-quality speech in a target voice from a two-second audio prompt, and Audiobox extends that capability with voice-style prompting from audio as short as three seconds — directly displacing the audiobook narration Plaintiffs Dorcus and Nassif provide and the long-form investigative audio journalism Plaintiffs Marin, Rogers, Flowers, Lacour, and Amer have spent their careers developing. The Meta AI assistant, deployed across Facebook, Instagram, WhatsApp, Messenger, and Threads, serving nearly a billion monthly active users, generates voice content in the same broadcast journalism and conversational audio markets in which Plaintiffs Marin and Rogers built their

careers. The Reels AI voice translation feature generates synthesized voice content mimicking the sound and tone of source voices in the same markets in which Plaintiffs Flowers, Amer, and Lacour produce their work. Meta's Massively Multilingual Speech model, trained on speech data spanning more than 1,100 languages, generates Arabic-accented and Levantine-language voice content in the precise market — culturally authentic Arabic-accented narration — in which Plaintiff Nassif has built her career. Each of these products was built using the vocal characteristics of the human performers it now displaces — including, on information and belief, the vocal characteristics of every Plaintiff in this case.

10. Plaintiffs' injuries are concrete and particularized. Meta extracted Plaintiffs' voiceprints and biometric information without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Meta retains those voiceprints in its commercial models and continues to profit from them. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their livelihoods.

11. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that Meta unlawfully collected, retained, commercialized, and disseminated their voiceprints, failed to protect them from disclosure, and did so without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs

also assert that Meta's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act ("IRPA"), including the 2025 amendments prohibiting unauthorized digital replicas. Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

12. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 for violations of BIPA's notice, consent, retention, profiting, dissemination, and protection requirements, on the per-person, per-subsection basis as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); (ii) actual damages, statutory damages, and disgorgement of profits Meta has earned from the commercial exploitation of Plaintiffs' biometric data and identities under IRPA, ICFA, IUDTPA, and the common law of unjust enrichment; (iii) injunctive relief requiring Meta to (a) cease collecting biometric identifiers from voice recordings produced or recorded in Illinois without BIPA-compliant consent, (b) identify the sources of the voice training data used to build its foundational audio models, (c) destroy all voiceprints and biometric information unlawfully obtained from Plaintiffs and the Class, and (d) destroy or retrain, without the unlawfully obtained data, the foundational audio models — and the downstream commercial products built on those models — in which the unlawfully obtained biometric data are encoded; and (iv) reasonable attorneys' fees, costs, and expenses.

**PARTIES**

13.   Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago and whose recognitions include three George Foster Peabody Awards and, in 2025, the Order of Lincoln — Illinois's highest civilian honor. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 80-84.

14.   Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago), and whose recognitions include a National Emmy Award and the Edward R. Murrow Award. Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Meta extracted his voiceprint are described at ¶¶ 75-79.

15.   Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound, and whose investigative podcast *Somebody* was a 2021 Pulitzer Prize finalist for Audio Reporting. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 85-89.

9

16. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 90-94.

17. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for the major American publishers from her professional home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 95-99.

18. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast work, including the 2024 Pulitzer Prize– and Peabody Award–winning *You Didn't See Nothin'*, is produced in Chicago. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Meta extracted his voiceprint are described at ¶¶ 100-104.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American

actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois and whose narrations for Penguin Random House, Hachette, and Simon & Schuster include culturally and linguistically authentic Levantine Arabic-accented narrations of works by Arab and Palestinian American authors. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 105-109.

20.     Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal executive offices at 1 Hacker Way, Menlo Park, California 94025. The artificial intelligence research and product development at issue — including the development and deployment of the foundational audio models Voicebox, Audiobox, the Massively Multilingual Speech model, and SeamlessM4T, and the deployment of those models and their derivatives in Meta's commercial voice products across Facebook, Instagram, WhatsApp, Messenger, Threads, Meta AI, AI Studio, and Ray-Ban Meta smart glasses — is conducted within Meta Platforms, Inc. itself rather than through a separate operating subsidiary. The Meta corporate functions whose knowledge and conduct are at issue in this Complaint, including legal, policy, compliance, executive, artificial intelligence research, and artificial intelligence product, are functions of Meta Platforms, Inc.

**JURISDICTION AND VENUE**

21.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy

exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied: Plaintiffs are citizens of Illinois, and Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business in California. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

22.    The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay*, No. 25-2185. Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment.

23.    This Court has specific personal jurisdiction over Meta on multiple, independently sufficient grounds. Meta has purposefully directed its conduct toward Illinois and this District in ways that directly bear on Plaintiffs' claims.

24.    Meta maintains business operations in Illinois, including a Chicago office in this District at which Meta's engineering, sales, and operations personnel work in support of Meta's commercial product portfolio. Meta sells

Ray-Ban Meta and Oakley Meta smart glasses in Illinois through LensCrafters, Sunglass Hut, and other authorized retailers in this District, including the dedicated Ray-Ban Meta retail presence at locations on or near North Michigan Avenue. Meta derives substantial advertising revenue from Illinois businesses and Illinois consumers across Meta's consumer applications, and Meta sells enterprise services — including, following Meta's July 2025 acquisition of PlayAI, enterprise voice-agent services — to Illinois-based commercial customers.

25. Meta deploys to Illinois users, on a continuing daily basis, the voice AI products at issue in this Complaint: the Meta AI assistant integrated across Facebook, Instagram, WhatsApp, Messenger, and Threads; AI Studio's voice-enabled character and creator products; the Reels AI voice translation feature (subject to the Illinois carve-out alleged at ¶¶ 56-60, the very existence of which is itself evidence that Meta directs the underlying products at Illinois users absent the carve-out); and Ray-Ban Meta and Oakley Meta smart glasses, which Meta sells and operates in Illinois. Meta's family of applications reaches approximately 3.58 billion daily active users worldwide; Meta's Chief Executive Officer has publicly identified Meta AI as approaching one billion monthly active users. On information and belief, a substantial share of those users is in Illinois, consistent with Illinois's population and consumer technology market share. Each of those Illinois deployments encodes or deploys capabilities derived from Meta's foundational audio models, in which Plaintiffs' and Class members' biometric data is encoded.

26. Meta has previously appeared in Illinois federal courts in BIPA matters concerning the collection of biometric identifiers from Illinois residents, including In re Instagram BIPA Consumer Privacy Litigation, No. 1:20-cv-08208 (N.D. Ill.), which Meta settled for $68.5 million. Meta has not, in those actions, contested the propriety of an Illinois forum for BIPA claims arising from Meta's commercial conduct involving Illinois residents' biometric data.

27. Meta's deliberate carve-out of Illinois (and only Illinois and Texas) from the geographic availability of the Reels AI voice translation feature, as alleged at ¶¶ 56-60, is itself a Meta admission that Meta's voice AI products are otherwise directed at Illinois users and that Meta is subject to Illinois jurisdiction with respect to those products.

28. Plaintiffs' claims arise directly from Meta's Illinois-directed conduct. Meta extracted the voiceprints of Plaintiffs and the Class — persons whose voice recordings were produced or recorded in Illinois — without the notice, consent, or written release BIPA requires. The voiceprints are now encoded in the parameters of Meta's foundational audio models, which Meta deploys, markets, sells, delivers, and (through research-community releases) disseminates to Illinois customers, Illinois users, and the Illinois developer ecosystem through the channels identified above. Every Illinois deployment, sale, and release of a Voicebox-, Audiobox-, MMS-, or SeamlessM4T-derived capability monetizes or further disseminates the biometric data Meta obtained from Plaintiffs and the Class without their consent. Meta's Illinois contacts are not incidental to this Complaint; they are the downstream commercialization

14

and continuing dissemination of the upstream biometric extraction that gives rise to this Complaint, as more fully alleged in the Illinois nexus subsections at ¶¶ 63-74.

29.     Exercising specific personal jurisdiction over Meta in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with the requirements of due process. Illinois has a strong interest in providing a forum for the redress of unlawful biometric data collection from voice recordings produced or recorded in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5. Plaintiffs, as Illinois residents whose biometric privacy was invaded in Illinois and whose recordings were produced or recorded in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on Meta of litigating in Illinois is not undue, given Meta's substantial Illinois commercial activity, its resources as a publicly traded technology company with FY2025 revenue of approximately $200.97 billion and market capitalization of approximately $1.81 trillion, and its experience as a federal-court litigant in BIPA matters — including the $650 million BIPA settlement in *In re Facebook Biometric Information Privacy Litigation,* the $68.5 million BIPA settlement in *In re Instagram BIPA Consumer Privacy Litigation* in this District, and Meta's ongoing defense of the *Delgado* BIPA voiceprint class action in the Northern District of California. Meta could reasonably anticipate being haled into Illinois courts for claims like Plaintiffs' that arise from Meta's extraction and commercial

15

exploitation of biometric identifiers from voice recordings produced or recorded in Illinois.

30.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred here: Plaintiffs are residents of this District, their recorded vocal performances were produced and distributed from this District, the biometric privacy violations Plaintiffs allege occurred in this District, and the commercial exploitation of Plaintiffs' voiceprints continues through Meta's sale and delivery of the voice AI products at issue to customers in this District. Venue is independently proper under 28 U.S.C. § 1391(b)(1) because Defendant Meta is subject to personal jurisdiction in this District for the reasons set forth above and therefore "resides" in this District for venue purposes under 28 U.S.C. § 1391(c)(2).

## FACTUAL BACKGROUND

*Meta's Training-Data Acquisition Practices*

31.     Meta's artificial intelligence research and product divisions train foundational audio models — including Voicebox[1], Audiobox, the Massively Multilingual Speech ("MMS") model, SeamlessM4T, and their successors — on large corpora of audio recordings drawn from multiple sources. Those sources include, on information and belief, audio scraped from public-facing websites

---

[1] Meta, *Introducing Voicebox: The Most Versatile AI for Speech Generation* (June 16, 2023), https://about.fb.com/news/2023/06/introducing-voicebox-ai-for-speech-generation/ (last visited May 12, 2026); *see also* Meta AI, *Introducing Voicebox: The first generative AI model for speech to generalize across tasks with state-of-the-art performance* (June 16, 2023), https://ai.meta.com/blog/voicebox-generative-ai-model-speech/ (last visited May 12, 2026).

and audio-distribution platforms; licensed and unlicensed research datasets containing speech recordings from broadcast media, podcast distribution, audiobook production, and similar professional and amateur audio sources; user-generated audio content uploaded to Meta-operated platforms; and audio acquired through third-party data vendors and research partnerships.

32.     Meta has not publicly disclosed the complete provenance of any of the foregoing training corpora. Meta has, at various times during the Class Period, characterized its training-data sources in general or aggregate terms — as "publicly available," "licensed where appropriate," "diverse," or "multilingual", without identifying the specific datasets, the specific sources within those datasets, or the specific individuals whose biometric source material has been ingested.

33.     The aggregate scale of Meta's audio training corpora reaches into the hundreds of thousands of hours of recorded human speech, drawn from millions of individual speakers. A substantial portion of that material — the precise portion is not presently knowable to Plaintiffs because Meta has not disclosed it and maintains it under its exclusive control — consists of voice recordings produced or recorded in Illinois.

*How Meta's Voice AI Extracts and Encodes Voiceprints*

34.     Modern AI voice synthesis works by training neural networks on large quantities of recorded human speech. During training, the network learns to identify and reproduce the acoustic features that make individual voices distinctive — pitch, timbre, resonance, accent, cadence, articulation, and the

dynamics of emotional expression. The network encodes those features as mathematical representations and stores them in the model's parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices. The capacity of the resulting model to generate speech that sounds like a specific human speaker is the operational signature of voiceprint extraction at scale.

