**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>       v.<br><br>META PLATFORMS, INC., a Delaware corporation,<br><br>               Defendant. | Case No. 1:26-cv-5438<br><br>District Judge Steven C. Seeger |

**<u>MEMORANDUM OF LAW IN SUPPORT OF
META PLATFORMS, INC.'S MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND..............................................................................................4

LEGAL STANDARD..........................................................................................................5

ARGUMENT .......................................................................................................................6

I. PLAINTIFFS' BIPA CLAIMS FAIL.......................................................................6

    A. Meta Is Not Subject To BIPA Because It Is Exempt Under Section 25(c) ............6

    B. Plaintiffs Do Not Plead Facts Plausibly Showing That Meta Collected Or Possessed Their "Voiceprints"...................................................................................8

        1. Plaintiffs Do Not Plausibly Allege That Meta Used *Their* Particular Voices To Train The Challenged AI Models................................................9

        2. Plaintiffs Do Not Plausibly Allege That, If Meta Used Their Voice Recordings, It Transformed Them Into BIPA-Protected "Voiceprints" Capable Of Identifying Them..............................................11

    C. Plaintiffs' BIPA Claims Suffer From Additional, Claim-Specific Defects...........13

        1. Plaintiffs Lack Standing To Pursue Their Section 15(a) Claim ................13

        2. Plaintiffs' Section 15(c)-(e) Claims Fail Because They Do Not Plausibly Allege That Meta Encodes Voiceprints In The Challenged Models....................................................................................................14

II. PLAINTIFFS' IRPA CLAIMS FAIL......................................................................16

    A. Plaintiffs Fail To Plausibly Allege That Meta Used Their Identities For A "Commercial Purpose" Under Section 30(a)..........................................................16

    B. Plaintiffs Fail To State A Section 30(b) Or 30(d) "Digital Replica" Claim ..........18

III. PLAINTIFFS' ICFA CLAIMS FAIL......................................................................21

    A. Plaintiffs Fail To State An ICFA Deception Claim................................................21

        1. Plaintiffs Fail To Allege A Deceptive Statement ....................................21

        2. Plaintiffs Do Not Plausibly Allege Proximate Cause ..............................23

    B. Plaintiffs Fail To State An ICFA Unfairness Claim...............................................25

1.     Plaintiffs Fail To Plead An Unfair Practice ...............................................25

2.     Plaintiffs Fail To Plead Proximate Cause ..................................................26

IV.     PLAINTIFFS' IUDTPA CLAIM FAILS .............................................................26

V.     PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS ..............................................30

CONCLUSION ......................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amer v. Eleven Labs Inc.*,
No. 26-cv-5437 (N.D. Ill.) ....................................................................................1

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................5, 6, 13

*ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*,
282 F. Supp. 3d 1043 (N.D. Ill. 2017) ...............................................................28

*Atkins v. City of Chicago*,
631 F.3d 823 (7th Cir. 2011) ................................................................................9

*Bartnett v. Abbott Lab'ys*,
492 F. Supp. 3d 787 (N.D. Ill. 2020) .................................................................21

*Batson v. Live Nation Ent., Inc.*,
2013 WL 992641 (N.D. Ill. Mar. 13, 2013), *aff'd*, 746 F.3d 827 (7th Cir.
2014) ...................................................................................................................25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................5, 11

*Bryant v. Compass Grp. USA, Inc.*,
503 F. Supp. 3d 597 (N.D. Ill. 2020) ...................................................................7

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
761 F.3d 732 (7th Cir. 2014) ..............................................................................21

*Connick v. Suzuki Motor Co.*,
675 N.E.2d 584 (Ill. 1996)..................................................................................20

*Craw v. Clorox Co.*,
692 F. Supp. 3d 854 (C.D. Ill. 2023) ......................................................21, 22, 23

*D'Ambrosio v. Meta Platforms, Inc.*,
176 F.4th 928 (7th Cir. 2026) .............................................................................17

*Davis v. e.l.f. Cosms., Inc.*,
2024 WL 2722663 (N.D. Ill. May 28, 2024)................................................14, 15

*Desmond v. Chi. Boxed Beef Distribs., Inc.*,
921 F. Supp. 2d 872 (N.D. Ill. 2013) ..................................................................27

iv

*Doe v. Northwestern Univ.*,
586 F. Supp. 3d 841 (N.D. Ill. 2022) ...................................................................................7

*Dorcus v. Adobe, Inc.*,
No. 26-cv-5575 (N.D. Ill.) .................................................................................................1

*Duerr v. Bradley Univ.*,
590 F. Supp. 3d 1160 (C.D. Ill. 2022) ............................................................................6, 7

*Entm't One UK Ltd. v. 2012Shiliang*,
384 F. Supp. 3d 941 (N.D. Ill. 2019) ...............................................................................27

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)...........................................................................................................29

*Flowers v. Microsoft Corp.*,
No. 26-cv-5491 (N.D. Ill.) .................................................................................................1

*Fox v. Dakkota Integrated Sys., LLC*,
980 F.3d 1146 (7th Cir. 2020) .........................................................................................14

*Hogan v. Amazon.com, Inc.*,
2022 WL 952763 (N.D. Ill. Mar. 30, 2022).......................................................................9

*Hounen Solar, Inc. v. UL LLC*,
2025 WL 3093720 (N.D. Ill. June 26, 2025).....................................................................27

*Huston v. Hearst Commc'ns, Inc.*,
53 F.4th 1097 (7th Cir. 2022) ...............................................................................16, 17, 18

*In re Google Generative AI Copyright Litig.*,
809 F. Supp. 3d 903 (N.D. Cal. 2025)...............................................................................11

*In re Mosaic LLM Litig.*,
2025 WL 2402677 (N.D. Cal. Aug. 19, 2025) ..................................................................11

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ............................................................................................10

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020)...........................................................................................................20

*Kadrey v. Meta Platforms, Inc.*,
2023 WL 8039640 (N.D. Cal. Nov. 20, 2023) ..................................................................15

*Kahn v. Walmart Inc.*,
107 F.4th 585 (7th Cir. 2024) .......................................................................................21, 25

*Lacour v. Apple Inc.*,
No. 26-cv-5536 (N.D. Ill.) ...........................................................................................1

*Lawrence v. Trax Recs., Inc.*,
2025 WL 919616 (N.D. Ill. Mar. 26, 2025)...............................................................27

*Love v. Simmons*,
2024 WL 809107 (N.D. Ill. Feb. 27, 2024) ...............................................................30

*Lynch Ford, Inc. v. Ford Motor Co.*,
957 F. Supp. 142 (N.D. Ill. 1997)..............................................................................28

*MacLeod v. ComEd*,
248 N.E.3d 1133 (Ill. App. 2024).......................................................................24, 26

*Marin v. Alphabet, Inc.*,
No. 26-cv-5436 (N.D. Ill.) ...........................................................................................1

*Martell v. X Corp.*,
2024 WL 3011353 (N.D. Ill. June 13, 2024)..........................................................8, 12

*McGoveran v. Amazon Web Servs., Inc.*,
175 F.4th 434 (3d Cir. 2026) ........................................................................................6

*Mosley v. Gen. Revenue Corp.*,
2020 WL 4060767 (C.D. Ill. July 20, 2020)...............................................................12

*Nassif v. Samsung Elecs. Co., Ltd.*,
No. 26-cv-5567 (N.D. Ill.) ...........................................................................................1

*Parungao v. Cmty. Health Sys., Inc.*,
858 F.3d 452 (7th Cir. 2017) ........................................................................................8

*Patterson v. Respondus, Inc.*,
2022 WL 7100547 (N.D. Ill. Oct. 11, 2022)............................................................6, 7

*Perdue v. Hy-Vee, Inc.*,
455 F. Supp. 3d 749 (C.D. Ill. 2020) .........................................................................30

*Praither v. Northbrook Bank & Tr. Co.*,
192 N.E.3d 747 (Ill. App. 2021) ................................................................................20

*Ramirez v. LexisNexis Risk Sols.*,
729 F. Supp. 3d 838 (N.D. Ill. 2024) .........................................................................24

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017) .......................................................................15

*Roake v. Forest Pres. Dist. of Cook Cnty.*,
849 F.3d 342 (7th Cir. 2017) ...........................................................................5, 9

*Rogers v. Amazon.com, Inc.*,
No. 26-cv-5497 (N.D. Ill.) .....................................................................................1

*Rogers v. Nvidia Corp.*,
No. 26-cv-5478 (N.D. Ill.) .....................................................................................1

*Rowe v. Papa John's Int'l, Inc.*,
2024 WL 3925411 (N.D. Ill. Aug. 23, 2024) .........................................................1

*Speakers of Sport, Inc. v. ProServ, Inc.*,
178 F.3d 862 (7th Cir. 1999) ...............................................................................26

