**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. 26-cv-05438 |
| Plaintiffs, | ) | Hon. Steven C. Seeger |
| v. | ) | |
| META PLATFORMS, INC., a Delaware corporation, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO META PLATFORMS, INC.'S**
**MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

**Page**


I. Introduction....................1

II. Rule 12 Tests the Complaint, Not Meta's Web Pages....................4

III. Section 25(c) Does Not Support Dismissal....................5

A. Meta Has Not Established That Meta Payments Was Subject to Title V....................6

B. No Authority Extends the Exemption to Unrelated Affiliate Conduct....................8

IV. Meta's Audiobox Disclosures Make Plaintiffs' Inclusion Plausible....................10

A. The Complaint Connects Plaintiffs' Catalogs to Audiobox's Corpus....................10

B. Retail Catalog Totals Do Not Establish the Probability of Inclusion....................12

C. Meta's Cases Require a Factual Connection, Not a Particular Form of Proof....................13

V. The Complaint Plausibly Alleges Speaker-Identifying Voiceprints....................14

A. Meta's Disclosed Processing Supports the Alleged Extraction....................14

B. Identification Does Not Require a Name Label or an Authentication Purpose....................15

VI. Count II Alleges the Unlawful Retention *Fox* Held Concrete....................17

VII. Meta's Model-Content Premise Does Not Defeat Counts III Through V....................18

A. Count III Alleges Commercial Access to the Allegedly Biometric-Bearing Models....................19

B. Count IV Alleges Transfers and External Releases....................20

C. Count V Pleads Direct Protection Failures and an Unanswered Comparator....................20

VIII. Count VI Pleads Three Distinct IRPA Violations....................21

A. Section 30(a) Alleges Identity Used to Sell a Voice-Generation Service....................21

B. Section 30(b) Pleads Meta's Own Knowing Distribution. ....22

C. Section 30(d) Pleads Knowing Facilitation in the Alternative. ....23

IX. Count VII Alleges Unfair Acquisition and Plaintiff-Directed Deception ....23

A. Meta's Alleged Acquisition Practice Is Unfair Under *Robinson*. ....24

B. Plaintiffs Allege Their Own Economic Loss Caused by Meta. ....25

C. The Alleged Omission Was Directed to Plaintiffs. ....26

X. Count VIII Alleges Ongoing, Redressable Speaker-Identity Confusion ....27

A. The Output, Not the Silence, Is the Alleged Deceptive Act. ....28

B. Plaintiffs Face Continuing Harm That Disclosure Would Reduce. ....29

XI. Count IX Survives With Its Predicate Claims ....30

CONCLUSION ....30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrego v. Guevara,*
No. 23-cv-1740, 2024 WL 3566679 (N.D. Ill. July 29, 2024) ....18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....4

*ATC Healthcare Servs., Inc. v. RCM Technologies, Inc.,*
192 F. Supp. 3d 943 (N.D. Ill. 2016) ....28

*ATC Healthcare Servs., Inc. v. RCM Technologies, Inc.,*
282 F. Supp. 3d 1043 (N.D. Ill. 2017) ....29

*Atkins v. City of Chicago,*
631 F.3d 823 (7th Cir. 2011) ....4, 12

*BBL, Inc. v. City of Angola,*
809 F.3d 317 (7th Cir. 2015) ....20

*Bryant v. Compass Group USA, Inc.,*
958 F.3d 617 (7th Cir. 2020) ....17

*Carpenter v. McDonald's Corp.,*
580 F. Supp. 3d 512 (N.D. Ill. 2022) ....16

*Cisneros v. Nuance Communications, Inc.,*
2026 WL 2542772 (7th Cir. Aug. 28, 2026) ....2, 6, 8, 18

*Clements v. Gunnar Optiks, LLC,*
No. 25-1890, slip op. (7th Cir. July 10, 2026) ....7

*D'Ambrosio v. Meta Platforms, Inc.,*
176 F.4th 928 (7th Cir. 2026) ....22

*Dancel v. Groupon, Inc.,*
949 F.3d 999 (7th Cir. 2019) ....22

*Davis v. e.l.f. Cosms., Inc.,*
2024 WL 2722663 (N.D. Ill. May 28, 2024) ....19

*De Bouse v. Bayer AG,*
235 Ill. 2d 544 (2009) ....27

*Delgado v. Meta Platforms, Inc.,*
No. 3:23-cv-04181-SI, Dkt. 111 (N.D. Cal. Aug. 1, 2025) ....7

*Delgado v. Meta Platforms, Inc.,*
No. 3:23-cv-04181-SI, Dkt. 174 (N.D. Cal. May 19, 2026)
(unsealed June 25, 2026) ....16

*Dinerstein v. Google, LLC*,
73 F.4th 502 (7th Cir. 2023) ....................26

*Doe v. Northwestern University*,
586 F. Supp. 3d 841 (N.D. Ill. 2022) ....................8

*Duerr v. Bradley University*,
590 F. Supp. 3d 1160 (C.D. Ill. 2022) ....................8

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)....................30

*Fox v. Dakkota Integrated Systems, LLC*,
980 F.3d 1146 (7th Cir. 2020) ....................17

*Geinosky v. City of Chicago*,
675 F.3d 743 (7th Cir. 2012) ....................4

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
128 F.3d 1074 (7th Cir. 1997) ....................5

*G.T. v. Samsung Electronics America, Inc.*,
2026 WL 2279903 (7th Cir. Aug. 7, 2026)....................15

*Hayes v. CGB Enterprises, Inc.*,
2024 WL 3091083 (C.D. Ill. June 20, 2024) ....................21

*Heard v. Becton, Dickinson & Co.*,
524 F. Supp. 3d 831 (N.D. Ill. 2021) ....................20

*Hogan v. Amazon.com, Inc.*,
No. 21 C 3169, 2022 WL 952763 (N.D. Ill. Mar. 30, 2022) ....................13

*Hooks v. CloudSpotter Technologies, Inc.*,
No. 25 C 9754, 2026 WL 1045734 (N.D. Ill. Apr. 17, 2026)....................7

*Huston v. Hearst Communications, Inc.*,
53 F.4th 1097 (7th Cir. 2022) ....................22

*In re Google Generative AI Copyright Litigation*,
809 F. Supp. 3d 903 (N.D. Cal. 2025) ....................13

*In re Mosaic LLM Litigation*,
No. 24-cv-01451-CRB, 2025 WL 2402677 (N.D. Cal. Aug. 19, 2025)....................13

*In re Mosaic LLM Litigation*,
2026 WL 1097738 (N.D. Cal. Apr. 21, 2026) ....................13

*In re Text Messaging Antitrust Litigation*,
630 F.3d 622 (7th Cir. 2010) ....................4, 12–13

*Javid v. M.A.C. Cosmetics Inc.*,
No. 25 CV 11693, Dkt. 30 (N.D. Ill. June 4, 2026)....................16

*Kadrey v. Meta Platforms, Inc.*,
2023 WL 8039640 (N.D. Cal. Nov. 20, 2023) ....................18

*Kahn v. Walmart Inc.*,
107 F.4th 585 (7th Cir. 2024) ....................24, 27, 29–30

*Kaschak v. Bankers Healthcare Grp., LLC*,
No. 23-cv-15452, Dkt. 24 (N.D. Ill. Apr. 25, 2024) ....................24

*Lan-Oak Park District v. The Lansing Journal LLC*,
No. 24 C 5565, Dkt. 24 (N.D. Ill. Mar. 28, 2025) ....................28

*Larson v. Valente*,
456 U.S. 228 (1982)....................29

*Lawrence v. Trax Records, Inc.*,
No. 22 C 5660, 2025 WL 919616 (N.D. Ill. Mar. 26, 2025) ....................28

*Long MacLeod v. Commonwealth Edison Co.*,
2024 IL App (2d) 230237 ....................26

*Love v. Simmons*,
2024 WL 809107 (N.D. Ill. Feb. 27, 2024) ....................30

*Lynch Ford, Inc. v. Ford Motor Co.*,
957 F. Supp. 142 (N.D. Ill. 1997) ....................28

*Mahmood v. Berbix, Inc.*,
2022 WL 3684636 (N.D. Ill. Aug. 25, 2022) ....................19

*MAO-MSO Recovery II, LLC v. State Farm Mutual Automobile Insurance Co.*,
935 F.3d 573 (7th Cir. 2019) ....................30

*Martell v. X Corp.*,
2024 WL 3011353 (N.D. Ill. June 13, 2024) ....................17

*McGoveran v. Amazon Web Services, Inc.*,
175 F.4th 434 (3d Cir. 2026) ....................8

*Mosley v. General Revenue Corp.*,
2020 WL 4060767 (C.D. Ill. July 20, 2020) ....................17

*Parungao v. Community Health Systems, Inc.*,
858 F.3d 452 (7th Cir. 2017) ....................7