35.     Meta's published research and product documentation describe this process in technical detail. In the June 2023 Voicebox paper and announcement, Meta described Voicebox as a non-autoregressive flow-matching generative model that produces audio conditioned on a text transcript and an audio prompt as short as two seconds.[2] Voicebox operates on discrete acoustic tokens produced by a neural audio codec (EnCodec) that, in Meta's own description, compress raw audio waveforms into a token sequence preserving the speaker-distinctive acoustic features of the input audio.[3] The flow-matching network is trained to reconstruct masked portions of token sequences, and at inference time can be conditioned on a brief audio prompt to generate continuations that match the speaker's vocal characteristics. The operational capability Meta sells through Voicebox, zero-shot text-to-speech in

---

[2] Matthew Le et al., *Voicebox: Text-Guided Multilingual Universal Speech Generation at Scale*, arXiv:2306.15687 (June 23, 2023), https://arxiv.org/abs/2306.15687 (last visited May 12, 2026).

[3] Alexandre Défossez et al., *High Fidelity Neural Audio Compression*, arXiv:2210.13438 (Oct. 24, 2022), https://arxiv.org/abs/2210.13438 (last visited May 12, 2026).

a target voice from a two-second prompt, is the direct consequence of voiceprint extraction at scale during pretraining.

36. Audiobox, announced in November 2023, extends the Voicebox architecture by separately conditioning generation on a voice prompt and a description of speech style, with reference audio durations as short as 3 seconds.[4] The technical capability Audiobox sells — generating new speech that combines the voice of a reference speaker with a designated speech style — is a direct consequence of disentangling speaker-identity representations from style representations during training. The Massively Multilingual Speech model, released in May 2023, builds on the wav2vec 2.0 self-supervised speech-representation architecture and produces speaker-conditioned speech across more than 1,100 languages.[5] SeamlessM4T, released in August 2023, builds on a multimodal encoder that produces SONAR sentence embeddings together with a text-to-unit (T2U) decoder that synthesizes speech in target voices across languages, including the cross-lingual preservation of source-speaker characteristics that drives the Reels AI voice translation feature.[6]

---

[4] Apoorv Vyas et al., *Audiobox: Unified Audio Generation with Natural Language Prompts*, arXiv:2312.15821 (Dec. 25, 2023), https://arxiv.org/abs/2312.15821 (last visited May 12, 2026).

[5] Vineel Pratap et al., *Scaling Speech Technology to 1,000+ Languages*, arXiv:2305.13516 (May 22, 2023), https://arxiv.org/abs/2305.13516 (last visited May 12, 2026).

[6] Seamless Communication et al., *SeamlessM4T: Massively Multilingual & Multimodal Machine Translation*, arXiv:2308.11596 (Aug. 22, 2023), https://arxiv.org/abs/2308.11596 (last visited May 12, 2026).

37. In each of these models, the speaker-identifying features of the training audio, the unique combination of physiological vocal characteristics and learned speech behaviors that distinguish one human voice from another, are extracted during training and encoded in the parameters of the resulting model. Meta's product documentation for Voicebox describes the capability of producing speech in the target voice from a short reference audio prompt as a property of the trained model. That capability does not exist unless the model has learned, during training, to represent speaker identity with sufficient fidelity to reproduce it from a brief example. The speaker-identifying representations the model uses to do so, variously denominated in Meta's technical materials as speaker embeddings, audio prompts, discrete acoustic tokens, voice-style prompts, and SONAR embeddings, are voiceprints in any operational sense of the term.

38. BIPA's definitions confirm the legal classification. The statute defines "biometric identifier" to include "voiceprint." 740 ILCS 14/10. It separately defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." Id. The speaker embeddings, acoustic tokens, voice prompts, and SONAR embeddings produced by Meta's voice synthesis pipeline fall within both definitions. The label the AI research community uses for these representations does not determine their statutory classification; the function of the data does. The function of these representations — to encode the unique acoustic signature of

20

a human speaker in a form that the trained model can use to reproduce that signature — is precisely the function BIPA places under the consent regime of § 15(b) and the protective regime of § 15(a), (c), (d), and (e).

*The Chronology of Meta's Public Disclosures*

39.    Throughout the Class Period, Meta has made a sequence of public statements, research publications, and Securities and Exchange Commission disclosures that, taken together, establish that Meta's account of its training-data sources has evolved as public and regulatory scrutiny of AI training practices has intensified.

40.    In or about May 2023, Meta released the MMS research paper, which described training on speech data spanning more than 1,100 languages. The MMS disclosure identified certain religious audio sources for the multilingual training data, but did not identify the full provenance of the English-language training data.

41.    In or about June 2023, Meta released the Voicebox research paper and announcement, describing Voicebox as having been trained on more than 50,000 hours of English speech, and a separate large-scale dataset of approximately 50,000 hours of multilingual audiobooks. The announcement did not identify the speakers, the source platforms, or the consent status of the underlying recordings.

42.    In or about September 2024, Meta publicly acknowledged for the first time, in connection with regulatory inquiries in the European Union and the United Kingdom, that Meta had used publicly posted content from

21

Facebook and Instagram users to train Meta's generative AI systems. Meta thereafter provided EU users with a mechanism to object to such use. Meta did not provide U.S. users with a comparable mechanism.

43. Across these disclosures, Meta has never publicly identified the specific audio datasets ingested for training of Voicebox, Audiobox, MMS, SeamlessM4T, or their successors; the consent status of the speakers whose recordings were ingested; the geographic origin of the recordings; or the retention status of the underlying biometric data after training. The sequence and content of Meta's disclosures establish that Meta treats the provenance of its audio training data as competitively and legally sensitive and has made affirmative choices about which categories of training-data information to disclose and which to withhold.

*Meta's Terms of Service Cannot Supply BIPA-Compliant Consent*

44. During the Class Period, Meta amended the Terms of Service governing Meta's consumer platforms — Facebook, Instagram, WhatsApp, Messenger, and Threads — on multiple occasions, in ways that purportedly authorized Meta's use of user-uploaded content (including audio content) for training artificial intelligence systems. These amendments share three operative characteristics. Each amendment was retroactive in practical effect: by the time any given amendment took effect, Meta had already ingested user-uploaded content into training pipelines. Each amendment relied on the continued use of the platform as the mechanism for acceptance, without an affirmative opt-in. And the amendments applied only to users who had created

22

accounts on Meta's platforms — users who had never created such accounts were neither presented with the amendments nor bound by them.

45. The retroactive Terms of Service amendments cannot supply BIPA-compliant consent for three independent reasons. *First,* BIPA § 15(b) requires written release executed prior to the collection, storage, or use of biometric identifiers; retroactive consent is not consent within the meaning of the statute.

46. *Second,* BIPA § 15(b) requires that the individual be informed in writing of the specific purpose and length of term for which the biometric identifier or biometric information is being collected, stored, and used; generalized ToS language about "improving services" or "training models" does not satisfy this requirement.

47. *Third,* the named Plaintiffs and the Class never accepted any version of Meta's Terms of Service related to the use of their voiceprints for training foundational models, and were never presented with any consent mechanism.

48. In or about June 2024, Meta announced changes to its privacy policies in the European Union and United Kingdom that would enable Meta to use publicly available content from EU and UK users to train generative AI systems. Following objections from the Irish Data Protection Commission and other European regulators, Meta paused the rollout in June 2024 and subsequently implemented an opt-out mechanism for EU and UK users. Meta did not pause, did not implement an opt-out, and did not seek comparable regulatory clearance for the use of U.S.-origin content, including content

23

produced or recorded in Illinois. The asymmetric treatment is itself evidence of Meta's actual knowledge that AI training implicates privacy and biometric statutes, and that Meta deliberately chose not to extend the protections offered in regulated jurisdictions to Illinois-origin source material.

*Meta Built Consent Infrastructure for the Voices It Wanted,*
*and No Consent Infrastructure for the Voices It Took*

49. Meta's development and deployment of voice AI is the story of an institution that understands precisely when the commercial use of a human voice requires consent, possesses the operational capability to implement consent infrastructure at scale, and has chosen — repeatedly, deliberately, and contemporaneously — to apply that infrastructure selectively. The selectivity follows a single pattern: Meta obtained consent for the voices that served Meta's commercial interests, and obtained no consent for the voices Meta took to build the foundational models on which those commercial interests depend.

50. Meta obtained consent for the celebrity voices it wanted to license. In September 2024, Meta executed formal voice-licensing contracts with Awkwafina, Dame Judi Dench, John Cena, Keegan-Michael Key, and Kristen Bell, reportedly paying millions of dollars per celebrity, to license those celebrities' voices for use in Meta AI. Meta did so because the celebrities' identifiable voices created identifiable commercial liability; because the legal departments on both sides of those negotiations understood that the use of a person's voice in a commercial AI product requires that person's consent; and because Meta concluded that paying for consent was the path Meta wished to follow as to those individuals.

24

51.     Meta obtained consent for the musical works it wanted to use. In August 2024, Meta and Universal Music Group jointly announced an expanded multi-year licensing agreement specifically extending UMG's rights to address "unauthorized AI-generated content." Meta has publicly identified its MusicGen training corpus as comprising licensed music. Meta did so because the alternative, training on unlicensed musical recordings, created identifiable commercial liability that Meta concluded was not worth incurring.

52.     Meta built an operational infrastructure to identify, restrict, and withhold AI artifacts that Meta deems too sensitive for public release. In June 2023, Meta announced Voicebox and simultaneously declined to release the Voicebox model weights, inference code, or full technical specifications, citing, in Meta's own words, the potential for misuse of generative voice technology. Meta likewise designed the Llama community license to impose a 700-million-monthly-active-user threshold above which licensees must obtain a separate commercial license from Meta, demonstrating that Meta knows how to draw jurisdictional, scale, and use-case lines around AI artifacts when doing so serves Meta's commercial interests. And Meta produced selective provenance disclosures in the May 2023 MMS release that identified certain religious audio components of the MMS training corpus while withholding the provenance of the English-language Voicebox and Audiobox training corpora.

53.     Meta drew no analogous line and built no analogous consent infrastructure for the speakers whose voices populated the hundreds of thousands of hours of audio Meta ingested to train Voicebox, Audiobox, MMS,

SeamlessM4T, and their derivatives. Meta did not identify the speakers. Meta did not provide written notice of the purpose or duration of collection. Meta did not obtain a written release. Meta did not exclude Illinois-origin recordings from training corpora. Meta did not condition downstream licensee deployments on biometric compliance review.

54. The same engineering organization that designed the Voicebox non-release and the Llama 700-million-MAU threshold designed the foundational training pipeline. The same legal department that papered the celebrity contracts and the UMG license drafted the consumer Terms of Service that Meta now invokes as the purported consent baseline. The choice to apply consent infrastructure to the voices Meta paid for, rather than to the voices Meta took, was a contemporaneous, institutionally coherent decision made by Meta with full operational capability and full legal knowledge.

55. The decision was a commercial calculation. BIPA-compliant collection of voice training data would have required Meta to identify the source speakers, provide written notice of the specific purpose and duration of the collection, and obtain a written release from each speaker before ingesting the recording into the training pipeline. With training corpora measured in the hundreds of thousands of hours of audio — comprising, on information and belief, the recordings of millions of distinct speakers — that compliance burden would have constrained the speed and scale of Meta's voice AI development. Meta chose speed and scale over compliance. The decision is documented in the contrast between the robust consent infrastructure Meta deployed for the

26

celebrity voices it paid to license and the complete absence of consent infrastructure for the voices Meta took to train the foundational models. It is documented in the contrast between Meta's expressly licensed MusicGen training corpus and the unidentified, unlicensed, and unconsented audio corpus underlying Voicebox, Audiobox, MMS, and SeamlessM4T. And, as alleged at ¶¶ 56-60, it is documented in Meta's deliberate exclusion of the two U.S. states — Illinois and Texas, and only those two — whose biometric statutes Meta has previously been adjudicated and required to pay to satisfy.