*Strautins v. Trustwave Holdings, Inc.*,
27 F. Supp. 3d 871 (N.D. Ill. 2014) .....................................................................11

*Thornley v. Clearview AI, Inc.*,
984 F.3d 1241 (7th Cir. 2021) ...............................................................................1

*Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*,
241 N.E.3d 454 (Ill. 2024) ..............................................................................21, 23

*Vanzant v. Hill's Pet Nutrition, Inc.*,
934 F.3d 730 (7th Cir. 2019) .....................................................................21, 23, 30

*Watts v. Emergency Twenty Four, Inc.*,
2021 WL 2529613 (N.D. Ill. June 21, 2021) ........................................................13

*Zellmer v. Meta Platforms, Inc.*,
104 F.4th 1117 (9th Cir. 2024) .............................................................................12

## STATUTES

740 ILCS 14/5(a) ....................................................................................................1

740 ILCS 14/10 ...................................................................................................8, 12

740 ILCS 14/15 ........................................................................................................22

740 ILCS 14/15(a) .........................................................................................6, 13, 14

740 ILCS 14/15(c) ....................................................................................6, 13, 14, 15

740 ILCS 14/15(d) .........................................................................................6, 13, 14

740 ILCS 14/15(e) ......................................................................................... *passim*

740 ILCS 14/25(c) ........................................................................................................1, 6, 7, 8

765 ILCS 1075/5 ...........................................................................................................2, 16, 17, 18

765 ILCS 1075/30 ........................................................................................................17

765 ILCS 1075/30(a) ...................................................................................................2, 16, 17, 18

765 ILCS 1075/30(b) .................................................................................................. *passim*

765 ILCS 1075/30(d) .................................................................................................. *passim*

815 ILCS 505/2 ............................................................................................................21

815 ILCS 510/2(a)(2)-(3) ............................................................................................3, 27, 28

815 ILCS 510/3 ............................................................................................................27

12 U.S.C. § 1843(k)(4)(A) ..........................................................................................7

15 U.S.C. § 6809(3)(A) ...............................................................................................7

15 U.S.C. § 6809(6) .....................................................................................................7

## OTHER AUTHORITIES

Audible, *Learn about the Audible Standard Membership*,
https://help.audible.com/s/article/learn-about-standard-plan?language=en_US
(last visited July 30, 2026) ........................................................................................10

California Department of Financial Protection and Innovation, *Directory of
Money Transmitters*, https://dfpi.ca.gov/regulated-industries/money-
transmitters/directory-of-money-transmitters/ (updated July 29, 2026) ...................7

Massachusetts Division of Banks, Money transmitter licensee list (as of June 30,
2026), available for download at https://www.mass.gov/lists/download-a-list-
of-approved-licensees ................................................................................................7

Meta, AI at Meta: *Transparency about our training data*,
https://transparency.meta.com/features/ai-at-meta-training-data/ (last visited
July 30, 2026) .............................................................................................................22

Meta Platforms, Inc., Annual Report (Form 10-K) (Jan. 29, 2026), Ex. 21.1,
https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/b919eb05-86d9-
4412-a8ff-308be1afb070.pdf .....................................................................................7

Meta, *Privacy Policy* (effective Dec. 16, 2025),
https://www.facebook.com/privacy/policy/version/25862970456621906/ .............22

Meta, *Privacy Policy* (effective July 23, 2026),
    https://www.facebook.com/privacy/policy/ ............................................................22

No. Public Access 17-011, 2017 WL 10084298 (Ill. A.G. Aug. 14, 2017)....................................8

Spotify, *Audiobooks in Premium: Get lost in great stories*,
    https://www.spotify.com/us/audiobooks/ (last visited July 30, 2026)....................................10

Texas Department of Banking Entity Search, Entry for Meta Payments Inc.,
    https://www.dob.texas.gov/entity-search/entity-
    detail?bid=10346&eid=26&bn=0;
    https://www.facebook.com/payments_terms/licenses ............................................................7

**INTRODUCTION**

"This case is another drop in the tidal wave of cases under the Illinois Biometric Information Privacy Act [("BIPA")] that has crashed down and flooded courthouses across the state." *Rowe v. Papa John's Int'l, Inc.*, 2024 WL 3925411, at *1 (N.D. Ill. Aug. 23, 2024). No doubt due to its punishing damages provisions, BIPA has spurred "a spate of litigation testing the limits of the law's protections." *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1242 (7th Cir. 2021). This case seeks to stretch BIPA—and other Illinois statutes—far beyond those limits.

Plaintiffs are journalists and audiobook narrators who brought a suite of lawsuits against various companies seeking to redress alleged "compet[ition]" from AI voice technology "in the markets where they earn their living." Dkt. 1 ¶¶ 2, 9.[1] In Plaintiffs' telling, Meta's development and deployment of certain AI voice models violated not only each operative provision of Section 15 of BIPA, but also the Illinois Right of Publicity Act ("IRPA"), Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), and Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"). Plaintiffs fail to state a claim under any of those laws.

Plaintiffs' BIPA claims suffer from a threshold defect: Because Meta is an "affiliate" of a "financial institution" (Meta Payments Inc.) regulated under the Gramm-Leach-Bliley Act, Section 25(c) of BIPA exempts Meta from the law's substantive requirements. 740 ILCS 14/25(c). In any event, Plaintiffs' BIPA claims fail even absent that exemption. Enacted in response to the growing "use of biometrics … in the business and security screening sectors," 740 ILCS 14/5(a),

---

[1] *See Marin v. Alphabet, Inc.*, No. 26-cv-5436 (N.D. Ill.); *Amer v. Eleven Labs Inc.*, No. 26-cv-5437 (N.D. Ill.); *Rogers v. Nvidia Corp.*, No. 26-cv-5478 (N.D. Ill.); *Flowers v. Microsoft Corp.*, No. 26-cv-5491 (N.D. Ill.); *Rogers v. Amazon.com, Inc.*, No. 26-cv-5497 (N.D. Ill.); *Lacour v. Apple Inc.*, No. 26-cv-5536 (N.D. Ill.); *Nassif v. Samsung Elecs. Co., Ltd.*, No. 26-cv-5567 (N.D. Ill.); *Dorcus v. Adobe, Inc.*, No. 26-cv-5575 (N.D. Ill.). Plaintiff Flowers is not a party in the Amazon and Apple cases.

1

BIPA ensures that companies that collect biometric data engage in the proper handling, storage, and retention of that data. Those concerns are worlds away from Plaintiffs' speculation that their ability to thrive economically in audio-related fields will conceivably be harmed by competition from AI voice technologies.

To try to bring within BIPA's ambit their objections to Meta's AI training, Plaintiffs rely on a series of speculative and implausible assumptions. First, they posit that because their voices are "distinguished in their fields," Dkt. 1 ¶ 2, Meta must have used recordings of *their* specific voices—out of *all* available audio—to train the relevant AI models, *see id.* ¶ 31. Plaintiffs then speculate that, during the training process, Meta converted Plaintiffs' voice recordings—which themselves are not covered by BIPA—into BIPA-protected voiceprints capable of identifying the original speaker, *id.* ¶ 37, even though they allege (i) no facts to support that implausible inference and (ii) absolutely no reason for Meta to do so. This Court should reject Plaintiffs' effort to leverage rank speculation to extend BIPA beyond what the General Assembly intended.

Plaintiffs' other claims similarly fail. Plaintiffs assert Meta violated IRPA's prohibitions on unauthorized use of a person's "identity" for a "commercial purpose" and the distribution of "unauthorized digital replica[s]" of a person's voice. 765 ILCS 1075/30(a), (b), (d). But they plead no facts indicating that Meta has "public[ly] use[d] or h[eld] out" their identities to sell its models, as IRPA's "commercial use" prohibition requires. 765 ILCS 1075/5. Quite the opposite, Plaintiffs criticize Meta for *failing* to sufficiently "attribute[]" their purported personal roles in the creation of AI voice models. *Cf., e.g.*, Dkt. 1 ¶ 207. Nor do Plaintiffs plausibly allege that Meta distributed any particular "digital replica" of their voices or that it materially contributed, with actual knowledge, to such distribution. At most, Plaintiffs allege that some of Meta's models have the "capability" to do so because they can mimic *any* "target voice" based on a short sample. *Id.*

2

¶ 189. That theory, if accepted, would render any technology capable of emulating sample speech an IRPA violation as to every person in Illinois. IRPA's text, including its "actual knowledge" requirement, guards against that result and forecloses Plaintiffs' "digital replica" claim.