*Patterson v. Respondus, Inc.*,
593 F. Supp. 3d 783 (N.D. Ill. 2022) ....................8

*Patterson v. Respondus, Inc.*,
2022 WL 7100547 (N.D. Ill. Oct. 11, 2022) ....................7

*Perdue v. Hy-Vee, Inc.*,
455 F. Supp. 3d 749 (C.D. Ill. 2020) ....................29

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ....................4, 14

*Pittsfield Dev., LLC v. Travelers Indem. Co.*,
542 F. Supp. 3d 791 (N.D. Ill. 2021) ....................5

*Ramirez v. LexisNexis Risk Solutions,*
No. 22-cv-5384, Dkt. 49 (N.D. Ill. Apr. 8, 2024) ....................25–26

*Reynolds v. Higginbottom,*
No. 19-cv-5613, 2022 WL 864537 (N.D. Ill. Mar. 23, 2022) ....................10

*Rivera v. Google Inc.,*
238 F. Supp. 3d 1088 (N.D. Ill. 2017) ....................16

*Robinson v. Toyota Motor Credit Corp.,*
201 Ill. 2d 403 (2002) ....................24

*Rodriguez v. ByteDance, Inc.,*
No. 23 CV 4953, 2025 WL 672951 (N.D. Ill. Mar. 3, 2025) ....................19

*Rodriguez v. ByteDance, Inc.,*
2025 WL 2495865 (N.D. Ill. Aug. 29, 2025) ....................21

*Rowe v. Papa John's Int'l, Inc.,*
No. 23-cv-2082, 2024 WL 3925411 (N.D. Ill. Aug. 23, 2024) ....................4, 6, 17

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana,*
786 F.3d 510 (7th Cir. 2015) ....................30

*Speakers of Sport, Inc. v. ProServ, Inc.,*
178 F.3d 862 (7th Cir. 1999) ....................25

*Strautins v. Trustwave Holdings, Inc.,*
27 F. Supp. 3d 871 (N.D. Ill. 2014) ....................13–14

*Swanson v. Citibank, N.A.,*
614 F.3d 400 (7th Cir. 2010) ....................3–4

*Tobey v. Chibucos,*
890 F.3d 634 (7th Cir. 2018) ....................5

*Townsend v. Estates of Hyde Park, LLC,*
2026 IL App (1st) 250096 ....................10

*Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC,*
2024 IL 129183 ....................25, 27

*Watts v. Emergency Twenty Four, Inc.,*
2021 WL 2529613 (N.D. Ill. June 21, 2021) ....................17

*Williamson v. Curran,*
714 F.3d 432 (7th Cir. 2013) ....................4

*Zellmer v. Meta Platforms, Inc.,*
104 F.4th 1117 (9th Cir. 2024) ....................16–17

**STATUTES AND REGULATIONS**

15 U.S.C. § 6809(3)(A) ....................6

15 U.S.C. § 6809(4)(B) ....................9

15 U.S.C. § 6809(6) ....................8

740 ILCS 14/5(g) ....... 24
740 ILCS 14/10 ....... 1, 16, 18–19
740 ILCS 14/15(a) ....... 17
740 ILCS 14/15(b) ....... 1, 6, 13, 24
740 ILCS 14/15(c) ....... 13, 18–19
740 ILCS 14/15(d) ....... 18, 20
740 ILCS 14/15(e) ....... 18, 21
740 ILCS 14/15(e)(1) ....... 18, 21
740 ILCS 14/15(e)(2) ....... 18, 21
740 ILCS 14/25(c) ....... 2, 5–10
765 ILCS 1075/5 ....... 22
765 ILCS 1075/30(a) ....... 21, 24
765 ILCS 1075/30(b) ....... 21–23
765 ILCS 1075/30(d) ....... 21, 23
815 ILCS 505/10a(a) ....... 25
815 ILCS 510/2(a)(2)–(3) ....... 27–28
815 ILCS 510/2(b) ....... 28
815 ILCS 510/3 ....... 28, 30
Gramm-Leach-Bliley Act, Title V ....... 2, 5–10
12 C.F.R. § 1016.1(b)(1) ....... 9
12 C.F.R. § 1016.3(l)(3)(i) ....... 6
12 C.F.R. § 1016.3(l)(3)(ii)(C) ....... 9
12 C.F.R. § 1016.3(l)(3)(ii)(F) ....... 7

**RULES**

Fed. R. Civ. P. 8 ....... 12, 23–24, 28
Fed. R. Civ. P. 9(b) ....... 14, 23, 27–28
Fed. R. Civ. P. 12 ....... 4, 7
Fed. R. Civ. P. 12(b)(6) ....... 3–4, 6
Fed. R. Civ. P. 12(d) ....... 5

**OTHER AUTHORITIES**

Public Access Opinion No. 17-011,
2017 WL 10084298 (Ill. A.G. Aug. 14, 2017) ....... 14

## I. Introduction

Carol Marin and Phil Rogers spent decades reporting Chicago's news. Alison Flowers, Robin Amer, and Yohance Lacour built award-winning careers in audio journalism. Lindsey Dorcus has narrated more than 200 audiobooks, and Victoria Nassif narrates for major publishers. (Dkt. 1 ¶¶ 2, 13–19.) Their voices are not incidental to their work. They are the work.

Meta trained speech models on hundreds of thousands of hours of recorded human voices. Plaintiffs allege that Meta used their attributed broadcasts, podcasts, and audiobooks to extract speaker-identifying voiceprints without their consent. (*Id.* ¶¶ 75–109, 146–47.) Voicebox and Audiobox can generate speech in a target voice from a two- or three-second prompt. (*Id.* ¶¶ 9, 35–36.) Illinois's Biometric Information Privacy Act ("BIPA") expressly identifies a voiceprint as a biometric identifier and requires written notice and a written release before a private entity obtains one. 740 ILCS 14/10, 15(b). None of these Plaintiffs was told. None was asked. None consented. Public availability made their recordings accessible. It did not give Meta their written consent.

Meta knew how to obtain consent and control release. When it wanted celebrity voices, it paid for them. When it trained MusicGen, it used licensed music. When Voicebox posed misuse risks, it withheld the model weights. (Dkt. 1 ¶¶ 50–52.) Meta did not establish a comparable process for the source speakers whose recordings it used to train its foundational models. (*Id.* ¶¶ 53–55.) This case does not ask whether Meta may build useful voice technology. It asks whether Meta complied with Illinois law in obtaining the biometric data allegedly used to build it.

Meta's motion depends on three substitutions: a subsidiary list and license registries for Meta Payments' actual operations, current retail catalog totals for Meta's undisclosed training corpus and selection process, and Meta's technical assertions for the contents of Meta's own

systems. None establishes the disputed proposition for which Meta invokes it.[1]

*The first substitution* concerns Meta Payments. Meta says its subsidiary's money-transmitter licenses make Meta Platforms exempt from BIPA "in any manner," even for voice-AI operations unrelated to payments. (Dkt. 21 at 6–8.) *Cisneros* applied § 25(c) to Nuance "to the extent" it authenticated Schwab customers in financial transactions, on a record presenting no factual dispute requiring development. *Cisneros v. Nuance Communications, Inc.*, 2026 WL 2542772, at *2 (7th Cir. Aug. 28, 2026). Here the Complaint doesn't mention Meta Payments, and Meta's materials do not establish whether and when it was significantly engaged in covered financial activity. *Cisneros* did not decide whether a payments subsidiary's status exempts its parent's unrelated voice-AI operations, and Meta cites no decision authorizing that extension.

*The second substitution* replaces Meta's training pool with two current retail catalog totals, which Meta uses to call Plaintiffs' inclusion "infinitesimal." (Dkt. 21 at 9–11 & n.6.) Those pages are not Meta's corpus. They identify neither its source pool nor the selection method, count titles rather than training hours, and address only audiobooks. Meta's Audiobox paper describes more than 160,000 hours across audiobooks, podcasts, talks, conversations, and in-the-wild recordings. (Dkt. 1 ¶ 36 & n.4; Kimbarovsky Decl. Ex. 3 § 4.2.) The Complaint identifies substantial, speaker-attributed catalogs available before training, including Rogers's thousands of hours of archived broadcast recordings and the other Plaintiffs' long-form broadcasts, podcasts, and audiobook narrations. (Dkt. 1 ¶¶ 75–109.) The inference of inclusion rests on the combined allegations about those recordings' volume, characteristics, distribution, and timing, measured against Audiobox's disclosed speech domains. Meta's denominator assumes an internet-wide lottery; its papers describe a curated corpus. The source records are

---

[1] Meta also lists eight suits against other technology companies. (Dkt. 21 at 1 & n.1.) Suits against other defendants say nothing about whether this Complaint plausibly alleges Meta's conduct.

Meta's.