*Meta's Deliberate Geographic Carve-Out of Illinois*
*and Texas From the Reels Translation Feature*

56.     The Reels AI voice translation feature is a Meta product, built on Meta's foundational audio models, that automatically generates dubbed audio in other languages while preserving the source speaker's vocal characteristics across the translation. The feature's commercial value depends entirely on the cross-lingual speaker-similarity capability that exists in Meta's foundational audio models because, on information and belief, those models were trained on the unconsented voice recordings of speakers including Plaintiffs and the Class. The feature is, in operational substance, a real-time act of generating an unauthorized digital replica of a creator's voice in a different language.

57.     At the launch of the Reels AI voice translation feature and continuing through the filing of this Complaint, Meta has deliberately excluded the U.S. states of Illinois and Texas, and only those two states, out of all fifty, from the geographic availability of the feature. Persons in Illinois are blocked from accessing the feature's voice translation output. Creators based in Illinois

27

are blocked from publishing through the feature. The carve-out is jurisdictional, intentional, and persistent.

58. Public reporting and Meta's communications identify the reason for the carve-out as state biometric and voice-rights regulation. Illinois and Texas are the two U.S. jurisdictions in which Meta has been adjudicated, settled, and required to pay for the unconsented commercial use of biometric identifiers — Illinois under BIPA, where Meta paid $650 million in *In re Facebook Biometric Information Privacy Litigation* and $68.5 million in *In re Instagram BIPA Consumer Privacy Litigation*; and Texas under the Capture or Use of Biometric Identifier Act, where Meta paid $1.4 billion in 2024. Meta did not exclude any other state. Meta excluded the two states whose biometric statutes Meta has been forced, in prior litigation, to take seriously.

59. The Illinois/Texas carve-out is relevant to three propositions material to this Complaint. *First*, Meta has actual, present knowledge that BIPA reaches Meta's voice AI products: Meta's conduct in carving Illinois out of the Reels feature is an admission that Meta cannot lawfully deploy the feature to Illinois users on the same terms as users in jurisdictions without comparable biometric statutes. *Second*, Meta possesses the operational capability to identify and exclude Illinois users, Illinois content, and Illinois-origin material from its product offerings when Meta concludes that doing so serves Meta's interests. *Third*, Meta's decision to exclude Illinois users at the consumer endpoint of the product chain, while continuing to train its foundational audio models on Illinois-origin voice recordings at the input end of that same chain,

reflects a deliberate institutional choice: Meta will accept the marginal commercial cost of denying Illinois users access to the Reels feature to avoid Illinois liability for the downstream deployment, but Meta will not accept the marginal training-data cost of excluding Illinois-origin voice recordings from the foundational models to avoid Illinois liability for the upstream extraction. The same statute that the carve-out shows Meta to have understood at the consumer endpoint applies, with equal force, at the training-data endpoint.

60. Meta's exclusion of the Reels translation feature in Illinois is the geographic mirror image of the Illinois-origin training data on which the models powering the Reels feature were built. Meta knew enough to keep Illinois users from receiving the output of those models. Meta knew enough to keep the models out of Illinois at the consumer end. Meta deliberately and contemporaneously chose to ingest Illinois-origin voice recordings at the training end. That choice is the conduct on which this Complaint rests.

*Meta's Commercial Deployment and Monetization*
*of the Foundational Audio Models*

61. The voiceprints, voice embeddings, and biometric representations encoded in the parameters of Meta's foundational audio models — Voicebox, Audiobox, MMS, SeamlessM4T, and their successors — supply the voice quality, expressiveness, speaker similarity, multilingual range, and cross-accent capability that drive the commercial value of Meta's voice-enabled products. Meta monetizes those capabilities through an integrated commercial chain that includes, without limitation:

29

(a)     advertising revenue and user-engagement gains attributable to the Meta AI assistant, which Meta has integrated across Facebook, Instagram, WhatsApp, Messenger, and Threads, and which Meta's Chief Executive Officer has publicly identified as approaching one billion monthly active users, and to the Reels AI voice translation feature, which generates synthesized voice output mimicking the sound and tone of source voices;

(b)     revenue and platform value attributable to AI Studio's voice-enabled character and creator products;

(c)     hardware revenue and product differentiation attributable to Ray-Ban Meta and Oakley Meta smart glasses, which Meta sells in Illinois through LensCrafters, Sunglass Hut, and other authorized retailers in this District;

(d)     API, cloud, and partner-channel revenue attributable to commercial deployment of Meta's foundational audio models and to the enterprise voice agent technology Meta acquired through its July 2025 acquisition of PlayAI, including deployments to Illinois-based commercial customers;

(e)     developer-ecosystem value, platform reach, and commercial-moat value generated through Meta's selective open-weight, gated, and research-community releases of its foundation-model families, governed by the Llama community license alleged at ¶¶ 6, 52; and

(f)     strategic deployment value of voice synthesis and audio generation capability across Meta's broader commercial product portfolio.

62. The scale of Meta's commercial deployment of those capabilities is substantial. Meta's family of applications reaches approximately 3.58 billion daily active users worldwide; Meta reported revenue of approximately $200.97 billion for fiscal year 2025; and Meta carries a market capitalization of approximately $1.81 trillion. The voice quality and capability that Meta monetizes through each of the channels identified above is not severable from the biometric source material on which the underlying models were trained: the products' ability to generate realistic, expressive, and human-sounding voices, and to do so in target voices from short audio prompts, exists because of, and only because of, the voiceprints and biometric representations encoded in the models, including the voiceprints and biometric representations extracted from Plaintiffs and Class members. Every commercial deployment of a Voicebox-, Audiobox-, MMS-, or SeamlessM4T-derived capability through any of these channels therefore monetizes the unconsented biometric data Meta extracted from Plaintiffs and Class members, and continues to do so each day Meta retains and operates the foundational audio models in which that data is encoded.

*The Biometric Data Was Generated in Illinois*

63. The conduct giving rise to Plaintiffs' claims is localized in Illinois in four independent and mutually reinforcing respects:

(i) the biometric source material was generated in Illinois;

(ii) Meta's acquisition of that biometric source material was targeted at identifiably Illinois-origin content;

31

(iii)    BIPA's duties under § 15(a)–(e) run to the subjects of the biometric data, Plaintiffs and the Class, whose voices are Illinois-origin, irrespective of where Meta's computational infrastructure sits; and

(iv)    Meta's ongoing retention, dissemination, and commercial exploitation of the resulting biometric data is itself directed at, and felt in, Illinois.

Each of these grounds independently supports the application of BIPA, IRPA, ICFA, IUDTPA, and the common-law claims pled in this Complaint to Meta's conduct as to Plaintiffs and the Class.

64.    Plaintiffs' voices, the biological characteristics from which voiceprints and biometric information are derived, were produced by Plaintiffs while they were physically present in Illinois. The voice itself, as a unique biometric signature, came into existence in Illinois.

65.    The audio recordings embodying Plaintiffs' voices, from which Meta is alleged to have extracted voiceprints and biometric information, were created in Illinois. Plaintiffs were physically present in Illinois at the time of the recordings, the recordings captured the biometric characteristics of speakers who were in Illinois at the time of recording, and, as alleged with specificity in ¶¶ 75-109, the recordings were produced in Illinois studios, broadcast facilities, professional home recording studios in Chicago, and other Illinois-based production environments.

66.     The recordings were published from Illinois to publicly accessible platforms — broadcast-affiliated digital archives, audiobook distribution platforms, podcast distribution platforms, video distribution platforms, and similar channels — on which Plaintiffs' identities, geographic origin, professional biographies, and content catalogs were and are publicly visible to any person accessing the recordings. The metadata, descriptions, and contextual information accompanying the recordings publicly identified each Plaintiff as an Illinois-based speaker and identified the recordings as Illinois-origin content at the time the recordings were made and continuously thereafter.

67.     The biometric source material — the voice itself, the audio encoding of the voice, and the publicly distributed recordings embodying both — is therefore of Illinois origin. The biometric data Meta is alleged to have extracted from those recordings is Illinois-origin, regardless of where any subsequent computational processing occurred.

*Meta's Acquisition Was Targeted at*
*Identifiably Illinois-Origin Material*

68.     Meta accessed Plaintiffs' voice recordings from publicly accessible platforms on which the recordings were hosted with metadata identifying each Plaintiff by name and identifying the recordings' origin, as alleged with specificity in ¶¶ 75-109. To any person with knowledge of Illinois broadcast journalism, podcast production, audiobook narration, and voice-performance markets, the metadata accompanying Plaintiffs' recordings identified each Plaintiff as a speaker whose work originated from Illinois.

33

69. Meta's act of accessing and processing those recordings was therefore not the passive receipt of an anonymized dataset assembled by a third party. It was the affirmative acquisition of identifiable, attributed voice content — voice content that, at the time of acquisition, was publicly associated with Illinois-based speakers and Illinois-origin production, as alleged in ¶¶ 75-109. The Illinois affiliation of each Plaintiff and of each Plaintiff's recordings was knowable from publicly visible information at the time Meta accessed and processed the recordings. Meta's research practice, including its provenance-tracking capability demonstrated by the partial disclosures accompanying MMS (¶¶ 40, 52), confirms that Meta possessed the technical capability to identify and screen Illinois-origin recordings out of its training corpora. Meta chose not to apply that capability.

*BIPA's Duties Run to the Subject of the Biometric Data*

70. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure. The same is true of BIPA's retention obligations under § 15(a), the profiting prohibitions of § 15(c), the dissemination prohibitions of § 15(d), and the reasonable-care obligations of § 15(e), each of which protects the persons from whom biometric data is taken. The subjects of the biometric data at issue in this Complaint are Plaintiffs and the Class,

persons whose voices and recordings were generated in Illinois, as alleged in ¶¶ 64-67.

71.     Meta's continuing possession of voiceprints and biometric information generated in Illinois likewise runs afoul of obligations BIPA imposes for the benefit of the subjects of that data. Meta has not made publicly available a written retention schedule and destruction policy compliant with 740 ILCS 14/15(a) covering biometric data obtained from non-user training-data sources, as alleged at Count II below. Meta has provided no mechanism by which Plaintiffs or any other non-user training-data subject may seek removal or destruction of their biometric data, in contrast to the opt-out mechanism Meta extended to EU and UK users following regulatory objections, as alleged at ¶ 48. Meta's commercial deployments operate on a perpetual basis, resulting in the biometric data of Illinois-origin training subjects being, on information and belief, retained indefinitely. These continuing failures are owed to Illinois subjects whose biometric data was generated in Illinois.

*Ongoing Retention, Dissemination, and*
*Commercial Exploitation Is Directed at Illinois*

72.     Meta deploys, on a continuing daily basis, to Illinois users and Illinois customers each of the voice AI products identified at ¶¶ 24–25, each of which encodes or deploys capabilities derived from Meta's foundational audio models in which Plaintiffs' biometric data is encoded.

73.     Meta's research community, partner, and open-weight releases of components of MMS, SeamlessM4T, and other foundational audio models are continuing acts of dissemination of Illinois-origin biometric data into a

downstream ecosystem that includes Illinois developers, Illinois enterprises, and Illinois researchers. Each public-release act is a unilateral, irreversible act of dissemination by Meta into Illinois. Each such release is independent of, and additional to, the commercial deployments alleged in ¶ 61.