Plaintiffs' allegations are likewise a poor fit for ICFA, a consumer protection statute that prohibits statements or practices that are "unfair" or "deceptive" to a "reasonable consumer." Plaintiffs do not claim to be "consumers" of Meta's AI voice services, nor do they plausibly allege that Meta's challenged statements would likely mislead a reasonable consumer. Instead, they incorrectly contend that ICFA imposes an affirmative labeling requirement, forcing companies to anticipate and dispel incorrect assumptions a consumer may have about particular products. But an ICFA deception claim must rest on a defendant's actual representations, not a plaintiff's own assumptions or implausible extrapolations from the defendant's statements. Plaintiffs also fail to plead an unfair practice under ICFA, because they do not plausibly allege that Meta's challenged conduct violates public policy or substantially injures consumers. And ICFA's proximate cause requirement independently dooms Plaintiffs' claims under both theories, because the labels and disclosures they would impose on Meta would not redress their claimed competitive harms.

For similar reasons, Plaintiffs' claims are not cognizable under IUDTPA. As relevant here, IUDTPA prohibits conduct that creates a likelihood of confusion as to a product's source, sponsorship, or affiliation. *See* 815 ILCS 510/2(a)(2)-(3). Plaintiffs do not allege that Meta has created such confusion. Instead, they suggest that because downstream nonparties *other than* Meta could hypothetically use Meta's models in ways that generate consumer confusion or falsely suggest affiliation, *Meta* must disclose, at the point of audio generation, "that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use." Dkt. 1 ¶ 208. But, like ICFA, IUDTPA imposes no such free-floating labeling

requirement. Ultimately, Plaintiffs do not plausibly allege that their claimed injuries stem from Meta's conduct or would be remedied by requiring the labels they demand.

At bottom, Plaintiffs' statutory claims reflect professional anxiety in search of a cause of action. The same holds for their tagalong unjust enrichment claim. Plaintiffs may fear AI-driven disruption to their respective industries, but that does not justify stretching Illinois statutes beyond their plain meaning or purpose. The complaint should be dismissed.

## FACTUAL BACKGROUND

This case concerns certain of Meta's AI audio models—including Voicebox, Audiobox, the Massively Multilingual Speech model, and SeamlessM4T—that allow users to create audio containing translated speech and use AI-generated voices, among other things. Dkt. 1 ¶¶ 1, 9, 56. Plaintiffs are seven Illinois residents who work in broadcast journalism, podcasting, and audiobook narration and whose professional voice recordings are publicly available on multiple platforms, including broadcast digital archives, podcast and audiobook distribution platforms, and YouTube. *Id.* ¶¶ 13-19, 66, 76, 81, 86, 91, 96, 101, 106.

Plaintiffs' claims are premised on the unsupported assertion—pleaded on "information and belief"—that Meta "ingested" recordings of *their* specific voices in training the challenged AI models. *Id.* ¶¶ 77, 82, 87, 92, 97, 102, 107. But Plaintiffs identify no facts to support this key supposition. Instead, their theory appears to be that, because their voices are "distinguished in their fields," *id.* ¶ 2, Meta must have used *their* voices to train the models.

From there, Plaintiffs go on to speculate that, in training the models, Meta must have transformed their regular voice recordings—which fall outside BIPA's scope—into BIPA-protected "voiceprints" capable of identifying the original speaker. Plaintiffs acknowledge that, to be a "voiceprint" under BIPA, a "digital fingerprint of the human voice" must "identif[y]" a specific speaker. *Id.* ¶ 3-4. But, critically, they never explain how the challenged models—

4

which, in Plaintiffs' telling, generate *new* audio, *id.* ¶ 188—are capable of identifying them (or any other speaker), or why they would be. Plaintiffs do not, for example, allege that Meta collected or retained speaker-identifying information in the process of training the models.

Plaintiffs next speculate—again, without supporting factual allegations—that their supposed voiceprints are somehow "encoded in the parameters" of the relevant models, such that the voiceprint and the model are "the same thing." *Id.* ¶ 8. Relying on this "encoded in the model" theory, Plaintiffs posit that Meta disseminates their supposed biometric data every time it deploys the challenged models or makes their parameters available—regardless of whether Plaintiffs can be "identified" by any aspect of the AI. *E.g.*, *id.* ¶¶ 28, 117-121. All told, Plaintiffs claim that Meta violated Sections 15(a)-(e) of BIPA. *Id.* ¶¶ 142-183 (Counts I-V).

Plaintiffs also allege that Meta violated IRPA, ICFA, and IUDTPA by, among other things, using their identities for a commercial purpose without their consent; materially contributing to and facilitating the distribution of "unauthorized digital replicas" of their voices; and failing to make certain disclosures that Plaintiffs desire. *Id.* ¶¶ 184-208 (Counts VI-VIII). Finally, Plaintiffs bring an unjust enrichment claim under Illinois common law, theorizing that Meta unjustly benefitted at their expense through its (alleged) use of their "voice recordings, voiceprints, and identity attributes." *Id.* ¶¶ 209-215 (Count IX).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because that standard demands "more than a sheer possibility that a defendant has acted unlawfully," a complaint must plead facts that are more than "'merely consistent with' a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, only "well-pleaded factual allegation[s]" are "entitled to a presumption of truth." *Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 347 n.4 (7th

5

Cir. 2017). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted).

## ARGUMENT

## I. PLAINTIFFS' BIPA CLAIMS FAIL

Multiple, independent defects doom Plaintiffs' BIPA claims. The claims fail at the threshold because Section 25(c) exempts Meta from BIPA. Even if BIPA applied to Meta, Plaintiffs' claims fail because they do not plausibly allege that Meta (1) trained the challenged AI models on their voices in particular or (2) extracted and retained BIPA-protected "voiceprints" in the process. On top of those cross-cutting (and dispositive) flaws, Plaintiffs' claims under Sections 15(a), (c), (d), and (e) suffer from other claim-specific defects.

### A. Meta Is Not Subject To BIPA Because It Is Exempt Under Section 25(c)

Plaintiffs have no viable BIPA claims against Meta because, as an "affiliate" of a "financial institution" regulated under the Gramm-Leach-Bliley Act ("GLBA"), Meta is exempt from BIPA. Section 25(c) excludes from BIPA's reach "financial institution[s] … subject to Title V of the [GLBA] and the rules promulgated thereunder." 740 ILCS 14/25(c). The term "financial institution" in Section 25(c) extends more broadly than traditional financial institutions, including to entities like schools and technology companies. *E.g.*, *Duerr v. Bradley Univ.*, 590 F. Supp. 3d 1160, 1164, 1171 (C.D. Ill. 2022) (private university); *McGoveran v. Amazon Web Servs., Inc.*, 175 F.4th 434, 439 (3d Cir. 2026) (authentication services provider). And, significant here, Section 25(c) extends to "affiliate[s]" of covered financial institutions. 740 ILCS 14/25(c).

BIPA incorporates the GLBA's definitions of "affiliate" and "financial institution." *See Patterson v. Respondus, Inc.*, 2022 WL 7100547, at *2-6 (N.D. Ill. Oct. 11, 2022); *Duerr*, 590 F.

Supp. 3d at 1168-71.[2]  The GLBA defines "'financial institution'" to mean "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." 15 U.S.C. § 6809(3)(A).  As relevant here, 12 U.S.C. § 1843(k)(4)(A) states that "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities" all qualify as "financial in nature."  And the GLBA defines "'affiliate'" to mean "any company that controls, is controlled by, or is under common control with another company."  15 U.S.C. § 6809(6).

Under these definitions, Meta is exempt from BIPA as "an affiliate of a financial institution that is subject to" the GLBA.  Defendant Meta Platforms, Inc. is the parent company of Meta Payments Inc.,[3] which is registered in most states to transmit money[4] and thus a "financial institution" for GLBA purposes.  Because Meta "controls" Meta Payments Inc., Meta is "an affiliate of a financial institution that is subject to" the GLBA, and thus exempt from BIPA.  15 U.S.C. § 6809(6); 740 ILCS 14/25(c).  Courts have dismissed BIPA claims where, as here, a defendant demonstrates its exempt status under Section 25(c) using documents subject to judicial notice.  *See Duerr*, 590 F. Supp. 3d at 1171; *Doe v. Northwestern Univ.*, 586 F. Supp. 3d 841,

---

[2] This construction "ensure[s] that BIPA does not duplicate or conflict with the GLBA by subjecting any entities to both statutes."  *Patterson*, 2022 WL 7100547, at *4; *see also Bryant v. Compass Grp. USA, Inc.*, 503 F. Supp. 3d 597, 601 (N.D. Ill. 2020) ("The General Assembly likely excluded financial institutions because they are already subject to a comprehensive privacy protection regime under federal law.").

[3] *See* Meta Platforms, Inc., Annual Report (Form 10-K) (Jan. 29, 2026), Ex. 21.1, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/b919eb05-86d9-4412-a8ff-308be1afb070.pdf (listing subsidiaries).