*The third substitution* concerns what Meta's systems did with the recordings. Meta argues it had no reason to identify speakers, faults the absence of allegations that identifying information was stored "alongside" measurements, and disputes that millions of voiceprints could remain encoded in model artifacts. (Dkt. 21 at 11–16.) But Audiobox's disclosed methods separate speakers, pair utterances from the same speaker, encode voice prompts, and measure speaker similarity. (Dkt. 1 ¶ 36 & n.4; Kimbarovsky Decl. Ex. 3 §§ 5.2–5.3, 7.1.2–7.3, 7.5.1.) Those speaker-specific operations support the alleged extraction of representations capable of identifying speakers. The Complaint also alleges that Meta retains biometric data in training corpora, internal storage, and derivative embeddings, not only in finished model weights. (Dkt. 1 ¶ 177.) Meta's assertions about the contents of its systems do not resolve those allegations. And a dispute about what remains in finished weights does not answer the separate claim that Meta obtained voiceprints while processing the recordings.

Meta's count-specific arguments similarly isolate allegations from the conduct they describe. The retention claim alleges indefinite possession of Plaintiffs' biometric data, not merely a failure to publish a policy. The publicity claim alleges commercial operation of products exploiting Plaintiffs' identities, not merely their use in training. (Dkt. 1 ¶¶ 153–55, 188; Dkt. 21 at 13–14, 16–18.) Those allegations must be addressed, not reduced to narrower claims the Complaint does not plead.

Rule 12(b)(6) asks whether the Complaint's factual allegations present a story that "holds together," not whether Plaintiffs' account is more likely than Meta's. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Plaintiffs support their account with allegations about their recordings, Meta's disclosed training and processing methods, and its alleged retention and

exploitation of the resulting voiceprints. Meta may contest that account. A competing account does not, by itself, make the pleaded one implausible. The motion should be denied.

## II. Rule 12 Tests the Complaint, Not Meta's Web Pages

Rule 12(b)(6) tests "the sufficiency of the complaint, not its merits." *Rowe v. Papa John's Int'l, Inc.*, No. 23-cv-2082, 2024 WL 3925411, at *3 (N.D. Ill. Aug. 23, 2024) (Seeger, J.). The Court accepts well-pleaded facts, draws reasonable inferences for Plaintiffs, and asks "could these things have happened, not did they happen." *Swanson*, 614 F.3d at 404. Plausibility "is not akin to a 'probability requirement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The phrases Meta quotes from *Atkins* and *In re Text Messaging* restate plausibility; they do not require Plaintiffs to quantify the odds or prove the contents of Meta's undisclosed corpora. *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011); *In re Text Messaging Antitrust Litigation*, 630 F.3d 622, 629 (7th Cir. 2010). Facts within Meta's control may be pleaded on information and belief when the grounds are stated. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). The Complaint does so: Meta's disclosed source categories and processing pipeline, Plaintiffs' recordings available before training, and Meta's refusal to identify the datasets. (Dkt. 1 ¶¶ 31–43, 63(ii), 68–69, 75–109.)

A document referred to in the Complaint and central to the claim may be considered on a motion to dismiss. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). A plaintiff may also elaborate with facts consistent with the Complaint. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The Complaint cites Meta's Voicebox announcement and paper, Audiobox paper, MMS paper, and SeamlessM4T paper. (Dkt. 1 ¶ 31 n.1; ¶ 35 n.2; ¶ 36 nn.4–6.) Plaintiffs attach stable copies and rely on them only for the specific statements cited below. The November 2023 Seamless announcement corroborates the public release alleged in ¶ 120 and is

offered only as consistent elaboration.

Meta's materials prove less than Meta needs. Judicial notice reaches their existence and contents, not disputed factual inferences. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997); *Tobey v. Chibucos*, 890 F.3d 634, 647–48 (7th Cir. 2018). The 10-K, Meta webpage, and registries may show that Meta identified Meta Payments as a subsidiary and that the subsidiary held state licenses. They do not establish what the subsidiary does, significant engagement in financial activity, or Title V status during the relevant period. Retailer web pages may reflect present catalog totals; they do not show what Meta's earlier, curated corpora contained or how Meta chose what to include. Meta's privacy and transparency pages show text and dates, not what Plaintiffs were told (or not told) when Meta allegedly collected and processed their recordings and biometric data, without consent, years earlier. And the brief's assertions about what Meta's models retain (Dkt. 21 at 12, 15) are argument, not evidence.

Accepting those disputed propositions for their truth would require conversion under Rule 12(d) and an evidentiary response. At this stage, the question is whether Plaintiffs' story holds together, "not whether [Meta] has a story to tell, too." *Pittsfield Dev., LLC v. Travelers Indem. Co.*, 542 F. Supp. 3d 791, 802 (N.D. Ill. 2021) (Seeger, J.).

## III. Section 25(c) Does Not Support Dismissal

Meta's Section 25(c) argument is relevant only if Meta Payments was a financial institution subject to Title V during the periods at issue in this case. The Complaint says nothing about Meta Payments, and Meta's cited materials do not establish that predicate. The Court therefore need not decide Meta's broader claim that a payments subsidiary exempts its parent's unrelated voice-AI business. Meta's motion can be denied on a narrow ground.

### A. Meta Has Not Established That Meta Payments Was Subject to Title V.

*Cisneros* clarifies the procedural distinction. A BIPA complaint need not anticipate or plead around § 25(c), and the Seventh Circuit held that Rule 12(b)(6) was the wrong rule for a complaint that stated a § 15(b) claim. The Seventh Circuit affirmed the judgment because the parties agreed on what Nuance did and disputed only what § 25(c) meant, so there was no "factual dispute" for a trial, or for summary judgment, to resolve. 2026 WL 2542772, at *2.

This case is different. Here, the necessary predicates are neither pleaded nor agreed: what Meta Payments did, when it did it, and whether its activity was substantial enough during the relevant periods to bring it within Title V. The Complaint attributes the AI research, training, and deployment to Meta Platforms itself, not a separate operating subsidiary. (Dkt. 1 ¶ 20.) The Complaint does not mention Meta Payments and alleges nothing about Meta Payments' operations, much less that Meta Payments regularly transmitted money, was significantly engaged in financial activity, or was subject to Title V during the periods at issue. The Complaint therefore does not "defeat[] itself." *Rowe,* 2024 WL 3925411, at *12.

Meta tries to fill the gap with its Form 10-K, state registries, and license webpage. (Dkt. 21 at 7 nn.3–4.) At most, those materials show a subsidiary relationship, licenses dated as stated, and some Meta payment functionality. They do not show which entity performed which service, how regularly Meta Payments performed it, the magnitude of that activity, or when it occurred.

***A license is permission to engage in an activity, not proof that the licensee was significantly engaged in it years earlier.*** Federal law asks what the business does. A "financial institution" is an institution "the business of which is engaging in financial activities." 15 U.S.C. § 6809(3)(A). The governing regulation requires "significant[] engage[ment]." 12 C.F.R. § 1016.3(l)(3)(i). Its money-transmission example is a business that "regularly wires money to and

from consumers," because regular service demonstrates significant engagement. *Id.* § 1016.3(l)(3)(ii)(F). Meta's "and thus" (Dkt. 21 at 7) substitutes licensing for that test.

*Clements* and *Hooks* reject that approach. *Clements* vacated a Rule 12 dismissal because the district court took a factual assertion "on faith"; factual defenses normally require evidence, and discovery and summary judgment may be needed. *Clements v. Gunnar Optiks, LLC*, No. 25-1890, slip op. at 3, 5 (7th Cir. July 10, 2026). *Hooks* reached the same conclusion in the § 25(c) context: public materials showed financial activity only "to some unknown degree," not significant engagement, so the court required "a more robust set of facts." *Hooks v. CloudSpotter Technologies, Inc.*, 2026 WL 1045734, at *4–5 (N.D. Ill. Apr. 17, 2026). Meta's own authority preserves that distinction. *Patterson* adopted GLBA's definitions but declined to find significant engagement on the record presented, even after considering publicly available information. *Patterson v. Respondus, Inc.,* 2022 WL 7100547, at *8–9 (N.D. Ill. Oct. 11, 2022).

Meta took the same position in *Delgado*. The Delgado order records Meta's position that "discovery will demonstrate" its affiliation with Meta Payments, described Meta Payments as a financial institution "with respect to its licensed products and services that are subject to GLBA," and planned an early summary-judgment motion. *Delgado v. Meta Platforms, Inc.*, 2025 WL 2198612, at *2-5 (N.D. Cal. Aug. 1, 2025). The court recognized that further discovery was necessary because the facts were uniquely within Meta's possession. *Id.* at *4.

*Parungao* permits dismissal when properly noticed facts establish a defense as a matter of law. *Parungao v. Community Health Systems, Inc.*, 858 F.3d 452, 457, 459 (7th Cir. 2017). It does not supply facts the noticed materials omit. Even accepting the subsidiary relationship and licenses, Meta's sources do not establish the nature, regularity, or timing of Meta Payments' financial activities. The exemption cannot be resolved on this record.