74. The injury suffered by Plaintiffs and the Class is felt in Illinois. The privacy interest BIPA protects — the right to control the collection, retention, dissemination, and commercial use of one's biometric identity — is exercised by Plaintiffs in Illinois. Plaintiffs' loss of control over their biometric data, their loss of the licensing and consent rights BIPA and IRPA preserve, and the dilution of the commercial value of their voices in the markets in which they participate are all injuries Plaintiffs sustain in connection with their personal and professional activities, including activities in Illinois, as more fully alleged in ¶¶ 75-109. Together with the Illinois origin of the biometric data, the Illinois-targeted nature of Meta's acquisition, and the running of BIPA's duties to the Illinois subjects of the biometric data, this Illinois-localized harm establishes that the operative conduct giving rise to this case occurred, and continues to occur, primarily and substantially in Illinois.

*Named Plaintiffs' Individual Experiences*

*Philip Rogers*

75. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast

coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club — the awards conferred by Chicago's professional journalism organization for excellence in journalism conducted within the Chicago metropolitan region.

76. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio, continuously available through the NBC Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting. These platforms display metadata identifying Rogers as the speaker and Chicago as the location of production. Rogers's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

77. On information and belief, Rogers's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from his recordings are encoded in those models' parameters. Rogers's broadcast catalog matches the profile of training audio Meta's research describes — long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source — as alleged

37

at ¶¶ 31-38, 41. The recordings are accessible through the same categories of publicly distributed platforms (broadcast-affiliated digital archives, YouTube) that Meta and other AI companies use to acquire audio training data. Meta has refused to disclose the sources of the audio training data powering its commercial voice products, placing the specific records of training-data ingestion under Meta's exclusive control.

78. Rogers never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of his professional voice work for AI training. He never received notice that Meta had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release. Meta's collection of Rogers's voiceprint, and Meta's continuing possession and commercial exploitation of that voiceprint, occurred and continues without his knowledge or consent.

79. Rogers's injury is concrete and particular to him. Meta extracted his voiceprint from recordings he produced over four decades of professional work, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Rogers used to speak every day during his career. The technology Meta built using Rogers's voiceprint — including the Meta AI assistant deployed across Facebook, Instagram, WhatsApp, Messenger, and Threads, and the Voicebox and

Audiobox generative audio capabilities that produce broadcast-style narration from short audio prompts — now operates in the same broadcast journalism market in which Rogers built his career, against the same colleagues with whom he worked, in a competitive position Rogers neither chose nor authorized.

*Carol Marin*

80.     Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, the CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel, and spans television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, at least fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, the Sigma Delta Chi Ethics in Journalism Award, induction into the Chicago Journalism Hall of Fame, and, in 2025, the Order of Lincoln — Illinois's highest civilian honor.

81.     Marin's broadcast catalog is publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit digital archive of her broadcast investigative reporting, documentary work, and on-air interviews; the WTTW digital archive at news.wttw.com; the NBC Chicago digital archive at nbcchicago.com; and YouTube, where her Peabody

acceptance speeches, debate moderation, and archived broadcast segments are publicly available. These platforms display metadata identifying Marin as the speaker and Chicago as the location of production. Marin's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

82. On information and belief, Marin's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Marin's broadcast catalog matches the profile of training audio Meta's own research describes — long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source — as alleged at ¶¶ 31-38, 41. The recordings are accessible through the same categories of publicly distributed platforms from which Meta and other AI companies acquire audio training data. Meta has refused to disclose the sources of the audio training data powering its commercial voice products.

83. Marin never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

84.     Marin's injury is concrete and particular to her. The technology Meta built using her voiceprint — including the Meta AI assistant deployed across Facebook, Instagram, WhatsApp, Messenger, and Threads, the Voicebox generative audio model capable of producing authoritative narration from short audio prompts, and the Audiobox documentary-narration capabilities Meta has built — now operates in the same investigative broadcast journalism market in which Marin built her career, against the same colleagues with whom she worked, and in the documentary narration market in which Marin's voice is itself a recognized professional asset. Marin's voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature on which her career and recognized authority were built.

*Alison Flowers*

85.     Flowers is an investigative journalist and audio producer based in Chicago. She is the founder of Spiralbound, a production company at the intersection of investigative journalism and immersive storytelling, and previously served as Head of Production at the Invisible Institute. Flowers produced and reported the seven-part investigative podcast *Somebody*, a 2021 Pulitzer Prize finalist for Audio Reporting, winner of the National Magazine Award (the Ellie) for Podcasting, the Scripps Howard Award for Excellence in Radio/Podcast Coverage, the International Documentary Association award for Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival award for Best Serialized Story. *Somebody* topped *Rolling Stone*'s Best Podcasts of 2020 list, was ranked first on

41

*The New York Times*'s list of true-crime podcasts at the intersection of race, and was ranked second on *The Atlantic*'s 50 Best Podcasts of 2020.

86.     *Somebody* and Flowers's other audio reporting are publicly available across major podcast distribution platforms, including Apple Podcasts, Spotify, iHeartRadio, YouTube, and Stitcher. Flowers's work was also distributed through Google Podcasts before Google shut down that service in 2024. Flowers's audio reporting also airs on Reveal from the Center for Investigative Reporting, *The Heist* from the Center for Public Integrity, *Vox*, *Dateline NBC*, *Democracy Now!*, and other broadcast and digital outlets. These platforms display metadata identifying Flowers as the speaker and Chicago as the location of production. Flowers's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

87.     On information and belief, Flowers's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Flowers's investigative podcast catalog — long-form, single-speaker or small-ensemble, studio-quality, professionally produced, identifiable by name and source, distributed through the major public-facing podcast platforms — matches the profile of training audio Meta's research describes, as alleged at ¶¶ 31-38, 41. Meta has refused to disclose the sources of the audio training data powering its commercial voice products.

88.     Flowers never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

89.     Flowers's injury is concrete and particular to her. The technology Meta built using her voiceprint — including the Voicebox and Audiobox generative audio models capable of producing investigative-podcast-style narration and dialogue from short audio prompts, the Reels AI voice translation feature that produces synthesized voice output mimicking the sound and tone of source voices, and the voice AI capabilities of PlayAI (which Meta acquired) used to power enterprise voice products — now operates in the same investigative audio journalism market in which Flowers built her career, in a competitive position Flowers neither chose nor authorized.

*Robin Amer*

90.     Amer is a journalist, podcast creator, audio producer, and on-air host with more than twenty years of experience in digital, broadcast, and print media, the substantial majority of which has been produced in and from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the USA Today investigative podcast that peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker, The New*

43

*York Times*, *Quartz*, and Apple Podcasts. Her earlier work for *Gravy* contributed to that program's 2015 James Beard Award for Best Podcast. During three years at *The Washington Post* as Senior Producer for Audio Features, Amer won or was a finalist for the duPont–Columbia Award three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, whose ten-part series *Blood Memory* won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction.

91.     *The City*, *Gravy*, *Post Reports*, *Field Trip*, *Love + Radio: Blood Memory*, and Amer's other audio work are publicly available across major podcast distribution platforms, including Apple Podcasts, Spotify, iHeartRadio, Amazon Music, and YouTube. Amer's work was also distributed through Google Podcasts before Google shut down that service in 2024. These platforms display metadata identifying Amer as the speaker and Chicago as the principal location of production. Amer's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

92.     On information and belief, Amer's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Amer's podcast catalog — long-form, single-speaker host-narrator, studio-quality, professionally produced, identifiable by name and source, distributed through the major public-facing podcast platforms — matches the profile of training audio Meta's research describes, as

alleged at ¶¶ 31-38, 41. Meta has refused to disclose the sources of the audio training data powering its commercial voice products.

93. Amer never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

94. Amer's injury is concrete and particular to her. The technology Meta built using her voiceprint — including the Voicebox and Audiobox generative audio models capable of producing single-host investigative-narrative podcast-style audio from short audio prompts, the Reels AI voice translation feature, and the voice AI capabilities of PlayAI (which Meta acquired) used to power enterprise voice products — now operates in the same investigative audio journalism and podcast production markets in which Amer built her career, in a competitive position Amer neither chose nor authorized.

*Lindsey Dorcus*

95. Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for the major American publishers, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus is a 2020 Society of Voice Arts and

45

Sciences (SOVAS) Voice Arts Award winner (full-cast ensemble for *Wild Monsters Dance About*) and a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. *AudioFile Magazine* has reviewed her narration as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Her professional range includes General American, British (Received Pronunciation, Estuary, Cockney), Scottish, Irish (Dublin and Northern), French, American Southern, Greek, New England, New York, German, Indian, and Russian dialects. Dorcus records from a professional home recording studio in Chicago.

96.     Dorcus's audiobook narration is publicly available across the major audiobook and digital audio platforms, including Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, and Scribd/Everand. Her complete catalog of narrated titles is searchable and accessible on those platforms. These platforms display metadata identifying Dorcus as the narrator and embodying her continuous, studio-quality, single-speaker, long-form audio recordings. Dorcus's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

97.     On information and belief, Dorcus's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Dorcus's audiobook catalog matches the profile of training audio Meta's own research describes — long-form, single-speaker,

studio-quality, professionally produced, identifiable by name and source — as alleged at ¶¶ 31-38, 41. Meta has publicly stated that Voicebox was trained on more than 50,000 hours of English audiobook narration and approximately 50,000 hours of multilingual audiobook narration, as alleged at ¶ 41, thereby placing audiobook narration squarely within Meta's training data scope. Meta has refused to disclose the specific audiobook titles, narrators, or audio sources used to train its foundational audio models.

98.     Dorcus never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

99.     Dorcus's injury is concrete and particular to her. The technology Meta built using her voiceprint — including the Voicebox generative audio model, which Meta has stated was trained on tens of thousands of hours of audiobook narrations and which is capable of producing high-quality speech in a target voice from short audio prompts; the Audiobox extension of that capability; and the voice AI capabilities of PlayAI (which Meta acquired), which Meta has integrated into enterprise voice products — now operates in the same audiobook narration market in which Dorcus built her career, in a competitive position Dorcus neither chose nor authorized. Major American audiobook

publishers — including the publishers for whom Dorcus has narrated more than two hundred audiobooks — have begun to integrate AI-generated narration into their commercial offerings, displacing professional human narrators including Dorcus from the market in which she earns her livelihood.

*Yohance Lacour*

100.   Lacour is a journalist, audio storyteller, writer, and playwright from the South Side of Chicago whose professional work centers on telling stories of Black Chicago. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio. *You Didn't See Nothin'* was awarded the 2024 Pulitzer Prize for Audio Reporting and the 2024 Peabody Award, was named one of Apple Podcasts' 100 Best Podcasts of All Time, and received four nominations at the Black Podcasting Awards and two nominations at the Signal Podcasting Awards. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series.

101.   *You Didn't See Nothin'* is publicly available across major podcast and digital audio platforms, including Apple Podcasts, Spotify, iHeart Podcasts, YouTube, Amazon Music, and Overcast. Lacour has also appeared as a featured guest and interview subject on NPR's *Fresh Air* with Tonya Mosley, NPR's *All Things Considered* with Adrian Florido, the CBC's *Crime Story* podcast, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast. These platforms display metadata identifying Lacour as the speaker and Chicago as the location of production. Lacour's body of work has been continuously

available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

102. On information and belief, Lacour's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from his recordings are encoded in those models' parameters. Lacour's investigative-podcast catalog — long-form, single-speaker host-narrator, studio-quality, professionally produced, identifiable by name and source, distributed through the major public-facing podcast platforms — matches the profile of training audio Meta's own research describes, as alleged at ¶¶ 31-38, 41. Meta has refused to disclose the sources of the audio training data powering its commercial voice products.