[4] *See, e.g.*, California Department of Financial Protection and Innovation, *Directory of Money Transmitters*, https://dfpi.ca.gov/regulated-industries/money-transmitters/directory-of-money-transmitters/ (updated July 29, 2026); Massachusetts Division of Banks, Money transmitter licensee list (as of June 30, 2026), available for download at https://www.mass.gov/lists/download-a-list-of-approved-licensees;  Texas Department of Banking Entity Search, Entry for Meta Payments Inc., https://www.dob.texas.gov/entity-search/entity-detail?bid=10346&eid=26&bn=0; https://www.facebook.com/payments_terms/licenses (listing money transmitter licenses, including for Illinois).

843-44 (N.D. Ill. 2022); *see also, e.g.*, *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017) (courts take judicial notice of "matters of public record when the accuracy of those documents reasonably cannot be questioned").[5] The same result obtains here.

     **B.**     **Plaintiffs Do Not Plead Facts Plausibly Showing That Meta Collected Or Possessed Their "Voiceprints"**

Even if BIPA applied to Meta, Plaintiffs still fail to state a BIPA claim. Section 15 imposes requirements on private entities that collect or possess "biometric identifier[s]"—defined to include "voiceprint[s]"—and "biometric information," which is "information … based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. BIPA does not define the term "voiceprint," but as the Illinois Attorney General has explained, a voiceprint is "a record of mechanical measurement" that "is not the same as a simple recording of a voice." No. Public Access 17-011, 2017 WL 10084298, at *3 (Ill. A.G. Aug. 14, 2017). Additionally, "under a plain reading of BIPA, Plaintiff[s] must allege that the biometric identifier[s]" at issue—here, alleged voiceprints—"can be used to identify an individual." *Martell v. X Corp.*, 2024 WL 3011353, at *3 (N.D. Ill. June 13, 2024).

Plaintiffs' BIPA claims all rest on the premise that Meta collected or possessed their "voiceprints" and/or "biometric information" derived from their voiceprints. Dkt. 1 ¶¶ 146, 153, 161, 167, 173. That theory of BIPA liability requires layering one implausible assumption atop another: (1) that, out of *all* the voice recordings available to Meta, Meta trained the challenged models on recordings of *these* seven Plaintiffs in particular; and (2) that Meta transformed those recordings into BIPA-protected "voiceprints" capable of identifying the original speaker, despite

---

[5] Dismissal is appropriate even if Section 25(c) provides an affirmative defense. "[W]hen it is 'clear from … matters of which the court may take judicial notice[] that the plaintiff's claims are barred as a matter of law,'" dismissal "is appropriate." *Parungao*, 858 F.3d at 457, 459 (citation omitted) (affirming dismissal based on affirmative defense).

having no reason to do so. Plaintiffs' BIPA claims fail because they do not plead facts supporting either link in that speculative chain. *See Roake*, 849 F.3d at 347 & n.4 (declining to credit plaintiff's "conclusory and hypothetical assertion" and affirming dismissal where he "allege[d] no facts" supporting an element of liability).

### 1. Plaintiffs Do Not Plausibly Allege That Meta Used *Their* Particular Voices To Train The Challenged AI Models

Dismissal is warranted when BIPA plaintiffs fail to plausibly allege that their own voices were used to improve a defendant's technology. In *Hogan v. Amazon.com, Inc.*, the court granted dismissal where plaintiffs did "not plead facts to show that their images were specifically used to better the [facial recognition] technology or make it more marketable." 2022 WL 952763, at *7 (N.D. Ill. Mar. 30, 2022). As in *Hogan*, Plaintiffs' BIPA claims stumble because they do not plead facts indicating that Meta trained the challenged models on recordings of *their* voices.

Plaintiffs assert that Meta trained the challenged voice models "on large corpora of audio recordings drawn from multiple sources." *E.g.*, Dkt. 1 ¶ 31. But Plaintiffs do not plausibly allege that Meta used any specific corpus containing their particular voice recordings. Instead, Plaintiffs posit that because high-quality recordings of their voices exist on publicly accessible platforms, and because Meta (and other companies) trained AI models on audio from "the same categories of" publicly accessible platforms, the challenged models must have trained on Plaintiffs' voices. *Id.* ¶¶ 66, 68, 76-77, 82, 87, 92, 96-97, 102, 106. Plaintiffs offer no facts to support (or even reason to think) that Meta used recordings of *their* voices among the countless other "long-form, single-speaker, studio-quality, [and] professionally produced" recordings available publicly and to Meta. *Id.* ¶ 77. Given the vast quantity of audio available on the internet and elsewhere, the odds that Plaintiffs' specific voices were used is infinitesimal—far from the kind of well-pleaded factual allegation necessary to survive dismissal. *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th

Cir. 2011) ("[T]he complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote."); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("What is impossible has a zero likelihood of occurring and what is plausible has a moderately high likelihood of occurring. The fact that the allegations undergirding a claim *could* be true is no longer enough to save a complaint from being dismissed." (emphasis added)).

Indeed, the complaint's more specific allegations undermine the notion that Plaintiffs' voices were used. Plaintiffs allege that Meta's training sources include "certain religious audio sources," "more than 50,000 hours of English speech," "approximately 50,000 hours of multilingual audiobooks," and "publicly posted content from Facebook and Instagram users," Dkt. 1 ¶¶ 40-42—bodies of audio that represent a tiny fraction of all recorded speech available to Meta. But the complaint makes no factual allegations raising a plausible inference that Plaintiffs' works fall within those bodies of source material. At most, Plaintiffs Dorcus and Nassif plead that they have narrated audiobooks, including one bilingual anthology. *Id.* ¶¶ 95, 105. But given the hundreds of thousands of audiobook titles available online,[6] it is pure speculation that their works were among the specific "more than 50,000 hours" of English-language audiobook narration or 50,000 hours of "multilingual" audiobook narration that Meta allegedly used to train its Voicebox model. It is telling that Plaintiffs never state the number of hours of audiobook narration they recorded or what proportion it reflects of overall audiobook content on the internet—because that ratio would surely lay bare how implausibly speculative their claims truly are.

---

[6] *See, e.g.*, Audible, *Learn about the Audible Standard Membership*, https://help.audible.com/s/article/learn-about-standard-plan?language=en_US (last visited July 30, 2026) (indicating Audible's collection of audiobooks includes one million titles); Spotify, *Audiobooks in Premium: Get lost in great stories*, https://www.spotify.com/us/audiobooks/ (last visited July 30, 2026) (indicating Spotify's audiobook catalogue includes over 700,000 titles).

Ultimately, there is nothing to separate Plaintiffs from essentially anyone who has ever publicly posted their voice online, and certainly nothing to "nudge[]" their allegations "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Without plausible allegations "that any of their works were included in training datasets used to develop these models," Plaintiffs do not sufficiently allege that Meta trained the challenged models on their voices. *In re Google Generative AI Copyright Litig.*, 809 F. Supp. 3d 903, 914 (N.D. Cal. 2025) (dismissing copyright claim as to some models). Courts correctly dismiss similarly speculative claims. *See In re Mosaic LLM Litig.*, 2025 WL 2402677, at *2 (N.D. Cal. Aug. 19, 2025) (dismissing copyright claim where plaintiffs "d[id] not allege facts that could establish that the [challenged] models are actually trained on any shadow library websites, let alone those that contain Plaintiffs' works"); *Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 879-81 (N.D. Ill. 2014) (dismissing privacy claim where "some tax filers may have been affected while others were not, and [plaintiff's] complaint lack[ed] any allegations to plausibly place her into the former group rather than the latter"). This Court should do the same.

### 2. Plaintiffs Do Not Plausibly Allege That, If Meta Used Their Voice Recordings, It Transformed Them Into BIPA-Protected "Voiceprints" Capable Of Identifying Them

Even if Plaintiffs had plausibly alleged that their voices were used to train the challenged models, their BIPA claims still go nowhere. That is because Plaintiffs do not, as they must, plead facts indicating that Meta transformed those recordings into BIPA-protected "voiceprints" capable of identifying the speaker. Instead, Plaintiffs baldly assert that, during training, the challenged models "learn[] to identify and reproduce the acoustic features that make individual voices distinctive" and "encode[] those features as mathematical representations and store[] them in the model's parameters." Dkt. 1 ¶ 34.

Even accepting that conclusory allegation as true, Plaintiffs do not plead creation of a

11

BIPA-protected "voiceprint." There is "broad consensus that 'biometric identifiers' under BIPA must be able to identify," *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1123-25 (9th Cir. 2024), and the same holds for "biometric information," 740 ILCS 14/10. That a voiceprint must be able to identify follows from "a plain reading" of the statute. *Martell*, 2024 WL 3011353, at *3. Plaintiffs do not resist that premise. *See* Dkt. 1 ¶ 3 ("[A] voiceprint identifies the individual."). But they plead no facts explaining how—or why—any measurements Meta may have created from their voices would be capable of identifying them as the speaker. At most, Plaintiffs allege that "Meta accessed [their] voice recordings from publicly accessible platforms on which the recordings were hosted with metadata identifying each Plaintiff." *Id.* ¶ 68. But, crucially, they do not allege that Meta actually *collected* that metadata or *retained* it alongside the speaker-specific measurements it supposedly extracted from recordings. *See id.* ¶¶ 34-38 (describing supposed AI training process); ¶¶ 66, 68, 76, 81, 86, 91, 96, 101, 106 (alleging that metadata identifying Plaintiffs existed, but not that Meta collected or retained it).