### B. No Authority Extends the Exemption to Unrelated Affiliate Conduct.

Even assuming Meta later establishes Meta Payments' status and Meta Platforms' affiliation,[2] the cited cases do not establish the scope Meta claims. Section 6809(6) defines corporate affiliation, and "in any manner" is broad, but that describes the breadth of the exemption *once it applies*. Neither provision answers the question Meta asks the Court to decide: whether a subsidiary's regulated payments business confers enterprise-wide exemption on every business under common control and therefore exempts its parent's unrelated voice-AI operations.

*Cisneros* tied the exemption to the challenged financial activity. Nuance itself authenticated Schwab customers in financial transactions, and the Seventh Circuit held it exempt "to the extent" it did so. 2026 WL 2542772, at *2. *McGoveran* likewise rested on the complaint's allegations, and the plaintiffs' concession, that Pindrop itself authenticated customers conducting financial transactions. *McGoveran v. Amazon Web Services, Inc.*, 175 F.4th 434, 438–40 (3d Cir. 2026). *Duerr* and *Doe* treated qualifying universities as exempt from biometric-proctoring claims, but the defendant universities themselves were financial institutions. *Duerr v. Bradley University*, 590 F. Supp. 3d 1160, 1168–71 (C.D. Ill. 2022); *Doe v. Northwestern University*, 586 F. Supp. 3d 841, 843–44 (N.D. Ill. 2022). *Patterson* likewise refused to apply § 25(c) where the defendant had not established its own Title V status. *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 818–19 (N.D. Ill. 2022). None construed the affiliate branch or held that one company's regulated business confers enterprise-wide exemption on another.

[2] Plaintiffs assume for purposes of this motion that Meta Platforms is an "affiliate" under § 6809(6). They do not concede that "that is subject to Title V" modifies only "financial institution," rather than the coordinated phrase "a financial institution or an affiliate of a financial institution." The Court need not decide that grammatical question because Meta has not established the predicate facts.

***Title V follows the financial relationship. Meta's theory follows only the corporate chart.*** GLBA defines a financial institution by its activities. Regulation P calls an automobile dealer a financial institution "with respect to its leasing business" and governs nonpublic personal information about individuals obtaining financial products or services. 12 C.F.R. §§ 1016.1(b)(1), 1016.3(l)(3)(ii)(C). Publicly available information is excluded from nonpublic personal information. 15 U.S.C. § 6809(4)(B). The Complaint alleges no financial relationship between Plaintiffs and Meta Payments; their recordings were not connected to payment transactions; and Meta identifies no Title V rule governing the alleged acquisition of public recordings, extraction and retention of voiceprints, or the training and dissemination of AI speech models.

An activity-linked construction does not read "affiliate" out of the statute. At a minimum, it protects an affiliate performing services within the regulated financial relationship, including processing transactions, authenticating customers, screening for fraud, or handling customer records. Section § 25(c) would prevent BIPA from regulating that work a second time. Meta describes no comparable role for Meta Platforms. Its interpretation would not avoid duplicate regulation. It would exempt conduct that Title V does not regulate at all. Its own Form 10-K describes licenses for "regulated Payments-related products and activities" and compliance obligations "in relation to" "licensed Payments products and activities." (Dkt. 21 at 7 n.3 (quoting Meta Platforms, Inc., Annual Report, at 43).) The motion keeps the corporate relationship but drops the activity limits.

Meta's construction has no limiting principle. A single licensed payments subsidiary would exempt every company under common control from every BIPA duty. It would not matter

what data was collected, from whom, or why. Title V's duties, meanwhile, would stay confined to financial products, customers, and data.

Consequences cannot override unambiguous text, but they do matter when deciding whether the text compels the enterprise-wide rule Meta proposes. *Townsend v. Estates of Hyde Park, LLC*, 2026 IL App (1st) 250096, ¶ 17. Meta cites no decision adopting that extension, and Plaintiffs are aware of none.[3] The Court need not adopt it here, especially when Meta has not established the predicate status in the first place.

## IV. Meta's Audiobox Disclosures Make Plaintiffs' Inclusion Plausible

Meta argues that no Plaintiff is plausibly connected to any model. (Dkt. 21 at 8–9.) The Complaint answers with Audiobox's disclosed training corpus and each Plaintiff's identified recordings in its speech domains. (Dkt. 1 ¶¶ 31, 36 & n.4, 75–109.) The inference rests on those allegations together, not public availability alone. The remaining source-level fact is which recordings Meta used, a fact Meta has not disclosed. (*Id.* ¶¶ 32–33, 43.) That is a grounded inference, not a bare possibility.

### A. The Complaint Connects Plaintiffs' Catalogs to Audiobox's Corpus.

As this Court explained, plausibility concerns "putting meat on the bone, from a factual standpoint," not the probability of success. *Reynolds v. Higginbottom*, No. 19-cv-5613, 2022 WL 864537, at *1 (N.D. Ill. Mar. 23, 2022). The Complaint supplies that factual detail.

Audiobox's paper identifies Mix-185K, containing more than 160,000 hours of speech across audiobooks, podcasts, read sentences, talks, conversations, and in-the-wild recordings. Audiobox Speech then used a 100,000-hour transcribed English subset. Meta segmented multi-

[3] *Townsend* referred to § 25(c) in passing as a "blanket exclusion," but the case did not involve § 25(c) or construe its affiliate branch. 2026 IL App (1st) 250096, ¶ 26. *Townsend* also treated a concluding federal-law phrase as limiting and declined to supply an unsupported "missing link" at the pleading stage. *Id.* ¶¶ 24, 31.

speaker conversations, transcribed untranscribed speech, identified language, and filtered recordings against stated thresholds. (Dkt. 1 ¶ 36 & n.4; Kimbarovsky Decl. Ex. 3 §§ 4.2, 5.3.) The paper describes Meta's actual collection and processing, not simply the kinds of audio that could train a model.

The Plaintiff-specific allegations identify substantial bodies of that material. Rogers alleges thousands of hours of archived broadcast audio; Marin identifies decades of reporting, interviewing, and documentary narration available through NBC Chicago, WTTW, Media Burn, and YouTube. (*Id.* ¶¶ 75–82.) Flowers, Amer, and Lacour identify named, long-form podcasts, including *Somebody*, *The City*, and *You Didn't See Nothin'*, distributed through major audio platforms. (*Id.* ¶¶ 85–92, 100–102.) Dorcus alleges more than 200 narrated audiobooks; Nassif identifies narration for major publishers, distributed through named audiobook services. (*Id.* ¶¶ 95–97, 105–107.)

The Complaint alleges that these attributed catalogs were available before training and describes their length, production quality, and speaker-specific format. It also alleges acquisition through public websites, audio platforms, datasets, and vendors, and Meta's direct access to Plaintiffs' attributed recordings. (*Id.* ¶¶ 31–33, 68–69, 75–109.) These allegations go beyond the partial disclosures in ¶¶ 40–42. They supply the asserted connection between a particular model's disclosed training domains and each Plaintiff's identified work. The distinction from anyone who posted a voice online is catalog depth, format, distribution, and timing, not fame.[4] (Dkt. 21 at 11.)

---

[4] Plaintiffs have that too. Marin holds three Peabody Awards and the Order of Lincoln; Rogers, a National Emmy; Lacour, a Pulitzer Prize and a Peabody; Flowers's *Somebody* was a Pulitzer finalist; Amer's *The City* received duPont-Columbia honors; and Dorcus's narration is reviewed by name in the trade press. (Dkt. 1 ¶¶ 75, 80, 85, 90, 95, 100.) Renown bears on whether an ordinary listener would recognize their voices, which matters under the Right of Publicity Act (§ VIII). It does not bear on whether Meta collected them.

Meta's public-domain audiobook point concerns Voicebox. (Dkt. 1 ¶ 31 & n.1.) Voicebox is narrower. Meta's announcement identifies more than 50,000 hours of public-domain audiobooks and a two-second reference capability. (*Id.* ¶ 31 & n.1; Kimbarovsky Decl. Ex. 1B at 5.) It does not establish that Audiobox's separate, multi-domain corpus carried the same restriction. A narrower source description for one model does not defeat the alleged acquisition through another. Plaintiffs need not establish inclusion in every model to answer Meta's categorical argument that none is plausibly connected to any model.

**B. Retail Catalog Totals Do Not Establish the Probability of Inclusion.**

Meta's Audible and Spotify pages supply neither the relevant source pool nor a selection method. They postdate training, count retail titles rather than training hours, may overlap, and cover only audiobooks.[5] Nothing connects those totals to how Meta assembled its corpus. Judicial notice of the pages' text does not establish that missing connection. *See supra* § II.