103. Lacour never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of his professional voice work for AI training. He never received notice that Meta had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

104. Lacour's injury is concrete and particular to him. The technology Meta built using his voiceprint — including the Voicebox and Audiobox generative audio models capable of producing investigative-podcast-style narration from short audio prompts, the Reels AI voice translation feature that produces synthesized voice output mimicking the sound and tone of source

voices, and the voice AI capabilities of PlayAI (which Meta acquired) — now operates in the same investigative audio storytelling and podcast journalism markets in which Lacour built his career, in a competitive position Lacour neither chose nor authorized.

*Victoria Nassif*

105. Nassif is a first-generation Lebanese-Palestinian American professional actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois. Nassif's audiobook narration has been commercially released by Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster. Her notable narrations include *The Next New Syrian Girl* by Ream Shukairy (Hachette), in which she performed multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist that was shortlisted for the Ursula K. Le Guin Prize; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life,* a bilingual Arabic-English anthology compiled by Susan Abulhawa. Nassif has also performed on-camera in NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Nassif's professional range spans General American, British (Received Pronunciation, Cockney), Persian, Levantine Arabic, and American Southern, among others. As a Lebanese-Palestinian American who speaks Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle

50

Eastern and Arab American characters and settings — a distinctive professional asset in the audiobook narration market.

106.  Nassif's audiobook narration is publicly available across major audiobook and digital audio platforms, including Audible, Apple Books, Spotify, and Libro.fm. These platforms display metadata identifying Nassif as the narrator and embodying her continuous, studio-quality, single-speaker, long-form audio recordings. Nassif's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

107.  On information and belief, Nassif's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Nassif's audiobook catalog matches the profile of training audio Meta's own research describes — long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source — as alleged at ¶¶ 31-38, 41, and the multilingual and culturally-specific dimension of her work falls within the categories Meta has emphasized in its public training-data disclosures, including Meta's statement that Voicebox was trained on approximately 50,000 hours of multilingual audiobook narrations and that the Massively Multilingual Speech model was trained on speech data spanning more than 1,100 languages, as alleged at ¶¶ 40-41. Meta has refused to disclose the specific audiobook titles, narrators, multilingual sources, or

51

culturally specific narration sources used to train its foundational audio models.

108. Nassif never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

109. Nassif's injury is concrete and particular to her. The cultural and linguistic specificity of Nassif's professional voice work — authentic Levantine Arabic-accented narration of works by Arab and Palestinian American authors — is itself the basis of her distinctive market position. The technology Meta built using her voiceprint — including the Massively Multilingual Speech model trained on speech data spanning more than 1,100 languages including Arabic, the SeamlessM4T model designed for cross-lingual speech generation, the multilingual capabilities of Voicebox, and the Reels AI voice translation feature that produces synthesized voice output in multiple languages — can now generate Arabic-accented English narration and Levantine Arabic-accented voice content that competes specifically with Nassif's professional niche. That competitive capability exists because voice characteristics encoded in Meta's foundational audio models include the characteristics of speakers like Nassif whose recordings supplied the multilingual and cross-accent training data on

52

which the models were built. The technology Meta built using Nassif's voiceprint now operates in the precise market — culturally authentic Arabic-accented narration — in which Nassif has built her career, in a competitive position Nassif neither chose nor authorized.

*The Voice Products Compete With*
*the People Whose Voices Built Them*

110. The voice AI products built on Plaintiffs' biometric data are now sold and deployed into the markets where Plaintiffs and the Class earn their livelihoods. The competitive substitution is not abstract, future, or speculative. It is operational, present, and rapidly accelerating, and in each instance, it is enabled by, and only by, the vocal characteristics Meta extracted from human performers without their consent.

111. Audiobook narration is one of the markets most directly affected. Professional audiobook narration has historically been performed by human narrators at industry rates of $250 to $400 per finished hour, meaning a typical ten-hour novel costs $3,000 to $4,000 to narrate. Meta's Voicebox model, which Meta has stated was trained on more than 50,000 hours of English audiobook narrations and approximately 50,000 hours of multilingual audiobook narrations, can produce high-quality speech in a target voice from a two-second audio prompt. Audiobox extends that capability to controllable narration with voice-style prompting from audio as short as three seconds. The major American audiobook publishers — including Penguin Random House, Hachette, Simon & Schuster, and Macmillan, each of whom has commissioned Plaintiffs Dorcus and Nassif to narrate audiobooks — have begun to integrate

53

AI-generated narration into their commercial offerings. The technology Meta built using Plaintiffs Dorcus's and Nassif's voiceprints is now, on information and belief, deployed in the same audiobook narration market in which Dorcus and Nassif earn their livelihoods, at a cost per finished hour that is orders of magnitude lower than human narrator rates, as a direct substitute for the human narration Plaintiffs provide.

112. Long-form investigative audio journalism is similarly affected. Meta's Voicebox and Audiobox models generate single-host narrative and conversational audio in the formats and at the production quality that Plaintiffs Marin, Rogers, Flowers, Amer, and Lacour have spent their careers developing. The Meta AI assistant, deployed across Facebook, Instagram, WhatsApp, Messenger, and Threads, and identified by Meta's Chief Executive Officer as approaching one billion monthly active users, generates spoken audio content in the same broadcast journalism and conversational audio markets in which Plaintiffs Marin and Rogers built their careers, and in the same investigative podcasting market in which Plaintiffs Flowers, Amer, and Lacour produce their work.

113. Localization voiceover is similarly affected. The Reels AI voice translation feature, built on SeamlessM4T and the multilingual capabilities of Voicebox, automatically generates dubbed audio in other languages while preserving the source speaker's vocal characteristics. The product replaces the localization voiceover work that voice actors have historically performed, and is offered to creators at no marginal cost.

54

114. The culturally specific niche in which Plaintiff Nassif practices is similarly affected. The MMS model is trained on speech data spanning more than 1,100 languages, including Levantine Arabic. SeamlessM4T is designed for cross-lingual speech generation. Voicebox's multilingual capabilities include Arabic. The combination produces a technical capability — culturally authentic Arabic-accented English narration and Levantine Arabic-accented voice content — that competes specifically with Nassif's professional niche, and that competitive capability exists because the vocal characteristics encoded in Meta's foundational audio models include the characteristics of speakers like Nassif whose recordings supplied the multilingual and cross-accent training data on which the models were built.

115. Enterprise voice deployment is similarly affected. Meta's July 2025 acquisition of PlayAI extends the enterprise reach of Meta's foundational audio models to commercial customers, including Illinois-based commercial customers, who now obtain voice-agent capabilities derived from the same models in which Plaintiffs' voiceprints are encoded.

116. Each of these products was built using the vocal characteristics of the human performers it now displaces. Plaintiffs allege, on information and belief, that the voiceprints of every Plaintiff in this case are among the voiceprints encoded in the foundational audio models on which these products depend. The market substitution is therefore not merely temporal but causal: the machines generate the audio they generate because the performers' voiceprints were extracted from their recordings and embedded in the model

parameters that produce the output. That is the operational definition of biometric exploitation under BIPA, of unauthorized use of identity under IRPA, of unfair conduct under ICFA, and of unjust enrichment at common law.

*Meta's Dissemination of the Foundational Audio Models*
*and the Voiceprints Encoded Within Them*

117. The voiceprints and biometric information in which Plaintiffs' and Class members' biometric identifiers are encoded are not stored in a single location or accessed by a single legal entity. They are deployed, served, retrained, and disseminated across Meta's corporate, cloud, and ecosystem infrastructure, in the ordinary course of Meta's voice AI business and through Meta's deliberate public-release decisions, in three categories of dissemination, each of which independently violates 740 ILCS 14/15(d).

118. Meta's global product, research, engineering, and infrastructure organizations are operated by, or in coordination with, Meta-affiliated entities and subsidiaries across multiple jurisdictions. The development, evaluation, deployment, and operation of Voicebox, Audiobox, MMS, SeamlessM4T, and their derivatives requires the transmission of model parameters — and, on information and belief, of the voiceprints and biometric information encoded within those parameters — among Meta-affiliated entities in the ordinary course of Meta's integrated enterprise. Plaintiffs and Class members did not consent to any such transmission. No enumerated exception under 740 ILCS 14/15(d) applies.

119. Meta's commercial voice products are operated, in part, on cloud infrastructure provided by Meta's service-provider counterparties, and Meta

56

engages third-party annotators, reviewers, and contractors in the training, evaluation, and refinement of its foundational audio models. Meta's Ray-Ban Meta AI Glasses Voice Privacy Notice acknowledges that third-party reviewers evaluate voice recordings collected through Meta's products. Each transmission of model parameters or voice data to a service-provider counterparty, or to a third-party reviewer, is a transmission of the voiceprints and biometric information encoded within those parameters and recordings. Plaintiffs and Class members did not consent. No enumerated exception under 740 ILCS 14/15(d) applies.

120. Meta has affirmatively published the parameters of foundational audio models — including, on information and belief, components and successor releases of the Massively Multilingual Speech model and the SeamlessM4T model — under research-community and gated-release licenses that make those parameters available, in whole or in part, to any party in the world. Each such release is a unilateral, irreversible act of dissemination by Meta. The parameters of these models encode the voiceprints and biometric information that Meta extracted from the training recordings, including, on information and belief, the voiceprints and biometric information of Plaintiffs and Class members. By releasing the parameters, Meta has disseminated the encoded biometric data into the global research, developer, and commercial ecosystems. Meta's June 2023 decision to decline to release the Voicebox model weights confirms that Meta understands the dissemination implications of publishing model parameters trained on speaker-identifying audio: Meta

declined to publish Voicebox precisely because Meta concluded that public release would expose Meta to unacceptable risk. The risk Meta declined to incur with Voicebox is the risk Meta affirmatively incurred — with respect to Plaintiffs' and Class members' biometric data — through the public releases of other foundational audio models. Plaintiffs and Class members did not consent to any of these public releases. No enumerated exception under 740 ILCS 14/15(d) applies.

121. Each of the three categories above constitutes an independent violation of § 15(d). The third category, affirmative public release, is the most consequential, because it is irreversible. Once the parameters are published, the encoded biometric data falls into the hands of any party worldwide who downloads the model. The continuing nature of Meta's exposure to liability for those public releases, and the continuing nature of the dissemination, are addressed in the prayer for relief, including the request for an order requiring Meta to take all reasonable measures to recall and remove the unlawfully encoded model parameters from public and partner availability.

*Meta Acted Willfully and Recklessly*

122. Meta's collection, retention, commercial exploitation, and dissemination of Plaintiffs' voiceprints without notice or consent was not the result of inadvertence or unfamiliarity with BIPA. Meta acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

58

*No Defendant Has Had More Direct Notice of BIPA Than Meta*

123.   No defendant in any BIPA matter pending in the United States has had more direct, more sustained, or more financially consequential notice of BIPA's requirements than Meta.

124.   In April 2015, Illinois Facebook users filed a putative class action against Facebook, Inc. (now Meta Platforms, Inc.) alleging that the company's Tag Suggestions feature extracted facial geometry from user-uploaded photographs in violation of BIPA. *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747-JD (N.D. Cal.). In May 2018, the United States District Court for the Northern District of California certified a class of Illinois Facebook users. In August 2019, the Ninth Circuit affirmed class certification, holding that the BIPA violations alleged were sufficient to confer Article III standing because BIPA "protect[s] concrete privacy interests" and that "the development of a face template using facial-recognition technology without consent ... invades an individual's private affairs and concrete interests." *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273–74 (9th Cir. 2019). The Supreme Court denied Meta's petition for certiorari in January 2020. *Facebook, Inc. v. Patel*, 140 S. Ct. 937 (2020).