The analysis could stop there, but the implausibility of Plaintiffs' voiceprint theory is underscored by the absence of any facts suggesting *why* Meta would collect or retain speaker-identifying data when training the challenged models. In Plaintiffs' telling, the models "generate realistic, expressive, and human-sounding voices." *Id.* ¶ 188. In other words, Plaintiffs allege that the models generate new audio, not authenticate or recognize a particular speaker. And they nowhere explain why generating *new* audio would require the ability to recognize any individual speaker whose voice was used at the outset to train the model. That critical omission warrants dismissal. *See Mosley v. Gen. Revenue Corp.*, 2020 WL 4060767, at *4 (C.D. Ill. July 20, 2020) (dismissing Telephone Consumer Protection Act ("TCPA") claim where plaintiff failed to offer sufficient reasons to make "the fact that the device used *might* have had the capability to use

randomly generated number systems … more than a speculative possibility").

Ultimately, "even though a plaintiff 'will rarely, if ever, know the specific functionality of a system used by a defendant' before discovery, the plaintiff must still allege sufficient facts to 'nudge' his claim 'across the line from conceivable to plausible.'" *Watts v. Emergency Twenty Four, Inc.*, 2021 WL 2529613, at *4-5 (N.D. Ill. June 21, 2021) (citation omitted) (dismissing TCPA claim).  Bereft of facts that would make it plausible that Meta created BIPA-protected voiceprints capable of identifying a particular speaker, Plaintiffs' BIPA claims fail.

*     *     *

In short, Plaintiffs' speculative theory of BIPA liability fails at every step.  They do not plausibly allege that Meta trained the challenged AI models on their specific voices.  And they do not plausibly allege that, if such training occurred, Meta created BIPA-protected, speaker-identifying voiceprints in the process.  At bottom, Plaintiffs' BIPA claims rest on bare "conclusions," "formulaic recitation[s]" of the statutory elements, and "naked assertion[s]." *Iqbal*, 556 U.S. at 678 (citations omitted).  That "will not do." *Id.* (citation omitted).

### C.     Plaintiffs' BIPA Claims Suffer From Additional, Claim-Specific Defects

Beyond these cross-cutting, fatal defects, Plaintiffs' BIPA claims suffer from other claim-specific flaws.  Plaintiffs lack standing to pursue their Section 15(a) claim.  And their claims under Sections 15(c), (d), and (e) fail because they rest on the premise that merely using the challenged models or disclosing their parameters uses or discloses BIPA-protected voiceprints— a premise that Plaintiffs do not plausibly allege.

#### 1.     Plaintiffs Lack Standing To Pursue Their Section 15(a) Claim

Plaintiffs' Section 15(a) claim alleges only that "Meta has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training data." Dkt. 1 ¶ 154; *cf. id.* ¶ 135(c).  Section 15(a) generally

13

requires covered private entities to develop and comply with "a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying" biometric data. 740 ILCS 14/15(a). But failing to develop and disclose a retention schedule are duties "owed to the public generally" that, without more, do not create the kind of "particularized harm" required to support standing for a Section 15(a) claim. *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1154 (7th Cir. 2020) (citation omitted). Because Plaintiffs allege "mere procedural failure[s]," they lack standing to pursue a Section 15(a) claim. *Id.* at 1149.

### 2. Plaintiffs' Section 15(c)-(e) Claims Fail Because They Do Not Plausibly Allege That Meta Encodes Voiceprints In The Challenged Models

Plaintiffs' Section 15(c), (d), and (e) claims rest on the premise that their "voiceprints" are embedded within the challenged AI models, so that using or distributing the models necessarily uses or distributes Plaintiffs' voiceprints. Even assuming (incorrectly) that Plaintiffs plausibly allege Meta used their voice recordings and turned them into voiceprints, each claim fails because Plaintiffs do not plausibly allege that millions of voiceprints are encoded in the models themselves.

Section 15(c), which prohibits "sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from" protected biometric data, 740 ILCS 14/15(c), reaches "commercial transactions where 'the access to biometric data is shared or given to another.'" *Davis v. e.l.f. Cosms., Inc.*, 2024 WL 2722663, at *8 n.4 (N.D. Ill. May 28, 2024) (citation omitted). Section 15(d) prohibits "disclos[ing], redisclos[ing], or otherwise disseminat[ing]" biometric data except in certain enumerated circumstances. Plaintiffs' theory appears to be that Meta violated Sections 15(c) and (d) simply by operationalizing the models in question. *See* Dkt. 1 ¶¶ 117-121, 158-169. But even assuming Meta created voiceprints while training the challenged AI models, Plaintiffs do not plausibly allege that their voiceprints are embedded in the models themselves, such that deploying the models or making available their parameters somehow "sells" or "discloses" Plaintiffs'

14

voiceprints. *See id.* ¶¶ 28, 117-121.[7] In Plaintiffs' view, each time anybody uses the relevant models or examines their parameters, they are able to access *millions* of "voiceprints." That wildly overbroad and implausible theory rests on conclusory assertions alone; Plaintiffs plead no *facts* indicating that the models' parameters are loaded down with millions of speaker-identifying voiceprints or that someone could use the models or their parameters to identify a particular speaker.

Plaintiffs' claim under Section 15(e)—which governs the "stor[age], transmi[ssion], and protect[ion] from disclosure" of biometric data—likewise rests on the unsupported premise that the challenged models and Plaintiffs' voiceprints are somehow "the same thing." *Id.* ¶ 8; *cf. id.* ¶¶ 180-181, 183. But Plaintiffs cannot bootstrap themselves into a BIPA claim simply by declaring, without elaboration, that AI models are "the same" as the alleged voiceprints purportedly used to create the models. *Cf. Kadrey v. Meta Platforms, Inc.*, 2023 WL 8039640, at *1 (N.D. Cal. Nov. 20, 2023) (holding it "nonsensical" for copyright plaintiffs to claim that the language models at issue "'are themselves infringing derivative works' [merely] because the 'models cannot function without the expressive information extracted' from the plaintiffs' books"). They must instead plausibly allege that "a biology-based set of measurements … that can be used to identify a person," *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094 (N.D. Ill. 2017), was inadequately stored, transmitted, or disclosed. Plaintiffs do no such thing. And to the extent their Section 15(e) claim rests on Meta's failure to exclude or obtain consent before using

---

[7] To the extent Plaintiffs claim that Section 15(c) reaches any use of biometric data to improve technology, including through training alone, *see* Dkt. 1 ¶ 161, that theory does not support a Section 15(c) claim. *See Davis*, 2024 WL 2722663, at *8 & n.4 (allegations that defendant "profited from the capture of … biometric data because the [relevant tool] improved users' experience on the website, which le[d] to increased sales volume" do not state a Section 15(c) claim).

Illinois-origin recordings or to "maintain records sufficient to permit auditing," *id.* ¶ 176, those alleged failures do not concern the storage, transmission, or protection of biometric data so as to implicate Section 15(e).

## II.      PLAINTIFFS' IRPA CLAIMS FAIL

IRPA protects an individual's right to control certain public uses of their "identity." *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1100 (7th Cir. 2022). As relevant here, IRPA forbids (i) publicly holding out a person's identity to advertise or sell a product without their consent and (ii) distributing or materially contributing to the distribution of an "unauthorized digital replica" of someone's voice. *See* 765 ILCS 1075/30(a), (b), (d). Plaintiffs do not plausibly allege that Meta held out their identities to market or sell the challenged models, or that Meta knowingly distributed or helped distribute any "digital replica" of a named Plaintiff's voice.

### A.      Plaintiffs Fail To Plausibly Allege That Meta Used Their Identities For A "Commercial Purpose" Under Section 30(a)

Section 30(a) of IRPA prohibits "us[ing] an individual's identity for commercial purposes" during their lifetime without consent. 765 ILCS 1075/30(a). IRPA defines "identity" to mean an "attribute … that serves to identify [an] individual to an ordinary, reasonable viewer or listener," including one's voice. 765 ILCS 1075/5. Plaintiffs' Section 30(a) claim focuses on the *inputs* for the challenged models: They allege that Meta "used [their] identities for commercial purposes … by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate [its] commercial voice products." Dkt. 1 ¶ 188. The claim fails on two independent grounds.

*First*, as explained, Plaintiffs do not plausibly allege that Meta trained the relevant models on *their* particular voices, *see supra* at 8-11, and thus do not plausibly allege that Meta used their "identities" as inputs for the models. The Section 30(a) claim fails for that reason alone.