More fundamentally, a speaker's share of available recordings is not the probability that at least one recording entered a training corpus. That inference requires a defined source pool and selection method. Meta supplies neither. Nor does the absence of a complete hour-by-hour inventory negate the pleaded catalog facts. (Dkt. 21 at 10.) The question is whether Meta obtained Plaintiffs' recordings and extracted voiceprints, not what percentage of the corpus those recordings supplied. Rule 8 does not require a ratio, and the ratio Meta wants would divide pleaded facts by a denominator Meta created from a sales page.

*Atkins* and *In re Text Messaging* require more than mere possibility. *Atkins*, 631 F.3d at 832; *In re Text Messaging*, 630 F.3d at 629. Neither converts plausibility into a ratio drawn from

[5] The SeamlessM4T paper describes pretraining on "1 million hours of open speech audio data" and a "multimodal corpus of automatically aligned speech translations." (Dkt. 1 ¶ 36 & n.6; Kimbarovsky Decl. Ex. 4 at 1.) Meta's November 2023 announcement adds that its expressive translation models were trained by applying its alignment method "to a proprietary dataset." (Dkt. 1 ¶ 120; Kimbarovsky Decl. Ex. 5 at 3).

retail listings. Indeed, *Text Messaging* sustained a complaint based on the combined force of circumstantial allegations, without direct evidence of the alleged agreement. *Id.*

### C. Meta's Cases Require a Factual Connection, Not a Particular Form of Proof.

*In re Google Generative AI Copyright Litigation* sustained claims identifying works in specific training datasets but dismissed claims about models appearing only in an unsupported list. 809 F. Supp. 3d 903, 914 (N.D. Cal. 2025). *Mosaic* likewise rejected generalized statements about open datasets, their size, and inaccessible provenance without facts connecting DBRX to sources containing the plaintiffs' works. *In re Mosaic LLM Litigation*, No. 24-cv-01451-CRB, 2025 WL 2402677, at *2 (N.D. Cal. Aug. 19, 2025). Neither makes a source-list entry the exclusive means of pleading the connection. Here, Meta's paper identifies Audiobox's actual corpus; the individual catalog allegations supply the circumstantial connection to Plaintiffs. This is not a model named without supporting facts.

*Mosaic*'s later order reinforces the need to identify the challenged act. Additional allegations tied copying of the plaintiffs' works to DBRX's development, and the court allowed the claim despite no allegation of copying in the final training dataset. *In re Mosaic LLM Litigation* , 2026 WL 1097738, at *1-2 & n.3 (N.D. Cal. Apr. 21, 2026). The relevant connection here is likewise to Meta's alleged acquisition and biometric processing of Plaintiffs' recordings. (Dkt. 1 ¶ 146; *infra* § V.)

*Hogan*'s missing-image discussion concerned the link to Rekognition profits under § 15(c) and unjust enrichment; its § 15(b) claim based on uploaded photographs survived. *Hogan v. Amazon.com, Inc.*, No. 21 C 3169, 2022 WL 952763, at *7–8 (N.D. Ill. Mar. 30, 2022). *Strautins* lacked facts placing the plaintiff in the affected subset, despite an available means to determine whether she was affected. *Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871,

879–81 (N.D. Ill. 2014). These decisions require support for the Plaintiff-specific connection, which the catalog and corpus allegations provide here.

Even under Rule 9(b), inaccessible facts may be alleged on information and belief when supported by plausible grounds. *Pirelli*, 631 F.3d at 443. Meta's nondisclosure explains why Plaintiffs plead inclusion circumstantially; it is not itself evidence of inclusion.[6] The affirmative grounds are Meta's disclosed collection and each Plaintiff's catalog depth, recording characteristics, attributed distribution, and alleged pretraining availability. Taken together, those facts support the inference that Meta used Plaintiffs' recordings, not merely that their voices were somewhere online.

## V. The Complaint Plausibly Alleges Speaker-Identifying Voiceprints

Meta treats the absence of allegations about retained name labels and an authentication purpose as fatal. (Dkt. 21 at 11–13.) Neither answers the pleaded mechanism: speaker-specific measurements capable of linking a voice to a person through attributed reference recordings.

### A. Meta's Disclosed Processing Supports the Alleged Extraction.

Plaintiffs do not equate a recording with a voiceprint. They allege that Meta processed their recordings into computational representations capable of identifying them. (Dkt. 1 ¶ 146.) That is the distinction the Attorney General drew between a simple recording and a "record of mechanical measurement." Public Access Opinion No. 17-011, 2017 WL 10084298, at *3 (Ill. A.G. Aug. 14, 2017).

Audiobox's paper supplies the processing details. Meta used diarization to divide multi-speaker conversations into single-speaker segments. For voice-prompt training, it paired each

[6] Meta disclosed source categories when it chose. The MMS paper identifies readings of publicly available religious texts as the basis of its new dataset. (Dkt. 1 ¶ 36 & n.5; Kimbarovsky Decl. Ex. 6 at 1.) Its source specificity contrasts with Audiobox's undisclosed title-, recording-, platform-, and speaker-level provenance.

target utterance with another from the same speaker, varying emotion, environment, or speaking rate to isolate vocal similarity. A Transformer converted the voice prompt into a numerical representation, and Meta measured the output's speaker similarity. (Dkt. 1 ¶ 36 & n.4; Kimbarovsky Decl. Ex. 3 §§ 5.3, 7.1.2–7.3, 7.5.1.) These operations support the alleged extraction of speaker-specific characteristics, not merely words or generic speech features.

Voicebox's evaluation likewise compared embeddings of generated speech and reference audio to measure voice similarity. (Dkt. 1 ¶ 35 & n.2; Kimbarovsky Decl. Ex. 2 § 4.) The speaker embedder was an evaluation tool, not part of Voicebox's generation architecture. It is relevant because it shows that Meta tested correspondence to a reference speaker, not just whether the output sounded human.

Count I concerns extraction during Meta's processing, not recovery from finished model weights. (Dkt. 1 ¶ 146.) The Complaint separately alleges continued retention in training corpora, internal storage, derivative embeddings, and model weights. (*Id.* ¶¶ 153, 177, 181.) Meta's objection to final weights does not answer the alleged earlier collection or retention elsewhere.

That direct processing also distinguishes *G.T.*, which required control over biometric data and rejected allegations concerning data on users' devices outside of Samsung's control. *G.T. v. Samsung Electronics America, Inc.*, 2026 WL 2279903, at *4–6 (7th Cir. Aug. 7, 2026). Here, Meta allegedly ingested the recordings and created and retained speaker-specific representations on its own systems. (Dkt. 1 ¶¶ 31, 36–38, 68–69, 146, 177, 181.) It was the alleged processor, not merely the vendor.

**B. Identification Does Not Require a Name Label or an Authentication Purpose.**

Meta's "alongside" requirement confuses an identifier with a label. Plaintiffs allege

identification through matching: the biometric representation supplies the voice match, and an attributed reference supplies the name. Section 10 does not require the vector, reference recording, and name to occupy the same file, table, or database record. *See Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094–97 (N.D. Ill. 2017). The Complaint identifies that connection: Meta allegedly acquired recordings from sources identifying each Plaintiff, and Plaintiffs' public catalogs provide named reference recordings. (Dkt. 1 ¶¶ 68–69, 75–109.)

*Javid* rejected a requirement that identifying information be collected simultaneously with biometric measurements; other information available to the defendant can supply the link. *Javid v. M.A.C. Cosmetics Inc.*, No. 25 CV 11693, Dkt. 30 at 11–13 (N.D. Ill. June 4, 2026). *Delgado* likewise distinguished identifying capability from actual identification. Delgado v. Meta Platforms, Inc., No. 3:23-cv-04181-SI, Dkt. 174 at 6–8 (N.D. Cal. May 19, 2026) (unsealed June 25, 2026). Plaintiffs must plausibly allege that Meta could make the identifying connection, not that it stored a name "alongside" every measurement.

Nor must Meta have collected a voiceprint to authenticate an account. The issue is whether the representation can identify, not whether Meta built the product to authenticate users.[7] *Carpenter* expressly recognizes that a voiceprint can be covered even when collected for another purpose. *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 518 n.2 (N.D. Ill. 2022). In any event, the disclosed same-speaker processing supplies a generation-related reason to model speaker-specific characteristics: preserving whose voice the output resembles while changing its words or delivery. *Supra* § V.A.

---

[7] Generation and identification are not opposites and the papers the Complaint cites supply a reason in any event. Audiobox paired each target utterance with another utterance from the same speaker and selected the pair to isolate vocal similarity. (Dkt. 1 ¶ 36 & n.4; Kimbarovsky Decl. Ex. 3 § 7.1.2.) Voicebox measured voice similarity by comparing the speaker embedding of generated speech with the embedding of the original audio context. (Dkt. 1 ¶ 35 & n.2; Kimbarovsky Decl. Ex. 2 § 4; see also *id.* § 5.7 & fig. 6.) Those operations gave Meta a generation-related reason to distinguish and model speaker-specific characteristics.