125.   In February 2021, the District Court granted final approval of a settlement under which Meta paid $650 million to the Illinois Facebook users on whose biometric data Meta had built its facial-recognition products without consent. The settlement was at that time the largest privacy settlement in United States history.

59

126. Meta was on actual, adjudicated, and paid-for notice, by no later than 2019 and unambiguously by 2021, that BIPA imposes statutory liability on the unconsented extraction of biometric identifiers from Illinois-origin source material; that statutory damages under BIPA can reach aggregate amounts in the hundreds of millions of dollars in classwide actions; that federal courts in both Illinois and California will enforce BIPA against Meta; and that the extraction of biometric identifiers from publicly available source material does not extinguish BIPA's consent requirements. With full knowledge of each of these propositions, Meta thereafter acquired the voice recordings of Plaintiffs and the Class — voice recordings produced or recorded in Illinois — extracted voiceprints and derived biometric representations from those recordings without consent, incorporated those biometric representations into commercial AI products, and has continued to do so through the date of this Complaint.

127. Meta's noncompliance was deliberate. As alleged in the factual background above, Meta possesses the operational capability to withhold sensitive AI artifacts (the Voicebox non-release), to draw jurisdictional and scale lines around AI artifacts when Meta's interests require (the Llama community license), and to disclose training-data provenance when Meta chooses (the partial MMS provenance disclosure). Meta built robust consent infrastructure for the celebrity voices Meta paid to license and the musical works Meta paid to license, and built none for the speakers whose voiceprints Meta took to train its foundational models. Meta deliberately carved Illinois and

60

Texas — the two jurisdictions whose biometric statutes Meta has been adjudicated and required to satisfy — out of the consumer endpoint of the Reels translation feature, while continuing to train on Illinois-origin recordings at the training endpoint. And Meta extended an opt-out mechanism to EU and UK users under regulatory pressure while withholding the same from U.S. users. Each of these is independent evidence that Meta's failure to obtain BIPA-compliant consent for the speakers whose voiceprints Meta extracted was a contemporaneous, institutionally coherent choice, made with full operational capability and full legal knowledge.

128. The knowledge of BIPA's requirements, the Facebook BIPA litigation, the *Patel* decision, the $650 million settlement, the selective release practices, the Llama license terms, and the MMS dataset disclosures resides at the level of Meta's legal, policy, compliance, and executive functions. Those functions span all of Meta's product divisions, including the artificial intelligence research and product divisions that developed and deployed Voicebox, Audiobox, MMS, SeamlessM4T, and the foundational audio models on which Meta's commercial voice products are built. Meta cannot disclaim the knowledge of the parent corporation by reference to the organizational separation of any operating division or research unit. And Meta cannot disclaim willfulness by reference to industry practice: BIPA's standard is not industry custom but the statute's text, and Meta should not be allowed to invoke industry practice as a defense to willfulness when Meta is itself among the largest contributors to whatever industry practice exists, when Meta's

61

Facebook BIPA litigation and $650 million settlement helped define the industry's notice of BIPA's reach, and when Meta's internal capabilities establish that compliance was operationally feasible.

129. Each of the violations alleged in this Complaint was therefore committed by Meta with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay*.

## CLASS ACTION ALLEGATIONS

130. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Meta extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of one or more of Meta's foundational audio models or commercial voice products derived from those models.

131. The Class Period extends from the earlier of (i) the date of Meta's first ingestion of voice recordings into any training corpus for any of the foundational audio models, or (ii) January 1, 2014, through the date of final judgment in this action.

62

132. Excluded from the Class are Meta, its officers, directors, agents, employees, affiliates, parents, and subsidiaries; the Court and its staff and immediate family members; and counsel of record for any party in this action and their immediate family members. Further excluded is any person who, prior to Meta's extraction of biometric identifiers or biometric information from that person's voice recordings, executed a written release that (a) was specifically directed to Meta, (b) specifically authorized Meta's use of the person's voiceprint or voice embedding for the training, fine-tuning, evaluation, or operation of one or more of Meta's foundational audio models, and (c) satisfied the notice and release requirements of 740 ILCS 14/15(b).

133. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

134. *Numerosity — Rule 23(a)(1).* Meta has publicly stated that Voicebox was trained on more than 50,000 hours of English speech and accompanying transcripts and a separate dataset of approximately 50,000 hours of multilingual audiobook narrations; that MMS was trained on speech data spanning more than 1,100 languages; and that SeamlessM4T was trained on a multilingual speech corpus of comparable scale. The speakers represented in those corpora number in the hundreds of thousands or more, of whom a substantial share — quantifiable only through discovery of Meta's training-data manifests — produced or recorded the relevant audio in Illinois. Illinois has

63

been a center of broadcast journalism, podcast production, audiobook narration, and voice performance throughout the Class Period, and on information and belief, Illinois-produced or Illinois-recorded audio content during the Class Period includes tens of thousands of hours of broadcast and cable journalism produced from Chicago-based newsrooms including WMAQ-TV, WBBM, WTTW, CBS Chicago, NBC Chicago, ABC 7 Chicago, and WGN; thousands of hours of podcast content produced by Illinois-based producers and distributed through public-facing platforms; thousands of audiobooks narrated by Illinois-based voice performers and distributed through Audible, Apple Books, Google Play Books, Spotify, Libro.fm, and similar platforms; and substantial volumes of public-affairs, sports, entertainment, and live-event broadcast content. Each of these categories contains both professional speakers and incidental speakers — interview subjects, panel guests, members of the public captured in broadcast contexts, secondary performers in audiobook ensembles, sources in long-form journalism — whose voices appear in publicly accessible recordings and whose voiceprints, if ingested by Meta, are subject to BIPA. Joinder of all such persons is impracticable for reasons including the size of the Class, the distribution of Class members across multiple jurisdictions of present residence, and the inability of individual Class members to identify themselves as such absent classwide discovery of Meta's training-data provenance.

135. *Commonality — Rule 23(a)(2).* There are questions of law and fact common to the Class, including without limitation:

(a)     whether Meta extracted voiceprints, voice embeddings, or other biometric identifiers or biometric information from voice recordings produced or recorded in Illinois;

(b)     whether Meta's extraction occurred without the informed written consent required by 740 ILCS 14/15(b);

(c)     whether Meta developed and made publicly available a written policy for retention and destruction of biometric identifiers and biometric information as required by 740 ILCS 14/15(a);

(d)     whether Meta profited from the biometric data they extracted, within the meaning of 740 ILCS 14/15(c);

(e)     whether Meta disclosed, redisclosed, or otherwise disseminated biometric data without the consent required by 740 ILCS 14/15(d);

(f)     whether Meta protected biometric identifiers and biometric information using the reasonable standard of care within Meta's industry, as required by 740 ILCS 14/15(e)(1);

(g)     whether Meta protected biometric identifiers and biometric information in a manner the same as or more protective than Meta's protection of other confidential and sensitive information, as required by 740 ILCS 14/15(e)(2), including whether Meta's withholding of Voicebox model weights from public release demonstrates a comparative-protection standard that Meta did not apply to the underlying biometric source material;

(h)     whether Meta's use of voiceprints and voice embeddings for the training, fine-tuning, evaluation, and operation of commercial voice products

65

constitutes commercial use of an individual's identity within the meaning of 765 ILCS 1075/30(a);

(i)      whether Meta's commercial voice products constitute or generate digital replicas within the meaning of 765 ILCS 1075/30(b), as amended by Public Act 103-836 effective January 1, 2025;

(j)      whether Meta's acquisition, retention, and commercial exploitation of biometric data extracted from Illinois-origin recordings without consent constitute unfair practices within the meaning of 815 ILCS 505/2, as construed in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002);

(k)      whether Meta's public representations concerning training-data sources, consent, and the protection of biometric data constitute deceptive practices within the meaning of 815 ILCS 505/2;

(l)      whether Meta's conduct constitutes deceptive trade practices within the meaning of 815 ILCS 510/2(a)(2) and 510/2(a)(3);

(m)      whether Meta has been unjustly enriched at the expense of Plaintiffs and the Class;

(n)      whether Meta's violations were committed intentionally or recklessly within the meaning of 740 ILCS 14/20(2); and

(o)      the appropriate scope of injunctive relief, including the destruction or retraining, without the unlawfully obtained biometric data, of the foundational audio models and downstream commercial products in which the unlawfully obtained biometric data are encoded.

66

136. *Typicality — Rule 23(a)(3).* The named Plaintiffs' claims are typical of the claims of the Class. Each named Plaintiff is a person whose voice recordings were produced or recorded in Illinois; from whom Meta, on information and belief, extracted voiceprints or voice embeddings for use in training Meta's foundational audio models; who did not provide the informed written consent required by BIPA, IRPA, or any other applicable statute; and who has been injured by Meta's unlawful conduct in the same manner as every other Class member. The named Plaintiffs' claims arise from the same operative facts and rest on the same legal theories as the claims of the absent Class members.

137. *Adequacy — Rule 23(a)(4).* The named Plaintiffs will fairly and adequately protect the interests of the Class. The named Plaintiffs have no interests adverse to those of the Class. Each named Plaintiff has retained counsel experienced in complex class action litigation, biometric privacy litigation, and Illinois consumer protection litigation. Class counsel have the resources and commitment necessary to prosecute this action vigorously on behalf of the Class.

138. *Rule 23(b)(2) Certification.* Meta has acted, and continues to act, on grounds generally applicable to the Class, by acquiring, retaining, and commercially exploiting biometric data extracted from Illinois-origin recordings without the consent of Plaintiffs and Class members. Final injunctive and declaratory relief is appropriate respecting the Class as a whole, including injunctive relief requiring the destruction or retraining, without the unlawfully

obtained biometric data, of the foundational audio models and downstream commercial products in which the unlawfully obtained biometric data are encoded; injunctive relief requiring Meta to cease ongoing collection, retention, and commercial exploitation of biometric data extracted from Illinois-origin recordings without BIPA § 15(b)-compliant consent; declaratory relief establishing Meta's violations of BIPA, IRPA, ICFA, and IUDTPA; and such other injunctive and declaratory relief as the Court deems just. Certification of the Class under Rule 23(b)(2) is therefore appropriate.

139. *Predominance.* Common questions predominate because Meta's BIPA compliance (or non-compliance) was uniform and classwide. Meta did not engage in individualized notice or consent processes with any class member. The question of whether Meta's training pipeline extracted voiceprints and/or biometric information is a common technical question. The question of whether Meta complied with § 15(a), (b), (c), (d), and (e) before extracting those voiceprints and/or biometric information is a common legal question with a common answer. The question of willfulness versus negligence turns on Meta's corporate knowledge and decision-making, which is classwide. Individual questions, primarily whether a specific class member's voice appears in the training data, are binary, objective, and determinable from Meta's own records, and they do not predominate over the common questions that drive the resolution of the litigation.

140. *Superiority.* A class action is the superior method for adjudicating these claims. The relevant factors confirm this conclusion:

(a)     *Interest of individual class members in controlling prosecution.* Individual class members, many of whom are voice actors, narrators, podcasters, and journalists who may be unaware that their voiceprints and/or biometric information were extracted, are unlikely to have the resources or incentive to prosecute individual BIPA actions against a company with a market capitalization of approximately $1.81 trillion. Individual statutory damages, while significant in the aggregate, may be modest for any single class member, making individual litigation economically impractical. A class action is the only realistic vehicle for redressing these widespread violations.

(b)     *Extent and nature of existing litigation.* The *Delgado* action in the Northern District of California asserts BIPA voiceprint claims arising from Meta's collection of voice data from individuals who interact with Meta's consumer products (Facebook, Messenger). The present action is independent of Delgado: it focuses on Meta's extraction of voiceprints from third-party-sourced training-data recordings of professional voice talent who never created a Meta account for the purpose of contributing voice training data, never agreed to any Meta terms governing AI training use of their professional voice work, and never had any contractual relationship with Meta governing the use of their professionally produced and distributed voice content. No other class action asserting these claims against Meta on behalf of Illinois residents whose professional voice recordings were used as training data is known to Plaintiffs at this time.