16

*Second*, and just as fundamentally, Plaintiffs do not allege use of their "identity for [a] commercial purpose[]." 765 ILCS 1075/30. "A free-floating profit motive is not enough" to constitute a commercial purpose under IRPA. *D'Ambrosio v. Meta Platforms, Inc.*, 176 F.4th 928, 936 (7th Cir. 2026). Rather, IRPA defines "[c]ommercial purpose" narrowly to mean the "public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5. So, to state a Section 30(a) claim, Plaintiffs must allege that Meta publicly used or held out their voices—which must identify Plaintiffs to an ordinary listener—to sell or advertise the challenged models or for fundraising purposes. Plaintiffs' allegations do not fit that mold.

Plaintiffs first assert that Meta used their voices to "develop" and "train" the relevant models. Dkt. 1 ¶ 188. But IRPA explicitly requires the "*public use or holding out* of an individual's identity." 765 ILCS 1075/5 (emphasis added). So the mere (supposed) *internal* use of Plaintiffs' voices to improve the models does not suffice. Plaintiffs' additional assertion that Meta uses their identities to "operate the commercial voice products that Meta monetizes," Dkt. 1 ¶ 188, fares no better. As the Seventh Circuit explained, "[i]t is not enough for [a plaintiff's] name and other information to appear on or within a product"; rather, his "identity must help sell something." *Huston*, 53 F.4th at 1102. Plaintiffs' Section 30(a) claim fails because they do not allege that Meta held their identities out *to the public* in order to market or sell the models at issue.

*Huston* confirms as much. The plaintiff there alleged that Hearst violated IRPA by selling mailing lists of magazine subscribers that included her "identifying information." *Id.* at 1099-1100. Her claim failed because, although she "alleged that her identity was included as part of the product sold," she "did not allege" that "her name was used *to sell or promote* the mailing

17

lists themselves." *Id.* at 1100 (emphasis added); *see also id.* at 1104. So too here: Plaintiffs do not allege that Meta "public[ly] use[d] or h[eld] out" their individually identifiable voices to sell or advertise the challenged models. 765 ILCS 1075/5; *see* Dkt. 1 ¶ 188. Just as Huston's mere presence on a mailing list did not support an IRPA claim even if it increased the list's value, Plaintiffs fail to state an IRPA claim even assuming that their voices were used to increase the value of the challenged models or could be replicated by a user who has accessed the models.

**B.      Plaintiffs Fail To State A Section 30(b) Or 30(d) "Digital Replica" Claim**

While Plaintiffs' Section 30(a) claim targets the alleged *inputs* of the relevant models, their Sections 30(b) and (d) claims target the models' *outputs*, which they assert are "digital replicas" under IRPA. Those claims fail, too, because Plaintiffs do not plead the existence of any particular "unauthorized digital replica" of their voices, or that Meta acted with actual knowledge in distributing or materially contributing to the distribution of any such replicas.

Section 30(b) prohibits "knowingly distribut[ing], transmit[ting], or mak[ing] available to the general public a sound recording or audiovisual work with actual knowledge that the work contains an unauthorized digital replica." 765 ILCS 1075/30(b). A "[d]igital replica" is "a newly created, electronic representation of the voice, image, or likeness of an actual individual created using a computer, algorithm, software, tool, artificial intelligence, or other technology that is fixed in a sound recording or audiovisual work in which that individual did not actually perform or appear, and which a reasonable person would believe is that particular individual's voice, image, or likeness being imitated." 765 ILCS 1075/5. Section 30(d), in turn, imposes liability on those who "materially contribute[] to, induce[], or otherwise facilitate[]" another person's violation of Section 30(b) "after having obtained actual knowledge that the other person is infringing upon an individual's rights." 765 ILCS 1075/30(d).

The precise contours of Plaintiffs' digital replica theory are unclear. To the extent it relies

18

on the premise that their own "voiceprints are … encoded in the foundational audio models on which Voicebox and Audiobox are built," Dkt. 1 ¶¶ 189-190, it fails given Plaintiffs' failure to allege that Meta encoded their voiceprints in the models, *see supra* at 8-15.  If instead Plaintiffs mean to allege that Voicebox and Audiobox violate IRPA because they can theoretically create digital replicas of *anyone's* voice, whether or not that voice was used to train the models, *see* Dkt. 1 ¶ 190, that theory fails, too.  Plaintiffs allege that the models can "generate realistic, expressive, and human-sounding voices … in target voices from short audio prompts." *Id.* ¶ 62; *see also, e.g.*, *id.* ¶ 189.  But if the "technical capability to produce an unauthorized digital replica," *id.* ¶ 189, were enough to create IRPA liability, IRPA could (setting aside extraterritoriality concerns) reach the use of most generative AI in Illinois.  That cannot have been the General Assembly's intent— and IRPA's text confirms as much.  IRPA's digital replica provisions require both the existence of a particular digital replica and "actual knowledge."  765 ILCS 1075/30(b), (d).  Plaintiffs plausibly allege neither.

*First*, Plaintiffs do not identify particular "sound recording[s] or audiovisual work[s]" that contain unauthorized digital replicas of their voices.  765 ILCS 1075/30(b); *see* Dkt. 1 ¶¶ 189-190.  Instead, they allege only that some models have the "capability" of creating them.  Dkt. 1 ¶¶ 189-190.  But Section 30(b) prohibits "knowingly distribut[ing], transmit[ting], or mak[ing] available to the general public a sound recording or audiovisual work … contain[ing] an unauthorized digital replica"—not simply possessing the capability of doing so.  765 ILCS 1075/30(b).  Plaintiffs therefore do not allege that Meta, or anyone else, violated Section 30(b).

*Second*, even if Plaintiffs pleaded the existence of specific digital replicas, they fail to allege Meta's "actual knowledge."  765 ILCS 1075/30(b), (d).  Settled law holds that an "actual knowledge" requirement erects a high bar.  As the Supreme Court held, "[t]o have 'actual

knowledge' of a piece of information, one must in fact be aware of it." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184 (2020). Illinois law is in accord. For example, a buyer is excused from providing notice to a seller before bringing a breach of warranty claim under the state's Uniform Commercial Code if the seller has "actual knowledge of the defect of the particular product." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 589 (Ill. 1996). As the Illinois Supreme Court explained, it is not enough to allege general knowledge of "problems with a particular product line"; instead, a buyer must allege "actual knowledge of the alleged breach of the particular products purchased by the named plaintiffs in [a particular] lawsuit." *Id.* at 594. And in interpreting the state's Fiduciary Obligations Act, the Illinois Appellate Court held that actual knowledge of a fiduciary's misappropriation of a principal's funds entails "'awareness at the moment of the transaction that the fiduciary is defrauding the principal'" or "express factual information" that the fiduciary's use of the funds is improper. *Praither v. Northbrook Bank & Tr. Co.*, 192 N.E.3d 747, 756 (Ill. App. 2021) (citation omitted).

From these principles, it follows that Plaintiffs must plausibly allege that Meta was contemporaneously aware that a particular sound recording or audiovisual work contained an unauthorized digital replica of a named Plaintiff's voice and then "distribute[d], transmit[ted], or ma[de] available to the general public" that work, or "materially contribut[ed] to, induc[ed], or otherwise facilitat[ed]" the same. 765 ILCS 1075/30(b), (d). Plaintiffs plead no facts supporting either contention. Rather, they assert only that the challenged models "are designed to and do generate, transmit, and make available voice outputs that constitute unauthorized digital replicas," and that Meta "materially contributes to and facilitates the distribution of such replicas through … integrated commercial channels." Dkt. 1 ¶¶ 189-190. Plaintiffs' failure to plead facts supporting actual knowledge is independently fatal to their "digital replica" theory of IRPA liability.

20

### III. PLAINTIFFS' ICFA CLAIMS FAIL

ICFA prohibits "unfair or deceptive acts or practices" in "trade or commerce." 815 ILCS 505/2. To state an ICFA claim, a private plaintiff must plausibly allege (1) "a deceptive or unfair act"; (2) "the defendant's intent that the plaintiff rely on the deceptive or unfair practice"; (3) "that the unfair or deceptive practice occurred during a course of conduct involving trade or commerce"; and (4) that the plaintiff "suffered 'actual damage'"—meaning "actual pecuniary loss"—"as a result of the defendant's violation." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014) (citations omitted). The statute "'imposes a proximate causation requirement' for private causes of action." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 462 (Ill. 2024). And when brought in federal court, deception claims must satisfy Rule 9(b)'s particularity requirement. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). Plaintiffs fail to state a claim under either the "unfair" or "deceptive" prong of ICFA.

#### A. Plaintiffs Fail To State An ICFA Deception Claim

Plaintiffs' ICFA deception claim fails twice over: They do not plead a deceptive statement or adequately allege proximate cause.