*Zellmer*'s capability requirement is consistent with this theory. Its contrary result followed undisputed evidence that the face signatures could not identify the plaintiff. *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1123–26 (9th Cir. 2024). *Martell* lacked facts showing that an image hash measured facial geometry. *Martell v. X Corp.*, 2024 WL 3011353, at *2–3 (N.D. Ill. June 13, 2024). *Mosley* and *Watts* rejected unsupported assertions of a telephone system's statutory capacity. *Mosley v. General Revenue Corp.*, 2020 WL 4060767, at *4 (C.D. Ill. July 20, 2020); *Watts v. Emergency Twenty Four, Inc.*, 2021 WL 2529613, at *4–5 (N.D. Ill. June 21, 2021). Here, the Complaint ties identifying capability to disclosed speaker-specific processing and attributed reference recordings. That supplies a factual basis for the inference, not merely the label "voiceprint."

## VI. Count II Alleges the Unlawful Retention *Fox* Held Concrete

Meta quotes *Fox* for the rule in *Bryant*, but omits *Fox*'s holding. (Dkt. 21 at 14.) *Bryant* denied standing where the plaintiff alleged only a failure to publish a retention policy. *Bryant v. Compass Group USA, Inc.*, 958 F.3d 617, 626 (7th Cir. 2020). *Fox* held that retaining a person's biometric data beyond § 15(a)'s destruction deadline is "as concrete and particularized" an injury as unlawful collection. *Fox v. Dakkota Integrated Systems, LLC*, 980 F.3d 1146, 1154–55 (7th Cir. 2020). Applying that distinction, this Court held that plaintiffs alleging both a missing policy and unlawful retention "check[ed] both boxes." *Rowe*, 2024 WL 3925411, at *5.

Count II checks both boxes. Paragraph 154 alleges no public retention-and-destruction policy for voiceprints extracted from non-user training data. Paragraphs 71 and 153–55 allege that Meta remains in possession of Plaintiffs' voiceprints, retains them indefinitely, and gives non-user subjects no means to obtain destruction. That is an alleged invasion of each Plaintiff's interest in their own biometric data, not a grievance shared with the public. It is *Fox*, not *Bryant*.

The Complaint also alleges the destruction trigger. Because Plaintiffs never interacted with Meta in connection with the collection, destruction was due when the initial purpose for collecting the data was satisfied. (Dkt. 1 ¶ 152.) Meta allegedly collected the data to train the identified models. (*Id.* ¶ 146.) The Complaint identifies Meta's 2023 announcements of those trained systems and alleges continued possession afterward. (*Id.* ¶¶ 5, 36, 40–41, 71, 153–55.) Those allegations support the inference that the pleaded training purpose had been satisfied. Whether Meta retained the data for another initial purpose is a factual question.[8]

## VII. Meta's Model-Content Premise Does Not Defeat Counts III Through V

Meta's common premise is that Plaintiffs' biometric data cannot remain in the model artifacts Meta monetizes, transfers, and protects. (Dkt. 21 at 14–15.) Section V explains why the Complaint plausibly alleges otherwise. But that premise does not exhaust three distinct provisions: § 15(c) regulates commercial transactions, § 15(d) dissemination, and § 15(e) protection. *Kadrey* addressed copyrightable expression, not speaker-identifying biometric information, which BIPA covers "regardless of how it is captured, converted, stored, or shared." *Kadrey v. Meta Platforms, Inc.*, 2023 WL 8039640, at *1 (N.D. Cal. Nov. 20, 2023); 740 ILCS 14/10.

Beyond that shared premise, Meta says little. On Count IV, it does not separately challenge any of the three disseminations the Complaint pleads. On Count V, it challenges the consent and audit allegations and stops. It says nothing about § 15(e)(2), which compares Meta's handling of biometric data with its other confidential data, or about the access controls,

[8] *Cisneros* identified but did not decide a possible standing issue where retained voice data could authenticate but not imitate a caller and would be harmless if leaked. 2026 WL 2542772, at *2. This Complaint alleges the opposite capability and risk, (Dkt. 1 ¶¶ 36–37, 52, 153), the risk Meta cited when it withheld Voicebox's weights (*id.* ¶ 52).

encryption, and retention limits the Complaint says Meta omitted under § 15(e)(1).[9]

### A. Count III Alleges Commercial Access to the Allegedly Biometric-Bearing Models.

Section 15(c) draws a line. Selling a product that biometric data helped improve is not profiting from the data. Selling access to the data itself is. *Rodriguez v. ByteDance, Inc.*, No. 23 CV 4953, 2025 WL 672951, at *18–19 (N.D. Ill. Mar. 3, 2025). Count III alleges more than just using Plaintiffs' voices to build better products. Meta allegedly earns API, cloud, and partner-channel revenue from commercial use of models that retain Plaintiffs' voiceprints. (Dkt. 1 ¶¶ 61(d), 115–16, 161(iv).) Those voiceprints allegedly remain encoded in the models and are reproduced in the audio they generate. (*Id.* ¶ 8, 116, 190.) Read together, these allegations support an inference that Meta charges customers for voice-generation services that make Plaintiffs' retained biometric information available through generated speech.

The relevant distinction is what the paying customer receives. *Davis* rejected a claim based on increased cosmetics sales resulting from a virtual try-on tool; no commercial transaction allegedly provided access to the plaintiffs' biometric data. *Davis v. e.l.f. Cosms., Inc.*, 2024 WL 2722663, at *8 & n.4 (N.D. Ill. May 28, 2024). By contrast, *Mahmood* allowed a § 15(c) claim where a rental company paid to use a facial-recognition platform to verify the plaintiff's identity. *Mahmood v. Berbix, Inc.*, 2022 WL 3684636, at *2 (N.D. Ill. Aug. 25, 2022).

*Rodriguez* likewise rejected using biometric data merely to improve AI technology, but distinguished a product incorporating biometric data such that marketing the product commercially disseminates that data. 2025 WL 672951, at *18–19. Plaintiffs invoke that distinction: the voiceprints allegedly remain available through the service Meta sells, rather than

[9] Meta may develop its preserved contention that Plaintiffs have not plausibly alleged biometric data in the relevant artifacts. It may not add a new, independent basis for dismissal in reply. *Abrego v. Guevara*, No. 23-cv-1740, 2024 WL 3566679, at *13 (N.D. Ill. July 29, 2024) (Seeger, J.) ("Reply briefs reply. They don't raise new arguments.").

merely having helped develop it. BIPA covers biometric information "regardless of how it is captured, converted, stored, or shared." 740 ILCS 14/10. Section V addresses Meta's challenge to the alleged retention of Plaintiffs' voiceprints. Count III's paid-access theory does not depend on treating every other revenue stream identified in ¶ 161 as a separate biometric transaction.

### B. Count IV Alleges Transfers and External Releases.

Meta recasts Count IV as one about "deploying the models or making available their parameters." (Dkt. 21 at 14–15.) The Complaint alleges three transfer events: transmissions among Meta affiliates; transmissions of parameters or voice data to service providers, cloud counterparties, annotators, and reviewers; and external releases of MMS and SeamlessM4T artifacts to a worldwide recipient class. (Dkt. 1 ¶¶ 118–120, 167.)

Meta's November 2023 Seamless announcement confirms a completed external release. Meta stated that contributions from the Seamless work, including models, code, and a watermark detector, were publicly released. (Dkt. 1 ¶ 120; Kimbarovsky Decl. Ex. 5 at 2-3, 8.) That supports the pleaded release event; whether the released artifacts contain Plaintiffs' biometric information remains the separate question addressed in Section V.

The external-release theory identifies the model artifacts, transferor, manner, and recipients. The others identify recipient categories and transfer channels. *Heard* sustained a § 15(d) claim without recipient names where the complaint supplied a plausible transfer architecture. *Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831, 843 (N.D. Ill. 2021). Meta's developed argument is that the transferred artifacts contain no plausibly alleged biometric data. It does not separately challenge dissemination, the pleaded recipients or mechanisms, or any statutory exception. If Section V's content allegation is plausible, Count IV survives. The

Court need not adjudicate its other theories piecemeal. *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).

### C. Count V Pleads Direct Protection Failures and an Unanswered Comparator.

Section 15(e) requires reasonable industry care, § 15(e)(1), and protection at least equal to Meta's treatment of other confidential and sensitive information, § 15(e)(2). Meta disputes whether Meta possesses biometric data and says consent and audit failures do not concern storage, transmission, or protection. (Dkt. 21 at 15–16.) It never separately analyzes § 15(e)(2).