69

(c)      *Desirability of concentration in this forum.* Concentrating this litigation in this District promotes efficiency. Plaintiffs are Illinois residents. The claims arise under Illinois statutes. The injuries were suffered in Illinois. This Court is well suited to adjudicate BIPA and other Illinois statutory claims.

(d)      *Likely difficulties in managing the class action.* This case is manageable as a class action. Meta's conduct was uniform and automated. The common questions identified above are susceptible to common proof. Class membership can be determined from Meta's own records. The damages framework under BIPA provides for per-violation liquidated damages that do not require individualized proof of actual damages. No unusual management difficulties are anticipated.

141.    To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Meta's concealment of its training-data sources, by Meta's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Meta had ingested their recordings into its training pipelines, and by the continuing nature of Meta's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational audio models in which the unlawfully obtained biometric data is encoded, each disclosure or transmission of that biometric data, and each public release of model parameters encoding that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 2023 IL 128004 (Ill. 2023), each

accruing a separate limitations period from the date of the discrete violative act.

**CLAIMS FOR RELIEF**

**Count I**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)**

*Brought on behalf of the Class*

142. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

143. Plaintiffs bring this Count individually and on behalf of the Class.

144. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

145. Meta is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

146. Meta collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class

71

members by ingesting their voice recordings into the training pipelines for Voicebox, Audiobox, the Massively Multilingual Speech model, SeamlessM4T, and the foundational audio models on which Meta's commercial voice products are built, and extracting from those recordings computational representations capable of identifying the speakers, as alleged at ¶¶ 31-38, 41 and ¶¶ 75-109. The resulting representations — variously denominated in Meta's technical and product documentation as speaker embeddings, audio tokens, voice prompts, and acoustic representations — are voiceprints and biometric information within the meaning of BIPA.

147. Meta did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Meta obtained no consent of any kind, in any form, from any Plaintiff or Class member, as alleged at ¶¶ 78, 83, 88, 93, 98, 103, 108. Meta's retroactive Terms of Service amendments cannot supply BIPA-compliant consent for the reasons alleged at ¶¶ 44-47.

148. Meta's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

149. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay*, in the amount of $1,000 per

72

negligent violation or $5,000 per intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

## Count II

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)

*Brought on behalf of the Class*

150.   Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

151.   Plaintiffs bring this Count individually and on behalf of the Class.

152.   Section 15(a) of BIPA requires a private entity in possession of biometric identifiers to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never interacted with Meta in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

153.   Meta has been, and remains, in possession of voiceprints and biometric information extracted from recordings of Plaintiffs and Class members, as alleged at ¶¶ 31-38, 41, and ¶¶ 75-109.

154. Meta has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training data and embedded in the parameters of Meta's foundational audio models. Meta's consumer-facing privacy notices contain retention provisions tied to consumer interaction with Meta's products. Those provisions are facially inapplicable to Plaintiffs and Class members, who had no consumer interaction with the Meta products that gave rise to the use of their voice recordings as training data. Meta has not provided, and on information and belief does not maintain, any mechanism by which non-user training-data subjects can request access to, correction of, or deletion of their biometric data.

155. Meta has developed and made publicly available retention and destruction schedules and policies governing other categories of confidential and sensitive information, including user account data, advertising data, and the personally identifiable information of authenticated users. Meta has done so because its legal and compliance functions understand the statutory and regulatory expectations that attach to those categories of data. Meta's failure to develop and publish an analogous policy for the biometric data encoded in its foundational audio models — biometric data that Meta retains indefinitely, that Meta cannot recover or destroy by deleting a row in a database because the data is encoded in commercial model weights, and that Meta has affirmatively disseminated through research-community releases — is conduct measured against Meta's own published practice for comparable categories of data.

156. Meta's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

157. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count III

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)

*Brought on behalf of the Class*

158. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

159. Plaintiffs bring this Count individually and on behalf of the Class.

160. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier may sell, lease, trade, or otherwise profit from a person's biometric identifier. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

161. Meta has profited and continues to profit from Plaintiffs' and Class members' voiceprints and biometric information by using them to develop, train, and commercially operate the foundational audio models that power Meta's commercial voice products, and by monetizing those products through the integrated commercial chain, including (i) advertising revenue and engagement gains attributable to Meta AI assistant deployments across Facebook, Instagram, WhatsApp, Messenger, and Threads; (ii) revenue and platform value attributable to AI Studio's voice-enabled character products; (iii)

75

hardware revenue and product differentiation attributable to Ray-Ban Meta smart glasses; (iv) API, cloud, and partner-channel revenue attributable to commercial deployment of Meta's foundational audio models; (v) developer-ecosystem and commercial-moat value generated through open-weight and gated releases of Meta's foundation-model families; and (vi) strategic deployment value across Meta's broader product portfolio. The voice quality, expressiveness, speaker similarity, and multilingual capability that Meta monetizes through these channels exists because of the voiceprints and biometric information encoded in Meta's foundational audio models. Meta's commercial exploitation of Plaintiffs' and Class members' voiceprints does not fall within any exception to § 15(c).

162. Meta's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

163. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count IV

## Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)

*Brought on behalf of the Class*

164. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

165. Plaintiffs bring this Count individually and on behalf of the Class.

166. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier may disclose, redisclose, or otherwise disseminate a

person's biometric identifier unless an enumerated exception applies. 740 ILCS 14/15(d).

167. Meta has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information in three categories of conduct, each independently sufficient to violate § 15(d): (a) transmission among Meta-affiliated corporate entities; (b) transmission to vendors, service providers, third-party reviewers, and cloud-infrastructure partners; and (c) affirmative public release of model parameters encoding the biometric data. Each category is alleged in detail at ¶¶ 118-120. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

168. Meta's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

169. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

### Count V

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)

*Brought on behalf of the Class*

170. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

171. Plaintiffs bring this Count individually and on behalf of the Class.

172. Section 15(e) of BIPA requires a private entity in possession of biometric identifiers to store, transmit, and protect the identifiers from

disclosure (1) using the reasonable standard of care within the entity's industry, and (2) in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: a private entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

173. Meta is a "private entity" within the meaning of BIPA. 740 ILCS 14/10. The voiceprints, voice embeddings, and derived biometric representations Meta extracted from Plaintiffs' and Class members' recordings are "biometric identifiers" within the meaning of 740 ILCS 14/10, and the information derived from those identifiers is "biometric information" within the same definition.

174. The reasonable standard of care for the storage, transmission, and protection from disclosure of biometric identifiers in the AI-research industry, throughout the Class Period, requires at minimum: affirmative provenance review of audio training corpora to identify recordings whose acquisition, redistribution, or commercial use requires consent under applicable biometric privacy statutes; exclusion of such recordings absent documented consent, or alternatively the obtaining of consent prior to ingestion; maintenance of records sufficient to permit downstream auditing of training-data provenance; and

78

implementation of access controls, encryption, and retention limits commensurate with the irrevocability of biometric identifiers.

175. Meta has had actual, adjudicated notice of BIPA's requirements since no later than 2019, as alleged at ¶¶ 123-126.

176. Despite this notice, Meta failed to implement any of the foregoing standard-of-care measures with respect to the voice recordings ingested for the training of Voicebox, Audiobox, MMS, SeamlessM4T, and the foundational audio models on which Meta's commercial voice products are built. Meta did not conduct a provenance review for Illinois-origin recordings. Meta did not exclude such recordings. Meta did not obtain consent. Meta did not maintain records sufficient to permit auditing of which Illinois-origin recordings were ingested. Meta implemented none of the access, retention, or use limitations that a reasonable AI-research entity with actual notice of BIPA would have implemented. Meta's conduct falls below the reasonable standard of care in its industry under § 15(e)(1).

177. Meta fails the § 15(e)(2) asymmetry test. Meta's established institutional practice with respect to its foundational voice models is to retain the encoded biometric data within model weights, training corpora, internal storage, and derivative embeddings without consent, without provenance documentation, and without the access controls Meta applies to its other confidential and sensitive information. Meta does not protect biometric identifiers in the same manner.

79

178. Meta treats its own commercial AI artifacts as confidential and sensitive information. Meta restricts access to its trained model weights, training configurations, evaluation datasets, and research methodologies through access controls, internal classification regimes, non-disclosure agreements with employees and contractors, and selective external release. Meta likewise protects its advertising data, enterprise customer data, internal financial information, employee personal information, and the personally identifiable information of users who have authenticated accounts on Meta's consumer platforms through layered technical, contractual, and policy safeguards.

179. Meta's withholding of Voicebox, alleged at ¶ 52, is a concrete instance of the protective regime Meta applies when Meta perceives reputational or legal exposure. Voicebox's capabilities are directly derived from, and encode, biometric identifiers extracted from voice recordings, and Meta has acknowledged that Voicebox is sufficiently sensitive that it would not be exposed through an open release.

180. The asymmetry is structural and operative. The same biometric data Meta treats as too sensitive to expose through model weight release is biometric data Meta did not adequately protect at the points of acquisition, storage, transmission, and incorporation into commercial products. Meta acquired the voice recordings without consent and without provenance review. Meta ingested the recordings into training pipelines without access controls calibrated to the sensitivity of biometric identifiers. Meta extracted voiceprints,

80

voice embeddings, and derived biometric representations and incorporated them into model weights that Meta itself regards as too sensitive to release publicly. Meta retains the underlying biometric data and the derivative models without consent, without retention limits, and without the comparative-protection regime that § 15(e)(2) requires. Meta has, moreover, affirmatively published the parameters of foundational audio models in which the unlawfully obtained biometric data of Plaintiffs and Class members is encoded, as alleged at ¶ 120. Open release is publication, not protection, and it is the operative violation of § 15(e)(2)'s asymmetry requirement.

181. Meta's violations of § 15(e)(1) and § 15(e)(2) are continuing. Every day Meta retains the unlawfully obtained biometric data in its training corpora, internal storage systems, derivative embeddings, and trained model weights without the standard of care required by § 15(e)(1) and without the comparative protection required by § 15(e)(2), Meta commits fresh violations of § 15(e).

182. Meta's violations of § 15(e) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

183. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I, and the injunctive and equitable relief set forth in the Prayer for Relief, including the destruction or retraining, without the unlawfully obtained biometric data, of the foundational models and downstream commercial products in which the unlawfully obtained biometric data are encoded.

81

## Count VI

### Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.

*Brought on behalf of the Class*

184. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

185. Plaintiffs bring this Count individually and on behalf of the Class.

186. The Illinois Right of Publicity Act protects an individual's right to control the commercial use of the individual's identity. 765 ILCS 1075/30(a) provides that a person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the individual. IRPA defines "identity" to include "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

187. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

188. Meta used Plaintiffs' and Class members' identities for commercial purposes within the meaning of IRPA, by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate the commercial voice products that Meta monetizes through the integrated commercial channels. Meta holds

82

out its products' ability to generate realistic, expressive, and human-sounding voices — and, in the case of Voicebox and Audiobox, the ability to generate speech in a target voice from short audio prompts — as a core commercial feature, a capability built from the identities of the individuals whose recordings were used to train the foundational models. Meta did not obtain written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

189. Voicebox is capable, by Meta's own description, of producing high-quality speech in a target voice from an audio prompt as short as two seconds; Audiobox extends that capability with voice-style prompting from audio as short as three seconds. The professional vocal performances of every Plaintiff in this case include continuous, studio-quality audio of materially greater duration than the threshold Meta's own models require to produce a recognizable replica. The technical capability to produce an unauthorized digital replica of each Plaintiff within the meaning of 765 ILCS 1075/30(b) is therefore not contingent or hypothetical. It is operational and present, and it exists because Plaintiffs' voiceprints are, on information and belief, encoded in the foundational audio models on which Voicebox and Audiobox are built.