##### 1. Plaintiffs Fail To Allege A Deceptive Statement

A statement is deceptive under ICFA if it would likely deceive a "'reasonable consumer'" given the "'totality of the information' available … at the point of deception." *Kahn v. Walmart Inc.*, 107 F.4th 585, 598 (7th Cir. 2024) (citation omitted). A plaintiff must plausibly allege that a reasonable consumer would be misled by the defendant's actual representations, not "by her own assumptions." *Craw v. Clorox Co.*, 692 F. Supp. 3d 854, 860-62 (C.D. Ill. 2023) (dismissing ICFA claim); *see also Bartnett v. Abbott Lab'ys*, 492 F. Supp. 3d 787, 801 (N.D. Ill. 2020) (similar). Plaintiffs allege Meta engaged in deceptive conduct in two distinct ways. Neither states a claim.

21

Plaintiffs first allege that it was deceptive for Meta to characterize its AI training data as "'publicly available,'" "'licensed where appropriate,'" "'diverse,'" and "'multilingual'" without disclosing that the data (allegedly) "included biometric voice identifiers extracted … without consent." Dkt. 1 ¶ 199. But Meta's statements are not deceptive because they make no representations, explicit or implicit, about the presence (or absence) of biometric voice identifiers. Describing data as "publicly available," "diverse," or "multilingual" says nothing about whether "biometric voice identifiers" were "extracted"—much less "without consent." And "licensed where appropriate" simply connotes that Meta received a license when legally appropriate; no reasonable consumer would derive from this statement an implied compliance with *BIPA*, whose operative provisions say nothing about "licensing" data. *See* 740 ILCS 14/15. In short, Meta's challenged statements "do[] not directly state, nor do[] [they] invite the inference," that its AI training data was free of unconsented biometric data. *Craw*, 692 F. Supp. 3d at 860.

Plaintiffs next say that it was deceptive for Meta not to inform U.S. users that publicly posted content could be used for AI training. Dkt. 1 ¶ 199; *see also id.* ¶ 48 (discussing "changes to [Meta's] privacy policies in the European Union and United Kingdom"). That theory founders as a factual matter: Since December 2025, Meta's Privacy Policy has informed users that Meta uses "[p]ublic content you or others create or share" to "[d]evelop[] and improv[e] AI at Meta."[8] But even if Meta did not make such disclosures, Plaintiffs' claim still fails: Plaintiffs plead no facts plausibly indicating that Meta's *silence* as to whether publicly posted content could be used for AI training purposes would lead a reasonable consumer to believe that no such use was possible.

---

[8] Meta, *Privacy Policy* (effective Dec. 16, 2025), https://www.facebook.com/privacy/policy/version/25862970456621906/; *see also* Meta, *Privacy Policy* (effective July 23, 2026), https://www.facebook.com/privacy/policy/; Meta, *AI at Meta: Transparency about our training data*, https://transparency.meta.com/features/ai-at-meta-training-data/ (last visited July 30, 2026).

At most, Plaintiffs plead that consumers might conceivably be "misled not by" *Meta's* representations, "but by [their] *own* assumptions." *Craw*, 692 F. Supp. 3d at 860 (emphasis added). Plaintiffs thus fail to plead a "likelihood of deception," *id.* at 862—dooming their deception claim.

### 2. Plaintiffs Do Not Plausibly Allege Proximate Cause

Even if Plaintiffs pleaded a deceptive statement, their deception claim still fails because they do not plausibly allege proximate cause. As the Illinois Supreme Court recently confirmed, in private plaintiff cases alleging deceit, ICFA's proximate cause requirement "means that *the plaintiff* must be the intended target of the alleged deception" and must have been "actually deceived by the misrepresentation." *Tri-Plex*, 241 N.E.3d at 462. Plaintiffs allege neither. To the extent they claim that Meta's alleged deceptions are targeted at users of the at-issue models or U.S. users of Meta's services who publicly post voice recordings, *cf.* Dkt. 1 ¶ 199, Plaintiffs do not allege that they are in either group. Because Plaintiffs "d[o] not plead that [they were] the intended recipient of the defendants' alleged deceptions," they "fail[] to plead all the elements of a[n ICFA] claim." *Tri-Plex*, 241 N.E.3d at 465. Compounding their proximate cause problems, Plaintiffs also do not allege that they were "actually deceived" by the statements or omissions. *Id.* at 462. Those shortcomings defeat their ICFA deception claim.

Plaintiffs likewise fail to allege proximate cause because they do not plead facts indicating that, "but for" Meta's ostensibly deceptive conduct, they "'would not have been damaged.'" *Vanzant*, 934 F.3d at 739 (citation omitted). Plaintiffs' claimed injuries take the form of "lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities." Dkt. 1 ¶ 200. But Plaintiffs do not plausibly allege that, if Meta had made the disclosures they desire, their alleged injuries would not have materialized. As the complaint makes clear, any diminishment in income or professional opportunities flows from the conduct of independent actors—namely, third parties

23

choosing AI-generated voices over human performers. *Id.* ¶¶ 110-114 (discussing alleged "competitive substitution"). That severs proximate cause as to any claim against Meta: "If [an] alleged cause does nothing more than furnish a condition which made the injury possible and that condition causes an injury by the subsequent independent act of a third party, the creation of that condition is not the proximate cause of the injury." *MacLeod v. ComEd*, 248 N.E.3d 1133, 1153 (Ill. App. 2024) (citation omitted).

The complaint does not plead facts suggesting that, if Meta had (i) disclosed that its AI training data (allegedly) "included biometric voice identifiers extracted … without consent" or (ii) told U.S. users that publicly posted content could be used for AI training, Dkt. 1 ¶ 199, third parties would have used human performers like Plaintiffs instead of AI-generated voices. Indeed, if a third party prefers AI-generated voices for reasons of cost or convenience, *cf. id.* ¶¶ 111, 113, a disclosure by Meta would not funnel demand back to human performers. And Plaintiffs plead no facts explaining why Meta's failure to make the disclosures they desire caused them to lose "control over their biometric data and professional identities." *Id.* ¶ 200.

That last theory of injury suffers from additional flaws. Insofar as it relies on the premise that Meta "collect[ed]" their biometric data, *cf.* Dkt. 1 ¶ 199, Plaintiffs plausibly allege no such collection. *See supra* at 8-13. Regardless, Plaintiffs fail to tie their supposed "loss of control over their biometric data and professional identities" to any *pecuniary* injury, as ICFA requires. *See Ramirez v. LexisNexis Risk Sols.*, 729 F. Supp. 3d 838, 846, 850 (N.D. Ill. 2024) (alleged "loss of privacy" from defendant "aggregating and selling [plaintiffs'] personal information without consent or compensation" did not "suffic[e] to plead actual damages as required" by ICFA). These defects in Plaintiffs' "loss of control" theory of harm apply across their ICFA claims.

24

In sum, Plaintiffs' deception theory fails because they do not plausibly allege that Meta engaged in deception, or that any deception was the proximate cause of their claimed injuries.

### B. Plaintiffs Fail To State An ICFA Unfairness Claim

Plaintiffs also claim that Meta's purported "collection and commercial exploitation of the biometric identifiers and biometric information of Illinois persons, without their knowledge or consent," is unfair for ICFA purposes. Dkt. 1 ¶ 198. That theory of ICFA liability fails as well, because Plaintiffs do not plead an unfair practice or (again) proximate cause.

#### 1. Plaintiffs Fail To Plead An Unfair Practice

As relevant here, a practice may be "unfair" for ICFA purposes if it "offends public policy" and/or "causes substantial injury to consumers." *Kahn*, 107 F.4th at 602; *see* Dkt. 1 ¶ 198. Plaintiffs do not plausibly allege that Meta's conduct is "unfair" by either measure.

Plaintiffs claim Meta's conduct "offends Illinois public policy as expressed" in BIPA and IRPA. *Id.* ¶ 198. That theory fails because Plaintiffs do not plausibly allege that Meta violated either statute. *See supra* at 8-21; *Batson v. Live Nation Ent., Inc.*, 2013 WL 992641, at *4 (N.D. Ill. Mar. 13, 2013) ("[B]ecause the practice does not violate federal or state antitrust law, it does not violate the public policies embodied in antitrust law"), *aff'd*, 746 F.3d 827 (7th Cir. 2014).