The Complaint alleges that Meta protects advertising, customer, financial, employee, and authenticated-user data through layered safeguards, while retaining and transmitting Plaintiffs' biometric data without comparable controls and releasing some allegedly biometric-bearing artifacts. (Dkt. 1 ¶¶ 177–180.) Voicebox's withholding corroborates Meta's ability to restrict sensitive AI artifacts; it is not the sole comparator. *Hayes* sustained a thinner comparison. *Hayes v. CGB Enterprises, Inc.*, 2024 WL 3091083, at *6–7 (C.D. Ill. June 20, 2024). Meta is right that lack of consent alone is not a storage safeguard. But Count V also identifies access controls, encryption, and retention limits, and alleges that Meta failed to apply them. (Dkt. 1 ¶¶ 174, 176.) *Rodriguez* held comparable allegations sufficient and rejected the premise that conduct overlapping other BIPA duties cannot also violate an industry standard of care. *Rodriguez v. ByteDance, Inc.*, WL 2495865, at *11 (N.D. Ill. Aug. 29, 2025). Meta does not answer those allegations or § 15(e)(2)'s comparator. Its partial response cannot support dismissal.

## VIII. Count VI Pleads Three Distinct IRPA Violations

Count VI pleads commercial use of identity under § 30(a), knowing distribution of a digital replica under § 30(b), and knowing facilitation of another's distribution under § 30(d). The digital-replica theories do not depend on § 30(a)'s commercial-purpose requirement.

**A. Section 30(a) Alleges Identity Used to Sell a Voice-Generation Service.**

Count VI alleges public use after training: Meta markets target-voice generation as a commercial feature and allegedly delivers speech reproducing Plaintiffs' individually identifiable voices. (Dkt. 1 ¶¶ 8, 61, 116, 187–190.) The asserted selling point is speech in the selected person's voice, not merely more natural-sounding speech.

IRPA covers public use of identity "on or in connection with" offering or selling a service, not only advertisements or endorsements. 765 ILCS 1075/5. *D'Ambrosio* rejected unrelated advertisements beside posts containing the plaintiff's image: "[a] free-floating profit motive is not enough." *D'Ambrosio v. Meta Platforms, Inc.*, 176 F.4th 928, 935–36 (7th Cir. 2026). *Huston* rejected a mailing-list sale where the plaintiff's identity was revealed only after purchase and did not help induce it. *Huston v. Hearst Communications, Inc.*, 53 F.4th 1097, 1101–04 (7th Cir. 2022). Here, Plaintiffs rely on the promised reproduction of the particular voice selected through a reference clip as the service's selling feature, not merely an identity hidden within a purchased product. (Dkt. 1 ¶¶ 188–190.)

The claimed identities are Plaintiffs' individually recognizable voices, not generic speech or a shared style. The Complaint identifies each speaker, the distinctive vocal characteristics allegedly modeled, and their reproduction. (Id. ¶¶ 75–109, 187–190.) That is the individual-specific inquiry *Dancel* requires. *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1006–09 (7th Cir. 2019). Sections IV and V address Meta's challenges to acquisition and processing.

**B. Section 30(b) Pleads Meta's Own Knowing Distribution.**

Section 30(b) prohibits knowing public distribution of a work with actual knowledge that it contains an unauthorized digital replica. The replica must be fixed in a sound recording or audiovisual work, recognizable as imitating the particular individual, and used in a work in

which that individual did not actually perform or appear. 765 ILCS 1075/5, 30(b). Plaintiffs rely only on distributions on or after January 1, 2025.

The asserted works are generated recordings imitating Plaintiffs' voices, not model weights. Paragraph 190 alleges that Meta's systems "do generate, transmit, and make available" unauthorized replicas of Plaintiffs through Meta AI, AI Studio, Ray-Ban Meta, and Reels voice translation. The supporting allegations identify Plaintiffs' source recordings, retained speaker-specific representations, short-prompt replication, and public deployment. (Dkt. 1 ¶¶ 8, 25, 61–62, 75–109, 116, 189–190; supra §§ IV–V.) The pleading question is whether those facts support actual public distribution, not whether Plaintiffs have attached an audio file.

Knowledge may be alleged generally, subject to Rule 8's plausibility requirement. Fed. R. Civ. P. 9(b). Plaintiffs infer actual knowledge from Meta's alleged acquisition of recordings attributed to them, its generation and distribution of their replicated voices, and its decision to proceed without consent. (Dkt. 1 ¶¶ 68–69, 188–191.) Meta's selective licensing and release restrictions corroborate that inference; they do not substitute for knowledge that the distributed work contains an unauthorized replica. (Id. ¶¶ 50–60.) That is a merits question, and Meta's prompt, generation, and distribution records will answer it.

### C. Section 30(d) Pleads Knowing Facilitation in the Alternative.

Section 30(d) reaches assistance to another person's § 30(b) violation after actual knowledge of that violation. 765 ILCS 1075/30(d). Plaintiffs infer that sequence from Meta's alleged knowing participation in generating replicas and facilitating users' public distribution through its own channels. (Dkt. 1 ¶¶ 190–191.) The theory is continued assistance after knowledge of the user's violation, not merely awareness that voice technology can be misused.

## IX. Count VII Alleges Unfair Acquisition and Plaintiff-Directed Deception

Meta's focus on public statements misses the independent unfairness claim. Paragraph 198 challenges obtaining and commercially exploiting Plaintiffs' biometric data without notice, consent, or an opportunity to refuse. That practice would remain unfair even if every public statement were true. Paragraph 199 separately alleges deception. *Kahn v. Walmart Inc.*, 107 F.4th 585, 601–03 (7th Cir. 2024), requires separate analysis and applies Rule 8 to unfairness not grounded in fraud. This Court likewise allowed unfairness to proceed despite deficient deception allegations. *Kaschak v. Bankers Healthcare Grp., LLC*, No. 23-cv-15452, Dkt. 24 at 22–27 (N.D. Ill. Apr. 25, 2024).

### A. Meta's Alleged Acquisition Practice Is Unfair Under *Robinson*.

A practice may be unfair because it offends public policy, is oppressive, or causes substantial consumer injury. One factor can be enough. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). Count VII plausibly alleges all three.

The alleged practice is oppressive because it left Plaintiffs no meaningful choice. Meta obtained their attributed recordings and extracted biometric data without notice, consent, or a means to refuse or negotiate. Its selective voice licensing suggests it could have obtained permission but chose not to. (Dkt. 1 ¶¶ 44–55, 75–109.) The Complaint alleges that bypassing notice and releases preserved training speed and scale. (*Id.* ¶¶ 7, 53–55.) That supports the inference that Meta intended Plaintiffs not to interfere with its acquisition. The intended response was no response. Meta does not address this *Robinson* factor.

The public-policy benchmark is equally specific. BIPA identifies biometric safeguards as necessary to public welfare and requires notice and a written release before acquisition; IRPA protects control over commercial use of identity. 740 ILCS 14/5(g), 15(b); 765 ILCS 1075/30(a).

Those statutes supply the benchmark, not an automatic ICFA violation. The no-choice acquisition method and resulting economic loss supply the additional allegations. Meta's contrary argument depends on dismissing the statutory claims already defended above.

The alleged injury is lost licensing income, reduced professional rates, and diverted work, not privacy injury alone. (Dkt. 1 ¶¶ 110–116, 198, 200.) Plaintiffs could not avoid undisclosed collection. Nor does the usefulness of voice technology establish a countervailing benefit from obtaining these Plaintiffs' data without permission, particularly when Meta allegedly licenses and pays for other voices.

**B. Plaintiffs Allege Their Own Economic Loss Caused by Meta.**

Calling Plaintiffs "competitors" does not resolve their claim. Section 10a permits suit by "[a]ny person" suffering actual damage. 815 ILCS 505/10a(a). *Tri-Plex* requires a business plaintiff to plead every element, rather than substitute harm to consumers for its own causally connected injury. *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶¶ 30–38. *Speakers of Sport* required a competitor to identify consumer-protection concerns, not merely a lost client. *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 868 (7th Cir. 1999).

The alleged consumer-protection concern is Meta's alleged systematic disregard of biometric safeguards in building consumer voice products, not protection from competition. (Dkt. 1 ¶¶ 25, 53–55, 197–198.) *Ramirez* rejected generalized privacy assertions without an applicable prohibition and found that available opt-outs undermined oppression. Here, BIPA supplies express public-welfare safeguards, and Plaintiffs allege no consent or opt-out process. The requested relief would protect individuals' control over their biometrics, not insulate professionals from lawful competition. *Ramirez v. LexisNexis Risk Solutions*, No. 22-cv-5384, Dkt. 49 at 5–10 (N.D. Ill. Apr. 8, 2024).