190. Independently, the Illinois Right of Publicity Act, as amended by P.A. 103-836 effective January 1, 2025, prohibits the knowing distribution, transmission, or making available to the general public of a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent or the consent of an authorized representative.

83

765 ILCS 1075/30(b). The amended IRPA further imposes liability on any person who materially contributes to, induces, or facilitates such distribution. *Id.* Meta's Voicebox and Audiobox models — together with the foundational audio models on which Meta's commercial voice products are built — are designed to and do generate, transmit, and make available voice outputs that constitute unauthorized digital replicas of the individuals whose voice recordings comprised the training data, including Plaintiffs and Class members. Meta materially contributes to and facilitates the distribution of such replicas through the integrated commercial channels, including Meta AI assistant deployments across Facebook, Instagram, WhatsApp, Messenger, and Threads; AI Studio's voice-enabled character products; Ray-Ban Meta smart glasses; and Meta's Reels AI voice translation feature, which expressly mimics the sound and tone of a creator's voice in synthesized output.

191. Meta's violations of IRPA were willful and knowing, as alleged at ¶¶ 122-129. Meta's institutional capability to obtain consent for the commercial use of human voices is confirmed by Meta's conduct, as alleged at ¶¶ 50-51 (celebrity voice licensing and Universal Music Group) and ¶¶ 56-60 (Illinois/Texas carve-out of the Reels translation feature). Meta therefore knows how to obtain consent for the commercial use of human voices, and knows that Illinois law constrains the commercial use of human voices, and applied that knowledge to celebrity voices Meta wished to license while declining to apply it to the voices of Plaintiffs and Class members whose recordings Meta had already used to train its foundational models.

192. Plaintiffs and the Class have suffered concrete injury from Meta's IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harms, including the diversion of licensing value and the diminished demand for authentic vocal performances in the markets where Plaintiffs and Class members earn their livelihoods.

193. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, profits attributable to Meta's unauthorized use of Plaintiffs' and Class members' identities, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are below that amount, punitive damages, injunctive relief, attorneys' fees pursuant to 765 ILCS 1075/55, and such other relief as the Court deems just and proper.

## Count VII

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

*Brought on behalf of the Class*

194. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

195. Plaintiffs bring this Count individually and on behalf of the Class.

196. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices ... in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices is broader than its prohibition of deceptive practices and reaches conduct that, even

absent affirmative misrepresentation, offends Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002).

197.   Meta engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice-enabled products and services to Illinois customers, and by collecting, extracting, and commercially exploiting the biometric identifiers and biometric information of Illinois persons in connection with that commerce.

198.   Meta's conduct is unfair within the meaning of ICFA. Meta's collection and commercial exploitation of the biometric identifiers and biometric information of Illinois persons, without their knowledge or consent, offends Illinois public policy as expressed in BIPA — the Illinois statute enacted specifically to address the unauthorized collection of biometric identifiers, 740 ILCS 14/5 — and as expressed in IRPA — the Illinois statute enacted specifically to address the unauthorized commercial use of personal identity, 765 ILCS 1075/30. Meta's conduct caused substantial injury to Plaintiffs and Class members, including the diversion of licensing income they would otherwise have earned for the use of their voices and the displacement of their professional voice work in the markets where they earn their livelihoods, as alleged at ¶¶ , 79, 84, 89, 94, 99, 104, 109. Plaintiffs and Class members could not reasonably have avoided this injury because they had no knowledge that Meta was collecting their biometric data.

199. Meta's conduct is also independently deceptive within the meaning of ICFA. Meta has, throughout the Class Period, characterized the sources of its AI training data in general or aggregate terms — as "publicly available," "licensed where appropriate," "diverse," or "multilingual" — without disclosing that the training data included biometric voice identifiers extracted from voice recordings of identifiable individuals without consent, as alleged at ¶ 32. Meta's asymmetric disclosure to European Union and United Kingdom users — to whom Meta disclosed the use of publicly posted content for AI training and provided an opt-out mechanism, while withholding the equivalent disclosure and opt-out from U.S. users including Illinois persons, as alleged at ¶ 48 — is itself a deceptive omission within the meaning of ICFA. Meta maintained substantial opacity about the sources of its voice training data while commercially exploiting that data at scale.

200. Meta's unfair and deceptive conduct proximately caused actual injury to Plaintiffs and Class members, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Meta's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, and not merely from the existence of competing AI products.

201. Meta's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged at ¶¶ 122-129.

87

202. Plaintiffs and the Class seek all relief available under ICFA, including actual damages, punitive damages under 815 ILCS 505/10a, injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

## Count VIII

### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.

*Brought on behalf of the Class (injunctive relief only)*

203. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

204. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

205. The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

206. Meta's commercial voice products generate voice outputs that sound like real human speakers, including voice outputs that, on information and belief, replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, shared, and commercially exploited without consumer-facing

disclosure that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. While Meta labels Reels-translated content as translated by Meta AI, no equivalent disclosure attaches to the underlying voice models Meta trained on Plaintiffs' and Class members' voices. The absence of disclosure creates likelihood of confusion or misunderstanding about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content.

207. Plaintiffs and Class members are persons likely to be damaged by Meta's deceptive practices within the meaning of 815 ILCS 510/3. Meta's conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

208. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Meta to provide adequate consumer-facing disclosure that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use. If the Court finds that Meta has willfully engaged in deceptive trade practices within the meaning of 815 ILCS 510/3, Plaintiffs also seek reasonable attorneys' fees.

## Count IX

### Unjust Enrichment (Illinois Common Law)

*Brought on behalf of the Class*

209. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

210. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

211. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

212. Meta obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Meta's foundational audio models; the product capability and competitive advantage Meta captured by training its models on a diverse corpus of professional human voices, including the voices of Plaintiffs and Class members; and the revenue Meta generates and continues to generate through the commercial exploitation of those models.

213. Meta obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and

resources to develop their voices and create professional recordings. Meta's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Meta, and Meta's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

214. Meta's retention of these benefits is unjust. Meta's conduct rests on proof of elements qualitatively different from copyright's exclusive rights — including the absence of biometric consent under BIPA, the absence of identity-rights consent under IRPA, and the unauthorized commercial extraction of biometric and identity-related personal attributes — and the unjust enrichment claim is therefore not preempted by federal copyright law. Meta's conduct violated the Illinois statutory protections for biometric data (BIPA) and for personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Meta's institutional practice confirms the inequity of its retention: Meta pursued lawful licensing where Meta found commercial value in obtaining consent, including Meta's MusicGen model and the celebrity and UMG licensing agreements alleged at ¶¶ 6, 50-51. Meta could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

215. Plaintiffs and the Class seek restitution of the benefits Meta has unjustly retained, including disgorgement of profits Meta earned from the

unauthorized exploitation of Plaintiffs' and Class members' voiceprints and identities, an accounting of those benefits, and such other equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Meta Platforms, Inc. and award the following relief:

A.      *Injunctive Relief.* Permanent and, where appropriate, preliminary injunctive relief requiring Meta to:

(1)      Cease the collection, capture, purchase, receipt through trade, or other obtaining of biometric identifiers from voice recordings produced or recorded in Illinois without first providing the written notice, disclosure of specific purpose and duration of collection, and written release that 740 ILCS 14/15(b) requires;

(2)      Cease the commercial use, sale, lease, trade, profiting from, or dissemination of voiceprints and biometric information of Plaintiffs and Class members that Meta has already collected without BIPA-compliant consent;

(3)      Identify and disclose, by name or other identifying information, the sources of all voice training data used to develop, train, fine-tune, evaluate, or operate Meta's foundational audio models, including without limitation Voicebox, Audiobox, the Massively Multilingual Speech model, SeamlessM4T, and their successors;

92

(4)     Develop and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information of non-users, in compliance with 740 ILCS 14/15(a);

(5)     Destroy all voiceprints and biometric information of Plaintiffs and Class members that Meta obtained without BIPA-compliant consent, and certify the destruction;

(6)     Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the foundational audio models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded, including without limitation Voicebox, Audiobox, the Massively Multilingual Speech model, SeamlessM4T, and their successors, together with any iterative or successor models trained from those models or derived from voiceprints encoded in them; and as to any gated, open-weight, research-community, or other public or partner releases of those models or components thereof, take all reasonable measures to recall and remove the unlawfully encoded model parameters from public and partner availability, including by issuing takedown requests, ceasing further distribution, revoking licenses, and providing notice to known downstream licensees;

(7)     Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a), and cease the distribution, transmission,

93

or making available of sound recordings or audiovisual works containing unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b); and

(8)     Provide adequate consumer-facing disclosure that voice outputs generated by Meta's commercial voice products are AI-generated, are derived from foundational audio models built using voice recordings of unidentified speakers, and have not been authorized by the individuals whose vocal characteristics are reproduced.

B.     *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendant is found liable, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C.     *IRPA Damages.* Award the actual damages Plaintiffs and Class members sustained as a result of Meta's unauthorized commercial use of their identities and voices, the profits Meta earned from that unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages where applicable, and punitive damages under 765 ILCS 1075/40.

D.     *ICFA Damages.* Award the actual economic damages Plaintiffs and Class members sustained as a result of Meta's unfair and deceptive practices, and punitive damages under 815 ILCS 505/10a.

94

E.     *Restitution and Disgorgement.* Order restitution of the benefits Meta has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints and identities; disgorgement of the profits Meta has earned through the integrated commercial chain alleged in this Complaint, including without limitation revenue and value from (i) advertising revenue and user-engagement gains attributable to Meta AI assistant deployments across Facebook, Instagram, WhatsApp, Messenger, and Threads; (ii) AI Studio's voice-enabled character and creator products; (iii) hardware revenue and product differentiation attributable to Ray-Ban Meta smart glasses; (iv) API, cloud, and partner-channel revenue attributable to commercial deployment of Meta's foundational audio models; (v) developer-ecosystem and commercial-moat value generated through open-weight, gated, and research-community releases of Meta's foundation-model families; and (vi) strategic deployment value of voice synthesis and audio generation capability across Meta's broader commercial product portfolio; and an accounting of all such revenues and benefits.

F.     *Non-Duplication.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G.      *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H.      *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendant Meta Platforms, Inc. on all Counts on which Defendant is found liable.

I.      *Attorneys' Fees and Costs.* Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 505/10a (ICFA), 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and any other applicable fee-shifting provision.

J.      *Interest.* Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K.      *Further Relief.* Award such other and further relief as the Court deems just, equitable, and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

96

Dated: May 12, 2026              LOEVY & LOEVY

                                 /s/ Ross Kimbarovsky
                                 _____

                                 Ross Kimbarovsky (6229590)
                                 ross@loevy.com
                                 Jon Loevy (6218524)
                                 jon@loevy.com
                                 Michael Kanovitz (6275233)
                                 mike@loevy.com
                                 Matthew Topic (6290923)
                                 matt@loevy.com
                                 Aaron Tucek (98624)
                                 aaron@loevy.com
                                 LOEVY & LOEVY
                                 311 North Aberdeen, 3rd Floor
                                 Chicago, IL 60607
                                 312.243.5900 (phone)
                                 312.243.5902 (fax)

                                 *Attorneys for Plaintiffs Carol Marin, Philip
                                 Rogers, Alison Flowers, Robin Amer,
                                 Lindsey Dorcus, Yohance Lacour, and
                                 Victoria Nassif.*