A "substantial injury to consumers" under ICFA must be (1) "substantial"; (2) "not … outweighed by any countervailing benefits to consumers or competition"; and (3) one that "consumers themselves could not reasonably have avoided." *Kahn*, 107 F.4th at 603. This test reflects ICFA's focus on consumer protection by asking whether *consumers* are injured. But Plaintiffs' claimed injuries—"lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities," Dkt. 1 ¶ 200; *see also id.* ¶ 198—are, at most, injuries to purported *competitors* to the challenged AI models, not *consumers* of the models. Those claimed injuries

25

thus are not the types of harms—such as paying inflated prices, receiving defective goods, or being defrauded in a transaction—that a consumer would suffer in the marketplace. *Cf. Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 868 (7th Cir. 1999) (rejecting ICFA claim where competitor-plaintiff did not sufficiently prove consumer protection concerns and noting that "to allow [a competitor] to obtain damages … when no consumer has been hurt is unlikely to advance the consumer interest"). Said differently, any diminishment in Plaintiffs' income or professional opportunities has nothing to do with Plaintiffs' use (or non-use) of the challenged models.[9]

### 2. Plaintiffs Fail To Plead Proximate Cause

Plaintiffs also fail to plead proximate cause as to their claimed injuries arising from "lost and diminished licensing income, suppressed voiceover and narration rates, [and] diverted opportunities." Dkt. 1 ¶ 200. As noted, Meta's purportedly unfair conduct is its alleged "collection and commercial exploitation of the biometric identifiers and biometric information of Illinois persons, without their knowledge or consent." *Id.* ¶ 198. But Plaintiffs do not plead facts plausibly showing that, if Meta had used no BIPA-protected content to train the challenged models, or if Meta had obtained consent to use such material, third parties would employ Plaintiffs or other voice performers in place of AI-generated voices. *Cf. MacLeod*, 248 N.E.3d at 1153.

## IV. PLAINTIFFS' IUDTPA CLAIM FAILS

Plaintiffs' IUDTPA claim also fails: IUDTPA does not impose the kind of free-floating labeling requirement Plaintiffs desire, and Plaintiffs do not plead that the injuries they fear are likely to be caused by *Meta's* conduct, as opposed to the conduct of third parties.

---

[9] And, again, to the extent Plaintiffs claim some abstract, non-pecuniary harm stemming from "loss of control over their biometric data and professional identities," that is not cognizable under ICFA. *See supra* at 24.

As relevant here, Section 2(a) of IUDTPA prohibits conduct that "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" or "as to affiliation, connection, or association with or certification by another." 815 ILCS 510/2(a)(2)-(3); *see* Dkt. 1 ¶ 205. A paradigmatic claim under those subsections involves a defendant accused of falsely implying sponsorship or affiliation.[10] A plaintiff "likely to be damaged" by such conduct may obtain injunctive relief. 815 ILCS 510/3. Courts regularly apply Rule 9(b)'s particularity requirement to IUDTPA claims of deceptive practices. *E.g.*, *Lawrence v. Trax Recs., Inc.*, 2025 WL 919616, at *2 (N.D. Ill. Mar. 26, 2025). But Plaintiffs' IUDTPA claim fails regardless of the applicable pleading standard.

Plaintiffs' IUDTPA theory rests on inaction by Meta. They assert that because the voice outputs of the challenged AI models do not carry "consumer-facing disclosure[s]" indicating "that the voice was AI-generated" and produced by a model "built using voiceprints collected without consent," or "that the individual whose vocal characteristics are reproduced has not authorized the use," consumers are likely to be confused "about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content." Dkt. 1 ¶ 206. But Plaintiffs do not allege that Meta made any *affirmative* representations that would imply that the voice outputs of the relevant models were *not* AI-generated, were built without alleged voiceprints, or were authorized by the speakers whose voices the models ostensibly imitated.[11] In other words, Plaintiffs' theory is that companies have a legal obligation under IUDTPA to disabuse consumers of any incorrect assumptions they might make about a product.

---

[10] *See Desmond v. Chi. Boxed Beef Distribs., Inc.*, 921 F. Supp. 2d 872, 878, 884 (N.D. Ill. 2013); *Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 947-48 (N.D. Ill. 2019); *Hounen Solar, Inc. v. UL LLC*, 2025 WL 3093720, at *4-5 (N.D. Ill. June 26, 2025).

[11] As explained, *see supra* at 19, Plaintiffs fail to allege that the challenged models actually "reproduce[]" the voice of any particular named Plaintiff.

27

This theory of deception is not cognizable under IUDTPA. "Implicit (if not explicit) within" the IUDTPA provisions Plaintiffs invoke "is that for a violation to occur, the defendant must make some form of a representation (or do something) to the public (or a potential buyer) regarding a good or service." *Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997). Where there "is no alleged representation by [the defendant] to anyone concerning an identifiable good or service," a Section 2(a) claim fails. *Id.* (dismissing IUDTPA claim premised on Ford's alleged "conceal[ment] from the buying public that it has an ownership interest" in other corporations). And here, Plaintiffs plead no facts indicating that Meta has *affirmatively* implied that "real persons created, endorsed, sponsored, approved, or have any affiliation with [its] AI-generated voice content." Dkt. 1 ¶ 206; *see id.* ¶¶ 203-208.

In any event, Plaintiffs' IUDTPA claim independently fails because they do not plausibly allege that they are likely to be damaged by Meta's conduct in the future, or that the injunctive relief they seek would redress their claimed harms. *See ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 282 F. Supp. 3d 1043, 1050 (N.D. Ill. 2017) ("The likelihood of future harm occurring absent an injunction is an element of liability on [an IUDTPA] claim, not merely a separate element of damages."). As explained, Plaintiffs fault Meta for failing to provide consumer-facing disclosures indicating that the outputs of the challenged models are "AI-generated"; "that the model … was built using voiceprints collected without consent"; or "that the individual whose vocal characteristics are reproduced has not authorized the use." Dkt. 1 ¶ 206. Plaintiffs claim that they are "likely to be damaged by Meta's deceptive practices" in the future—not because they *themselves* will be deceived or confused, or even because there is a likelihood that others will be confused about *Plaintiffs'* approval of or affiliation with content produced by the challenged models, but because Meta's conduct ostensibly "diverts demand from licensed human voice

28

performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods." *Id.* ¶ 207.

That theory fails to establish the requisite likelihood of future harm needed to pursue injunctive relief under IUDTPA. One clear indication is that Plaintiffs do not plausibly allege that, if Meta included the disclosures they seek to impose, *see id.* ¶ 208, those disclosures would either (i) inhibit uptake of AI voice performances enough to avoid "divert[ing] demand from licensed human voice performances" or (ii) improve "source attribution and authorization-status disclosure" in "voice services markets," as a whole, *id.* ¶ 207. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.").

Plaintiffs' first theory of harm essentially posits that, if third parties knew that the outputs of the challenged models were AI-generated and not authorized by "the individuals whose vocal characteristics are reproduced," then (1) third parties would be less likely to use AI-generated audio; (2) they would use human performers instead; and (3) these particular Plaintiffs would likely benefit. *See* Dkt. 1 ¶¶ 207-208. But Plaintiffs offer no factual allegations suggesting that, if Meta labeled the outputs of the models as they wish, third parties would choose to use human voice performers—much less these particular Plaintiffs—over AI-enabled alternatives. As explained, *see supra* at 24, Plaintiffs offer no reason to think that the disclosures they seek would meaningfully impact uptake of AI-generated audio or demand for human performers.

Plaintiffs also suggest that Meta's disclosures would somehow improve "source attribution and authorization-status disclosure" in *downstream* "voice services markets." But as Plaintiffs themselves allege, "[o]nce generated," Meta's "voice outputs can be downloaded, shared, and commercially exploited without consumer-facing disclosure[s]." Dkt. 1 ¶ 206. In other words, an

order requiring *Meta* to attach disclosures at the point of generation would not prevent third parties who later download, share, and commercially exploit those outputs from stripping away any disclosures Meta had attached. As a result, Plaintiffs do not plausibly allege that forcing Meta to make particular disclosures would actually prevent any downstream harm to them. Plaintiffs' claimed injuries thus are "not the type of harm that the Court is able to issue an injunction against," because the injuries depend on the conduct of third parties who Meta does not control. *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 773 (C.D. Ill. 2020) (explaining that "the Court cannot stop hackers from using [plaintiffs'] information in the future" and dismissing IUDTPA claim).

## V.       PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS

"Under Illinois law, unjust enrichment is not a separate cause of action." *Vanzant*, 934 F.3d at 739 (citation omitted). "Rather, it's a condition brought about by fraud or other unlawful conduct." *Id.* at 740. As this Court has explained, "unjust enrichment stands on the shoulders of some other claim." *Love v. Simmons*, 2024 WL 809107, at *16 (N.D. Ill. Feb. 27, 2024). "So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim … unjust enrichment will stand or fall with the related claim." *Id.* (citation omitted). Because Plaintiffs' "substantive claims fail," they "can't recover for unjust enrichment, either." *Id.*

### CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint in its entirety.

30

Dated: July 30, 2026

Respectfully submitted,

/s/ *Gary Feinerman*
Gary Feinerman (IL 6206906)
Kathryn K. George (IL 6306004)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312-876-7700
gary.feinerman@lw.com
katie.george@lw.com

Melanie M. Blunschi (*pro hac vice*)
Nicole C. Valco (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: 415-391-0600
melanie.blunschi@lw.com
nicole.valco@lw.com

*Attorneys for Defendant Meta Platforms, Inc.*

31