The economic allegations also concern an existing livelihood. Plaintiffs identify paid narration, broadcast, and podcast work, prevailing narration rates, and publishers' substitution of cheaper voice-AI narration. (Dkt. 1 ¶¶ 75–116.) Paragraph 200 alleges lost and diminished licensing income, suppressed rates, and diverted opportunities. Meta's celebrity licenses corroborate a market for voice-use rights; they neither establish Plaintiffs' rates nor substitute Meta's gains for Plaintiffs' losses. (*Id.* ¶¶ 50–53.) That distinguishes *Dinerstein*'s defendant-gain theory and *Ramirez*'s hypothetical compensation for personal data. *Dinerstein v. Google, LLC*, 73 F.4th 502, 516–18 (7th Cir. 2023); *Ramirez*, Dkt. 49 at 10–11.

The licensing theory is about Meta's own unauthorized use, not a publisher's subsequent purchase decision. Plaintiffs allege that Meta obtained a use of their professional voices for which they otherwise would have earned compensation. (Dkt. 1 ¶¶ 198, 200.) The additional displacement theory concerns substitutes Meta allegedly built from their voiceprints and deployed into their professional markets. (*Id.* ¶¶ 110–116.) Unlike *Long MacLeod*'s independent legislative and regulatory rate decisions, Meta's own acquisition and commercialization are the challenged conduct. *Long MacLeod v. Commonwealth Edison Co.*, 2024 IL App (2d) 230237, ¶¶ 56–63. Plaintiffs must connect their losses to unauthorized conduct, not AI competition generally. But invoking third-party purchasers neither answers the licensing theory nor establishes that all alleged displacement is caused by parties other than Meta.

### C. The Alleged Omission Was Directed to Plaintiffs.

The alleged omission is not just something absent from a public statement. Meta allegedly withheld the collection, purpose, and duration disclosures it was required to provide to each Plaintiff before obtaining that Plaintiff's biometric data, and then proceeded without a written release. (Dkt. 1 ¶¶ 44–55, 75–109, 146–148, 194, 199.) Plaintiffs were the designated

recipients of that information.

*De Bouse* rejected an omission claim where no communication reached the plaintiff; *Tri-Plex* likewise required deception of the intended target. *De Bouse v. Bayer AG*, 235 Ill. 2d 544, 554–56 (2009); *Tri-Plex*, 2024 IL 129183, ¶¶ 26–29. Neither addressed deliberate withholding of a notice specifically required before acquiring the plaintiff's own protected data. Plaintiffs' theory rests on that duty and its alleged deliberate evasion, not an assumption that marketwide silence assured lawful conduct.

The incorporated allegations supply the Rule 9(b) particulars: Meta obtained named Plaintiffs' attributed recordings through the identified acquisition pipelines during the pleaded model-development periods without the prescribed disclosures. (Dkt. 1 ¶¶ 31–38, 44–55, 75–109.) The precise acquisition dates remain in Meta's records, but the omitted information, intended recipients, and point at which disclosure was required are identified. The allegations also support the pleaded causal inference: withholding notice kept Plaintiffs unaware while Meta obtained commercially valuable uses they could otherwise have refused or conditioned on compensation. (*Id.* ¶¶ 7, 53–55, 198–200.) That is the alleged deception and resulting economic injury, not merely a failure to comply with a notice statute.

Meta's public provenance statements and selective European disclosures corroborate knowledge and deliberate nondisclosure; they are not the theory's sole basis. And later policies cannot establish notice to these Plaintiffs for collection that occurred years earlier. *See supra* § II. Both theories warrant denial of dismissal. In all events, objections directed only to deception do not dispose of the independently pleaded unfairness theory. *Kahn*, 107 F.4th at 601–03.

## X. Count VIII Alleges Ongoing, Redressable Speaker-Identity Confusion

Count VIII challenges audio that falsely appears to be Plaintiffs' speech or to carry their

approval. (Dkt. 1 ¶¶ 203–208.) Sections 2(a)(2) and (3) prohibit likely source, sponsorship, approval, or affiliation confusion. Injunctive relief does not require actual confusion, monetary loss, or intent to deceive. 815 ILCS 510/2(a)(2)–(3), 2(b), 3.

**A. The Output, Not the Silence, Is the Alleged Deceptive Act.**

Meta calls this a silence claim, but ¶ 206 alleges that its products generate outputs replicating or closely simulating Plaintiffs' distinctive voices. Read with the alleged distribution channels, the challenged conduct is creating and delivering speech likely to be mistaken for Plaintiffs' own or for content they approved. (Dkt. 1 ¶¶ 61, 190, 206.) The missing disclosure leaves that false attribution uncorrected.

*Lynch Ford* requires a representation or other public-facing act concerning goods or services; nondisclosure of dealership ownership supplied neither. *Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997). Here, the allegedly misleading communication is the generated voice itself. Plaintiffs seek correction of apparent participation or approval, not a general duty to label artificial intelligence.

Rule 8 governs this nonfraud confusion theory. *ATC Healthcare Servs., Inc. v. RCM Technologies, Inc.*, 192 F. Supp. 3d 943, 954 n.3 (N.D. Ill. 2016). *Lawrence* applied Rule 9(b) without opposition to that standard; it did not address *ATC*'s distinction between fraud and confusion theories. *Lawrence v. Trax Records, Inc.*, No. 22 C 5660, 2025 WL 919616, at *2 (N.D. Ill. Mar. 26, 2025). Count VIII challenges the outputs' misleading attribution, not a scheme to induce reliance through fraud.

*Lan-Oak* requires facts supporting likely confusion, not statutory catchphrases. *Lan-Oak Park District v. The Lansing Journal LLC*, No. 24 C 5565, Dkt. 24 at 7–8 (N.D. Ill. Mar. 28, 2025). The Complaint meets that standard. It identifies Plaintiffs' attributed voice catalogs,

target-speaker generation from short reference clips, commercial distribution channels, and actual generation of Plaintiff-simulating outputs. (Dkt. 1 ¶¶ 35–37, 61, 75–109, 190, 206.) The alleged confusion concerns whether the recognizable speaker performed or approved the content, not whether it merely sounds human. Sections IV, V, and VIII address the supporting allegations. The question is whether those combined allegations plausibly support Plaintiff-specific outputs, not whether Plaintiffs attached a generated file or reproduced a user's prompt.

### B. Plaintiffs Face Continuing Harm That Disclosure Would Reduce.

Plaintiffs must plead likely future harm, not merely past loss. *ATC Healthcare Servs., Inc. v. RCM Technologies, Inc.*, 282 F. Supp. 3d 1043, 1050 (N.D. Ill. 2017). *Kahn* found no such threat where the plaintiff did not allege that he would return to Walmart or could not avoid its pricing practice. 107 F.4th at 606. Here, Meta allegedly continues generating and making available outputs imitating Plaintiffs, and others can circulate them without Plaintiffs' participation. (Dkt. 1 ¶¶ 25, 61–62, 206–207.) Avoiding Meta's products would not protect Plaintiffs from others attributing that speech or its approval to them.

Redressability does not require relief from every alleged injury. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). The requested disclosure need not restore every lost narration job; it would identify the audio as synthetic and the imitated Plaintiff as not having authorized it. (Dkt. 1 ¶ 208.) A listener can recognize synthetic speech yet mistakenly believe the imitated speaker licensed or approved it. Meta's existing Reels label addresses AI translation, not that separate authorization question. (*Id.* ¶ 206.)

The injunction would reach Meta's continuing creation and initial delivery of the challenged outputs. *Perdue* concerned future misuse of already-stolen data after the retailer had removed the malware. *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 773–74 (C.D. Ill. 2020).

Here, the injunction would address the defendant's own continuing conduct. Enjoining injury-producing conduct ordinarily redresses the resulting injury. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024). A later user's ability to remove a disclosure does not eliminate its benefit to recipients. Section 3 permits relief on reasonable terms. Disclosure accompanying Meta's delivery would address the pleaded misunderstanding before downstream redistribution, reducing the specific attribution and approval harms Count VIII alleges.

## XI. Count IX Survives With Its Predicate Claims

Meta's derivative rule cuts both ways. Count IX is tied to the alleged BIPA and IRPA violations, pleaded alternatively, and disclaims duplicative recovery. (Dkt. 1 ¶¶ 210, 212–14; Prayer for Relief ¶ F.) Because those predicates survive, so does Count IX. *Love v. Simmons*, 2024 WL 809107, at *16 (N.D. Ill. Feb. 27, 2024); *Kahn*, 107 F.4th at 606–07. Meta raises no independent objection.

## CONCLUSION

The Court should deny the motion. If it dismisses any claim, it should do so without prejudice and grant leave to amend. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519–20, 522–23 (7th Cir. 2015). Any jurisdictional dismissal must be without prejudice. *MAO-MSO Recovery II, LLC v. State Farm Mutual Automobile Insurance Co.*, 935 F.3d 573, 581 (7th Cir. 2019).

Dated: September 4, 2026

Respectfully submitted,

LOEVY & LOEVY

/s/ Ross Kimbarovsky

______________________________________

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902ax)

*Attorneys for Plaintiffs Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif*